IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PHILLIP WAYNE TOMLIN          *
(AIS # 235217),               *
                              *
        Petitioner,           *
                              *
v.                            *   CIVIL ACTION NO.10-00120-CG-B
                              *
TONY PATTERSON,               *
                              *
        Respondent.           *

<u>REPORT AND RECOMMENDATION</u>

This action was referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Local Rule 72.2(c)(4), and Rule 8 of the Rules Governing Section 2254 Cases. Petitioner, Phillip Wayne Tomlin, a state prisoner currently in the custody of Respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254, challenging the validity of his 1999 conviction in the Circuit Court of Mobile County, Alabama, for capital murder, for which he was sentenced to life in prison without the possibility of parole.[1] (Doc. 1 at

---

[1] As discussed herein, Petitioner was tried, convicted, and sentenced to death four times for the intentional murders of Richard Brune and Cheryl Moore, an offense made capital under <u>Alabama Code</u> § 13-11-2(a)(10) (1975), because two people were (Continued)

1

2). Following a careful review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[2] *See* 28 U.S.C. § 2254(e)(2).

---

intentionally killed pursuant to one act or a series of acts. On appeal of Petitioner's fourth trial, the Alabama Supreme Court remanded the case to the trial court with instructions to resentence Petitioner in accordance with the jury's recommendation of life imprisonment without the possibility of parole. *See* Ex parte Tomlin, 909 So. 2d 283, 287 (Ala. 2003).

[2] Because Petitioner filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." Kelley v. Secretary for Dep't of Corrs., 377 F. 3d 1317, 1337 (11th Cir. 2004). The legal standard for determining when an evidentiary hearing in a habeas corpus case is allowed is articulated in 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows thatB
>
> **(A)** the claim relies on
>
> > **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

(Continued)

2

FINDINGS OF FACT AND PROCEEDINGS

The Alabama Court of Criminal Appeals found the facts of this case to be as follows:[3]

> The State's evidence has been detailed in the previous opinions of this Court. *See* <u>Tomlin v. State</u>, 443 So. 2d 47, 516 So. 2d 790, and 591 So. 2d 550. The evidence presented at Tomlin's fourth trial did not vary in any great respect from the evidence presented at the other trials. The State's evidence tended to show that on January 2, 1977, Charles Castro and his wife reported to police that a body was lying next to a vehicle on the Theodore/Dawes exit ramp from I-10 in Mobile County. Police arrived at the scene and discovered 15-year-old Cheryl Moore lying beside the car and 19-year-old Richard Brune slumped behind the steering wheel. Both victims had been shot and had died as a result of

---

> constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Petitioner has failed to establish that an evidentiary hearing is warranted in this case.

---

[3] AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." <u>Bui v. Haley</u>, 321 F. 3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." <u>Id.</u> (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)). These facts are recited in the opinion of the Alabama Court of Criminal Appeals on Petitioner's direct appeal of his fourth trial and conviction. *See* <u>Tomlin v. State</u>, 909 So. 2d 213, 224-25 (Ala. Crim. App. 2002), *reversed in part*, <u>Ex parte Tomlin</u>, 909 So. 2d 283, 287 (Ala. 2002).

3

multiple gunshot wounds. The wounds were made with a .38 caliber pistol and a 16-gauge shotgun. Brune had been shot four times with a .38 caliber weapon and Moore had been shot once with a .38 caliber weapon. All of the .38 caliber bullet wounds were inflicted by the same weapon. The toxicologist also testified that wadding recovered from Moore's body during the autopsy matched the 16-gauge shotgun shells recovered from John Daniels's apartment.

The evidence further showed that in 1975, approximately two years before the murders, Tomlin's brother, David Tomlin, had been killed in a shooting involving one of the victims, Ricky Brune. Evidence established that David Tomlin and Ricky Brune were employed at a furniture store as guards. Brune told police after the incident that a shotgun was knocked over and accidentally discharged fatally wounding David Tomlin. Tomlin's father told police that he did not believe that the shooting was an accident and that his family wanted Brune to be charged with murder. Tomlin's father wrote a letter to police that stated that if the police did not act within a certain period he would take "further action."

At the time of the murders Tomlin was living in Houston, Texas, with his wife and two children. Tomlin's wife was employed at a local bar called the Wet and Wild Club. About 10 months before the murders, a Texas Ranger was in the club and met with Tomlin. The ranger testified that Tomlin told him that he had to go to Mobile to take care of some family business; specifically, that he was going to kill the person who had murdered his younger brother. Another Texas Ranger overheard Tomlin's statements.

Tomlin's in-laws, Randy and Danny Shanks, also testified that Tomlin arrived in Mobile unexpectedly on the day before the murders.

4

Randy Shanks testified that Tomlin told them that
he had flown from Houston, Texas, to New Orleans,
Louisiana, and that he had driven from New
Orleans to Mobile.   Shanks said that Tomlin told
them that he had come to avenge his brother's
death-he said he had come to kill Ricky Brune.
The Shankses testified that Tomlin was
accompanied by John Daniels and that he asked the
Shankses to get them a motel room.   The Shankses
took the two to a local motel where Randy Shanks
filled out a registration card.   Randy testified
that when they got to the room, Tomlin and
Daniels showed them a pistol and a sawed-off
shotgun.   He further testified that Tomlin
referred to Daniels as a "hit man."

   Other witnesses also testified that Tomlin
was Seen in Mobile on the day before and the day
of the murders.

   During the investigation, a Ford vehicle was
found abandoned at the New Orleans International
Airport.   The vehicle was registered to Brenda
Watson, Tomlin's sister.   Police discovered a
parking ticket dated January 2, 1977, at 8:08
p.m. inside the vehicle.   An airport employee
testified that a flight departed from New Orleans
at approximately 8:40 p.m. on January 2, 1977,
that was bound for Houston.   This employee also
testified that although Tomlin's name was not on
the flight manifest, at that time a last-minute
passenger could purchase a ticket for cash and
his/her name would not appear on the manifest.

   Mobile County Sheriff Deputy Warren Baker
testified that he went to Houston during the
investigation.   He said that he arrested John
Daniels and searched his apartment.   Baker
testified that he found a large bag with an
airline sticker on the bag-the flight number
matched the flight number of the flight that had
left New Orleans on January 2.   Baker also

5

recovered a sawed-off shotgun in the trunk of Daniels's car.

Tomlin testified at his first trial. This testimony was read into evidence at Tomlin's fourth trial. Tomlin testified that he was in Houston at the time of the murders and that the Shankses had lied about his whereabouts because they did not like him.

Tomlin v. State, 909 So. 2d 213, 224-25 (Ala. Crim. App. 2002), *reversed in part*, Ex parte Tomlin, 909 So. 2d 283, 287 (Ala. 2002).

In 1978, Petitioner was tried and convicted of capital murder in the Circuit Court of Mobile County, Alabama, and sentenced to death. *See* Tomlin, 909 So. 2d at 223; Ex parte Tomlin, 540 So. 2d 668, 669 (Ala. 1988). On September 23, 1988, the Alabama Supreme Court reversed Petitioner's conviction on the basis of improper closing argument by the prosecutor and ordered a new trial. Tomlin, 540 So. 2d 668.

In 1990, Petitioner was tried a second time, convicted of capital murder, and again sentenced to death. *See* Tomlin v. State, 591 So. 2d 550, 552 (Ala. Crim. App. 1991). On appeal, the Alabama Court of Criminal Appeals reversed Petitioner's conviction on several grounds, including the improper admission of evidence that Petitioner's co-defendant was awaiting execution on death row. Id. at 553-56.

6

In 1993, Petitioner was tried and convicted a third time and sentenced to death. *See* Tomlin v. State, 695 So. 2d 157, 161 (Ala. Crim. App. 1996).   The Alabama Court of Criminal Appeals reversed the conviction because two jurors failed to disclose information during voir dire. Id. at 174-76.

In 1999, Petitioner was tried and convicted a fourth time. *See* Tomlin, 909 So. 2d at 224.   During Petitioner's third trial, the jury had recommended by a vote of 12-0 that he be punished by life imprisonment without the possibility of parole.  Id. at 225.  The parties in the fourth trial stipulated to the previous jury's recommendation of life in prison without parole; however, following a sentencing hearing, the trial court overrode that recommendation and ordered that Petitioner be sentenced to death.  Id.

In 2000, Petitioner filed a direct appeal of his fourth conviction and sentence to the Alabama Court of Criminal Appeals.  (Doc. 10 att. 8 at 167).   The Alabama Court of Criminal Appeals affirmed his conviction and sentence on May 31, 2002.  *See* Tomlin v. State, 909 So. 2d at 280.   On November 22, 2002, the Alabama Court of Criminal Appeals overruled Petitioner's application for rehearing.  (Id. at 281).

On December 20, 2002, Petitioner filed a petition for a writ of certiorari with the Alabama Supreme Court (Doc. 11 att. 3), which the court granted for the limited purpose of reviewing Petitioner's sentence.  *See* Ex parte Tomlin, 909 So. 2d at 285. On October 3, 2003, the Alabama Supreme Court reversed Petitioner's death sentence and remanded the case with instructions that Petitioner be resentenced to life in prison without the possibility of parole.  Id. at 287.

On May 10, 2004, the Mobile County Circuit Court resentenced Petitioner to life in prison without the possibility of parole.  (Doc. 11, att. 7 at 13).  The Alabama Court of Criminal Appeals affirmed Petitioner's conviction and new sentence on August 27, 2004.  (Doc. 11, att. 8).  Petitioner filed a petition for a writ of certiorari in the Alabama Supreme Court, which was denied on March 18, 2005.  (Doc. 12, att. 1). The Alabama Court of Criminal Appeals issued a Certificate of Judgment on that same date, March 18, 2005.  (Doc. 12, att. 2). Petitioner filed a petition for a writ of certiorari in the United States Supreme Court, which that court denied on January 9, 2006.  *See* Tomlin v. Alabama, 546 U.S. 1089 (2006).

On January 3, 2007, Petitioner, represented by counsel, filed a petition for post-conviction relief under Rule 32 of the

8

Alabama Rules of Civil Procedure. (Doc. 12, att. 4 at 13).
Petitioner filed a separate Rule 32 petition, *pro se*, on or
about January 9, 2007. (Id. at 13). The Mobile County Circuit
Court denied Petitioner's Rule 32 petition on November 7, 2008,
as time barred, procedurally barred, and without merit. (Id. at
18-25). The Alabama Court of Criminal Appeals affirmed that
denial on June 12, 2009. (Doc. 12, att. 10).

On August 10, 2009, Petitioner filed a petition for a writ
of certiorari with the Alabama Supreme Court, which that court
denied on March 5, 2010. (Doc. 12, att. 12; Doc. 12, att. 13).
On that same date, the Alabama Court of Criminal Appeals issued
a Certificate of Judgment. (Doc. 12, att. 14).

On March 11, 2010, Petitioner filed the instant petition
for a writ of habeas corpus setting forth thirty claims in
support of his request for habeas relief. (Doc. 1). On June
29, 2010, Respondent filed an Answer to the petition and, on
December 3, 2010, Petitioner filed an objection thereto. (Docs.
9, 10, 11, 12, 19). The Court will consider each of
Petitioner's claims in turn.

## DISCUSSION

Title 28 U.S.C. § 2254 governs the authority of the federal
courts to consider applications for writs of habeas corpus

submitted by state prisoners.  *See* Henderson v. Campbell, 353 F.
3d 880, 889 (11th Cir. 2003).  Section 2254(d), as amended,
provides that:

> (d) An application for a writ of habeas
> corpus on behalf of a person in custody
> pursuant to the judgment of a State court
> shall not be granted with respect to any
> claim that was adjudicated on the merits in
> State court proceedings unless the
> adjudication of the claimB
>> (1) resulted in a decision that
>> was contrary to, or involved an
>> unreasonable application of,
>> clearly established Federal law,
>> as determined by the Supreme Court
>> of the United States; or
>> (2) resulted in a decision that
>> was based on an unreasonable
>> determination of the facts in
>> light of the evidence presented in
>> the State court proceeding.

Id.  In Williams v. Taylor, 529 U.S. 362, 412 (2000), Justice
O'Connor, writing for a majority of the Court, recognized that
"§ 2254(d)(1) places a new constraint on the power of a federal
habeas court to grant a state prisoner's application for a writ
of habeas corpus with respect to claims adjudicated on the
merits in state court."

> A state-court decision is contrary to
> the Supreme Court's clearly established
> precedent (1) if the state court applies a
> rule that contradicts the governing law as
> set forth in Supreme Court case law, or (2)

10

> if the state court confronts a set of facts
> that are materially indistinguishable from
> those in a decision of the Supreme Court and
> nevertheless arrives at a result different
> from Supreme Court precedent. *See* <u>Williams</u>
> <u>v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495,
> 1519-20, 146 L. Ed. 2d 389 (2000).
>
> A state court decision involves an
> unreasonable application of Supreme Court
> precedent "if the state court identifies the
> correct governing legal rule from [Supreme
> Court] cases but unreasonably applies it to
> the facts of the particular state prisoner's
> case." <u>Williams</u>, 120 S. Ct. at 1520. In
> addition, a state court decision involves an
> unreasonable application of Supreme Court
> precedent "if the state court either
> unreasonably extends a legal principle from
> [Supreme Court] precedent to a new context
> where it should not apply or unreasonably
> refuses to extend that principle to a new
> context where it should apply." <u>Id.</u>

<u>Bottoson v. Moore</u>, 234 F. 3d 526, 531 (11th Cir. 2000). Moreover, the Act presumes as correct all determinations of factual issues made by a state court and places the burden upon the petitioner of rebutting such a presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Having established the proper standard of review, the Court turns to Petitioner's claims.

A. <u>Claim One.</u>

On direct appeal of his fourth trial, Tomlin asserts, in Claim One, that the prosecutor used his peremptory challenges in

a racially discriminatory fashion in violation of <u>Batson v.</u>
<u>Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)
and the Sixth and Fourteen Amendments to the United States
Constitution.  (Doc. 1 at 15).  Respondent counters that this
claim was raised in the state courts and properly denied on the
merits.  (Doc. 9 at 14).

In <u>Batson</u>, the United States Supreme Court held that the
Equal Protection Clause of the Fourteenth Amendment prohibits
the use of peremptory challenges of venire members based solely
on the fact that the venire members belong to the same race as a
criminal defendant.  "Baton requires a court to undertake a
three-step analysis to evaluate equal protection challenges to a
prosecutor's use of peremptory challenges." <u>McGahee v. Alabama</u>
<u>Dep't of Corrections</u>, 560 F. 3d 1252, 1256 (11th Cir. 2009).
"First, the trial court must determine whether the defendant has
made a prima facie showing that the prosecutor exercised a
peremptory challenge on the basis of race . . . Second, if the
showing is made, the burden shifts to the prosecutor to present
a race-neutral explanation for striking the juror in
question . . . Third, the court must then determine whether the
defendant has carried his burden of proving purposeful

discrimination." <u>Rice v. Collins</u>, 546 U.S. 333, 338 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (citations omitted).

The crucial third step requires evaluation of the "persuasiveness of the justification proffered by the prosecutor," with the ultimate burden of persuasion regarding racial motivation resting at all times with the opponent of the strike (in this case, the petitioner). <u>Id.</u>; *see also* <u>Purkett v. Elem</u>, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ("If a race neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proven purposeful discrimination."). "The credibility of the prosecution's explanation is to be evaluated considering the totality of the relevant facts, including whether members of a race were disproportionately excluded." <u>Parker v. Allen</u>, 565 F. 3d 1258, 1271 (11th Cir. 2009) (citation omitted).[4]

---

[4] "Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation of a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a (Continued)

The state trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal.  *See* <u>Hernandez v. New York</u>, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).  Thus, the ultimate question for this federal court is whether the state appellate courts' determination that preemptory challenges of black jurors in this case were not "motivated by intentional racial discrimination" is a decision which was "contrary to" or "an unreasonable application of federal law" or a decision "that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  <u>Dallas v. Commissioner, Alabama Department of Corrections</u>, 2012 U.S. Dist. LEXIS 3877 *32-33 (M.D. Ala. January 12, 2012) (quoting 28 U.S. C. § 2254(d)(1) and (2).  Moreover, as noted *supra*, there is a presumption of correction to factual determinations made by state courts, and the presumption may be rebutted only by "clear and convincing evidence."  <u>Id.</u>, 2012 U.S. Dist. LEXIS * 33 (quoting 28 U.S.C. § 2254(e)(1) at 364).

---

subject that it alleges it is concerned."  <u>Parker</u>, 565 F. 3d at 1271 (citations omitted).

14

On direct appeal of Tomlin's fourth trial, the Alabama Court of Criminal Appeals reviewed and rejected Tomlin's claim that the prosecution exercised its peremptory strikes in a racially discriminatory manner to exclude black venire members.[5] In rejecting the claim, the Alabama Court of Criminal Appeals set forth the controlling law and observed as follows:

> The party alleging a Batson violation has the burden of establishing a prima facie case of discrimination. It is only when a prima facie case of discrimination has been established that the challenged party must explain its reasons for removing the designated jurors.
>
> Here, Tomlin argues that he established a strong prima facie case. We do not agree. A review of the record shows that Tomlin's only basis for making a Batson objection was the number of strikes the State used to remove black prospective jurors from the venire. Tomlin argues that the prosecutor used 15 of its 25 strikes to remove blacks. Our review of the record reflects that the

---

[5] Following this decision, the Alabama Supreme Court granted Tomlin's petition for a writ of certiorari for the limited purpose of reviewing his sentence. *See* Ex parte Tomlin, 909 S. 2d at 285. The Court ultimately reversed Tomlin's death sentence based on its finding that the trial court had improperly weighed the aggravating and mitigating circumstances at Tomlin's sentencing hearing. Id., at 286-87. The Alabama Supreme Court reversed and remanded the case with instructions for the trial court to resentence Tomlin to life in prison without the possibility of parole. Id. In all other respects, the decision of the Alabama Court of Criminal Appeals was affirmed.

prosecutor used 13 strikes to remove blacks,
11 strikes to remove whites, and 1 strike to
remove an individual of Oriental descent.
Defense counsel used all of its 25 strikes
to remove whites from the venire. Chosen
for Tomlin's jury were: 5 blacks, 5 whites,
1 Mexican-American, and 1 individual who
indicated on her jury questionnaire that she
was of the "I" race-we assume that this
indicates that this juror was of Indian
descent.

The trial court, without ruling on
whether a prima facie case of discrimination
had been established, requested that the
State give its reasons for striking the
black prospective jurors. Here, because the
only basis for the Batson objection was the
number of strikes that the State used to
remove blacks the trial court could have
lawfully found that the defense had failed
to establish a prima facie case of
discrimination.

Tomlin v. State of Alabama, 909 So. 2d 213, 241 (Ala. Crim.

2002).

The Alabama Court of Criminal Appeals evaluated the

reasons articulated by the prosecutor for his strikes because

the trial court had him to place those reasons on the record.

Id. The reasons proffered by the prosecutor included[6]:

---

[6] From the record, it appears that Prosecutor Valeska
conducted the actual striking of the jury, while Prosecutor
Estes offered the reasons for the strikes.

Prospective juror number thirty-one [W.V.]: expressed an opposition to capital punishment; is a minister; and expressed that he had speaking engagements during the week which the prosecutor thought might be on his mind.

Prospective juror number eight [D.H.]: stated that he did not believe in capital punishment and he also had problem having to look at possible photographs of people at crime scenes.

Prospective juror number forty-two [T.J.]: had been represented or was represented by Mr. Yelverton, who was the previous defense counsel in this case; also had a problem with the photographs; during the voir dire, she sat on the front row, and another juror had to calm her down and speak to her continuously; she also said she was just scared to death to be here.

Prospective juror number twenty-eight [B.A.]: responded to the question of philosophical or moral reservations about sitting in judgment of other people and she indicated that she had a problem judging other people.

Prospective Juror Number Sixty-four: [E.H.] reported that her son was represented by Mr. Madden, who was involved in this case earlier. Also, she was a school teacher and prosecutor stated that the state struck all Board of Ed-all school teachers.

Prospective Juror Number Thirteen: [J.R.] is single; a student with no children; prosecutor indicated that single with no children was another criteria that prosecution was tactically looking for in

17

case; also J.R. was struck because he is
very small and looked very young.

Prospective   Juror   Number   Fifty-four:
[K.J.] is a school teacher at LeFlore High
School.

Prospective Juror Number Thirty: [J.M.][7]
is young and did not have any children;
also, the father of one of the victims
reported that [J.M.] set directly in front
of him, and he observed [J.M.] talking
strangely and he did not feel comfortable
with him, but the victim's father did not
relay any specific statement made by [J.M.].

Prospective   Juror   Number   Twelve:
[B.T.]: made statement on the record about
difficulty looking at the pictures and she
has children; that's all; she is a postal
worker   and   prosecution   normally   strikes
postal workers; "that's common for us".

Prospective Juror Number Fifty-seven
[R.C.]: stated he has a brother and stepson
in the penitentiary; initially indicated
that he would not be able to follow the law
or instructions, and after exchange with
court, he finally said that he would be able
to but he acted reluctant to do so.

Prospective Juror Number Twenty-five
[S.S.]:  stated that he did had surgery
Tuesday; had a business to run and also he
was involved in an incident or his wife or

---

[7] Because of a stenographical error in the trial court
transcript, juror "J.M." is erroneously referenced in the
Alabama Court of Criminal Appeals opinion as juror "J.N." (Doc.
9-5 at 82).

ex-wife was involved in an incident in which nothing was ever done about it from the law enforcement standpoint and as a result, he did not feel comfortable about it or was upset about it.[8]

Prospective Juror Number Fifty-eight [J.H.]: is a young man with no children.

Prospective Juror Number Seven [A.L.]: Prosecutor stated he had a good faith belief that A.L. had been arrested and convicted of DUI.

Prospective Juror Number Seventy-five [J.J.]: stated her opposition to the death penalty; however, during individual voir dire, she stated that she could follow the law, but she would feel very uncomfortable if she felt like it was her responsibility at some later point that the person that she was judging would receive the death penalty.

Prospective Juror Number Seventy-one [S.P.]: "as far as [prosecutor was] concerned, he's on the jury.  We had to strike somebody, we struck <u>number</u> seventy-one.  That's the only reason <u>why</u> we struck him."  When the Court advised that the state had not given a reason for striking seventy-one, the prosecutor responded "he was young".

(Doc. 9-5 at 76-82).

---

[8] The record reflects that this prospective juror is Japanese. *See* (Doc. 9-8 at 175).

19

The Court of Appeals observed that "Tomlin argues primarily that the trial court erred in denying his Batson objection because one young white juror, J.R., was left on the jury."   Tomlin, 909 So. 2d at 245.   In rejecting Tomlin's claim, the Court held:

> Our review of the prosecutor's strikes shows that the first two strikes were used to remove white individuals.  The fourth and sixth strikes were used to remove white unmarried individuals who were 20 years of age.  The State's ninth strike was used to remove a 29-year-old white unmarried individual.  Out of the State's first 10 strikes, the State used 3 to remove young unmarried white individuals and 1 to remove a 24-year-old unmarried black individual. The record indicates that J.R. was married, although she was young.  The prosecutor's use of his strikes did not reflect any pattern of discrimination.  Also, a review of the voir dire examination does not show that any particular race of jurors were questioned more or less than others. Moreover, the prosecutor struck 11 whites, and the majority of the prosecutor's first strikes were used to remove white prospective jurors.  Most importantly, the record shows that defense counsel used every one of its 25 peremptory strikes to remove white prospective jurors from the venire. This placed the prosecution in a very tenuous position.  Last, five blacks served on Tomlin's jury along with five whites.

Id. 909 So. 2d at 245-246.

20

The state appellate court also discussed the fact that Tomlin challenged the prosecutor's strike of prospective juror no. 7 [A.L.] based upon his belief that A.L. had a prior conviction for driving under the influence. The appellate court found that the record reflects that the prosecutor advised that while he did not have a certified copy of prospective juror no. 7 [A.L.]'s conviction, he did have a sheet from the local District Attorney's office reflecting that A.L. had been convicted of driving under the influence, and that the trial court reviewed the sheet from the District Attorney's office before finding that no <u>Batson</u> violation had been established. The appellate court determined that the record supports the trial court's ruling, as a venire member's involvement with criminal activity is a race-neutral reason for removing a juror. <u>Id.</u> 909 So. 2d at 246-247. The Court of Appeals further determined that:

> The reasons advanced for striking the remainder of the black prospective jurors were not questioned at trial. We have stated, "There is no requirement that a prosecutor establish evidentiary support for every strike in every case, especially where the defendant has not specifically questioned the validity of the prosecutor's explanations or demanded further proof." <u>Hall v. State</u>, 816 So. 2d 80, 85 (Ala. Crim. App. 1999). However, because this is a

capital case, we will consider this argument on appeal.

One black prospective juror was struck because of his occupation-he was a teacher at a local high school. However, there is absolutely no evidence in the record, the voir dire, or the juror questionnaires, indicating that there was a white juror who was a teacher and who was not struck by the State. . . .

The remaining strikes were race-neutral. Strikes based on a juror's views toward capital punishment do not violate Batson. *See* Lucy v. State, 785 So. 2d 1174 (Ala. Crim. App. 2000). Striking a juror based on the fact that he or she has previously been represented by defense counsel is a reason that does not violate Batson. *See* Ward v. State, 539 So. 2d 407 (Ala. Crim. App. 1988).

"When reviewing a trial court's ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous." Yancey v. State, 813 So. 2d 1, 3 (Ala. Crim. App. 2001). We cannot say, after reviewing the record, the factors articulated in Branch, the fact that defense counsel struck all 25 whites from the venire, and the composition of the jury, that the reasons advanced by the prosecutor were merely a sham. There is no evidence indicating that the trial court abused its substantial discretion in denying the Batson motion.

Id., 909 So. 2d at 247.

In his brief before this Court, Tomlin makes the following general arguments: 1) the prosecutor struck 15 of 25 minority members of the venire panel, and offered pretextual, unsupported, contradictory and non-existent reasons for the strikes; 2) the prosecutor allowed whites to serve with the same characteristics as blacks who were stricken; 3) the prosecutor failed to question the minorities who were stricken, and 4) the prosecutor worked in a prosecution office that has been found to have violated Swain v. Alabama, 380 U.S. 202 (1965).  With respect to the individual strikes, Tomlin argues that the prosecution did not provide a reason for striking black prospective juror no. 71 [S.P.], and that the stated reason of age is pretextual because the prosecutor failed to strike a white female juror who was younger than prospective juror no. 71.   In addition, Tomlin argues that striking a black prospective juror because she is a postal worker is egregious, and that black prospective juror no. 7 (A.L.) was improperly struck based on an unverified conviction for driving under the influence.  (Doc. 1: Doc. 19 at 25-46).

Turning first to Tomlin's argument that the number of strikes that the prosecution exercised against blacks established strong evidence of discrimination, as noted *supra*,

23

the state appellate court found that the record does not demonstrate a pattern of discriminatory strikes by the prosecution. Indeed, there is no evidence that the prosecution struck all or nearly all of the minority prospective jurors. Instead, the record reflects that both sides were accorded twenty-five strikes, that four of the prosecution's first six strikes were white individuals, and that while the defense used each of its twenty-five strikes to strike white venire members, and thus effectively reduced the number of white individuals who were available for the prosecution to strike, nearly half of the prosecution's twenty-five strikes were exercised against white individuals. (Doc. 9-5 at 63-69; Doc 9-8 at 175-177). Thus, the mere fact that the prosecution struck 14 minority prospective jurors does not establish a pattern of discriminatory strikes against prospective minority jurors[9]. (Id.).

Furthermore, it is noteworthy, as observed by the appellate court, that the jury that was impaneled included five whites,

_____

[9] While Tomlin contends that the prosecution struck 15 minorities, the appellate court found and the record reflects that the prosecution struck 13 blacks, 1 Asian and 11 whites. (Doc. 9-5 at 63-69; Doc. 9-8 at 175-177).

five blacks, an Asian, and another individual who the appellate
court listed as Indian.  (Docs. 9-8 at 175-177; Doc. 9-8 at 175-
177).   In addition, one white and one black served as
alternates[10].   While the fact that some blacks are ultimately
impaneled to serve on the jury does not foreclose a Batson
challenge, a comparison of the jury that is impaneled to the
venire is properly considered in a Batson analysis.  See United
States v. Gamory, 635 F. 3d 480, 496 (11th Cir. 2011) (pointing
out that "there were three African-Americans seated on the jury"
in rejecting Batson challenge); United States v. Edouard, 485 F.
3d 1324, 1343 (11th Cir. 2007) (in finding that petitioner's
Batson claim fails, noting that "at least three black jurors
served unchallenged on the sworn panel"); United States v.
Puentes, 50 F. 3d 1567, 1578 (11th Cir. 1995) ("Although the
presence of African American jurors does not dispose of an
allegation of race-based peremptory challenges, it is a
significant factor tending to prove the paucity of the claim.");

---

[10] Both the trial court and the appellate court determined
that alternate jurors should be viewed as having been struck for
purposes of a Batson analysis.  Tomlin, 909 So. 2d at 244, n 7.
Here, there is nothing in the record to reflect that either
alternate replaced a seated juror and participated in
deliberations.

25

Lee v. Thomas, 2012 U.S. Dist. LEXIS 75470 (May 30, 2012, S.D.
Ala.)("Courts routinely discuss the final composition of a jury
in Batson challenges, at least in part because the composition
of the jury to the composition of the venire is a circumstance
that is properly considered in a Batson analysis.")

     With respect to Tomlin's assertion that the prosecution
allowed whites to serve with the same characteristics as blacks
who were stricken, the undersigned notes that a contention that
the prosecutor did not treat similarly situated black and white
venire persons similarly can be a viable basis for interposing a
pretext argument. Parker, 565 F. 3d at 1271.  An examination of
the trial transcript reflects that during the Batson hearing,
defense counsel made a general objection about the number of
blacks being struck by the prosecutor.  (Doc. 9-5 at 71-75).
Although the trial court did not find that a prima facie case
had been established, as noted, the appellate court presumed
that there had been a showing since the trial court proceeded to
the reasons for the prosecutor's strikes.  Once the prosecutor
offered the reasons for the state's peremptory strikes, and the
trial court implicitly found them to be race neutral, defense
counsel argued that the reasons were pretexual, and noted that
some jurors were struck because they had children while some

were struck because they did not have children.  (Doc. 9-5 at 82-83).  Defense counsel then specifically pointed out that black prospective juror no. 13 [J.R.] was struck for the stated reason that he was small and looked young, and that black prospective juror no. 30 [J.M.] was struck because he was young and had no kids, whereas white jurors no. 11 [J.R.] had no kids and white juror no. 47 [M.S.] had kids.  Defense counsel also asserted that there was no documentation that black prospective juror no. 9 [A.L.] had a DUI.  (Id.).

In addressing defense counsel's pretext arguments, the prosecutor explained that the state was attempting to strike potential jurors who were unmarried and had no children.  The prosecutor acknowledged that they may have missed someone, and explained that juror no. 11 [J.R.], the young white female cited by defense counsel, was married; thus, though young, she was not stricken.  The prosecutor further noted that while, in offering explanations for the state's strikes, he had mentioned the fact that black prospective juror no. 12 [B.T.] had children, he was trying to convey that one of the reasons that she was stricken was that she had expressed concerns with regard to childcare issues, and had in fact passed a note indicating such to the judge.  (Doc. 9-5 at 84-85).  With respect to black prospective juror no. 7

[A.L.], the prosecutor advised that he had a good faith belief that A.L. had been convicted of driving under the influence, based on a records check that had been conducted by the district attorney's office. Although the prosecutor did not have a certified copy of the conviction, he provided to the trial court and defense counsel documentation from the district attorney's office. (Id.).

As noted *supra*, the appellate court observed that Tomlin was primarily challenging the fact that one young white juror, namely juror no. 11 [J.R.] was allowed to serve, and it determined that the evidence did not demonstrate a pattern of discriminatory strikes but instead showed that the prosecutor struck both black and white jurors who were young and unmarried, and that juror no. 11 [J.R.] although young, was married. The court further noted that out of the state's first ten strikes, three were used to remove young, unmarried white individuals and one was used to remove a young black unmarried individual. 909 So. 2d at 245-246. Not only are these findings borne out by the record, but also a review of the jury questionnaires reflect that both prospective juror no. [J.M.] and prospective juror [J.R.] were single, and at the time of jury selection in 1999, they had only been out of high school for a couple of years;

28

thus, they were obviously younger individuals[11] (Doc. 9-9 at 175, 197).  Given that both prospective jurors no. 30 [J.M.] and no. 13 [J.R.] were single, whereas, juror no. 11 [J.R.] was married, the appellate court's determination that the striking of prospective jurors no. 30 and no. 13 was not pretexual is support by the record.

Tomlin also asserted both before this court, and the state appellate court, that the prosecution's strike of black prospective juror no. 71 [S.P.] was pretextual because like white juror no. 11 [J.R.], prospective juror no. 71[S.P.] was married, and was actually older than juror no. 11 [J.R.]; yet, he was struck for the purported reason that he was young[12].  The appellate court did not specifically address Tomlin's contention regarding prospective juror no. 71 [S.P.]; however, the

_____

[11] The Court cannot determine the exact ages of many of the members of the venire because information regarding dates of births were redacted from the questionnaire prior to filing presumably in compliance with court regulations regarding privacy. Notwithstanding, many of the questionnaires contain information regarding the dates that respective venire members attended high school; thus, based on those dates, where provided, the Court is able to draw inferences regarding the approximate ages of some of the venire members.

[12] In the State's brief before the appellate court, the state did not contest that black prospective juror no. 71 [S.P.] was older than white juror no. 11 [J.R.]. (Doc. 10-9 at 34-37).

appellate court did note that during jury selection, defense counsel did not question the reasons advanced for striking several of the black prospective jurors and, after examining the trial record, the appellate court concluded that the reasons advanced for each of the prosecution's strikes of black prospective jurors, were race neutral and that Tomlin failed to establish a Batson violation.

The trial transcript reflects as follows with respect to prospective juror no. 71 [S.P]: "Your Honor, at the point of the last strike for [S.P.] that as far as we were concerned, he's on the jury. We had to strike somebody, we struck number Seventy-one. That's the only reason why we struck him." After the Court stated that the prosecutor had not given a reason for the strike, the prosecutor then responded, "He was young, Your Honor." (Doc. 9-5 at 81).

The trial transcript also reflects that while defense counsel made a general pretext argument, the strike of prospective juror no. 71 [S.P.] was not one of the specific strikes that defense counsel argued was pretextual; thus, the trial court never had the opportunity to consider the contention that Tomlin now raises regarding this particular strike. Further, while the appellate court did not directly address this

30

specific strike it did find that the prosecution offered race-neutral reasons for its strikes and that Tomlin did not establish a Batson violation.   Based upon a through review of the record, the undersigned finds, that while black prospective juror no. 71 [S.P] and white juror no. 11 [J.R.] were similar in age and marital status, such is not sufficient to establish purposeful discrimination under the particular facts of this case.   The prosecutor's comments indicate that he was comfortable having prospective juror no. 71 [S.P.] serve as a juror, and was at end the process, he needed to make one more strike; thus, he selected S.P. because he was young.   The trial judge had an opportunity to consider the prosecutor's demeanor and creditability with respect to his asserted reason, which went unchallenged by defense counsel, and was satisfied that it was race neutral and credible[13].   Further, the record reflects

_____

[13]   The Supreme Court has repeatedly reminded lower federal courts that they are not the state courts, and as a result, they are not the factfinders on whether a prosecutor's race-neutral reasons were, in fact, credible. As observed by Justice Breyer: "The [state] trial judge is best placed to consider the factors that underlie credibility: demeanor, context and atmosphere. And the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a (Continued)

31

that the prosecutor's strike immediately prior to prospective juror no. 71 [S.P.] was prospective juror no. 10 [C.H.][14], a white individual, who like S.P., was married and was older than juror no. 11 [J.R.], the white female who was allowed to remain on the jury. (Doc. 9-5 at 63, Doc. 9-4 at 110). Against this backdrop of facts, the undersigned finds that while the prosecutor's reason for striking prospective juror no. 71 [S.P.] may be deemed illogical, or weak, it does not raise a strong inference of purposeful race discrimination.

The Court turns next to Tomlin's contention regarding the striking or prospective juror no. 7 [A.L.].  As noted, the appellate court addressed and rejected Tomlin's contention that the prosecution's strike of black prospective juror no. 7 [A.L.] was pretextual because there was no certification of his conviction.  In its decision, the appellate court found that involvement in criminal activity is a race-neutral reason for

_____

rational reason for an instinctive decision." Rice, 546 U.S. at 343-344 (Breyer, J., concurring)

[14] The questionnaire for prospective juror No. 10 [C.H.] reflects that she attended high school during 1972-1975; thus, by the court's calculation she was approximately 41-42 at the time of the trial in 1999.

removing a juror, that the trial court reviewed the documents that formed the basis of the prosecutor's strike of A.L. and that its ruling is supported by the record evidence.  909 So. 2d at 246-247.  Tomlin has not argued that prospective juror no. 7 [A.L.] did not in fact have a criminal conviction but instead contends that certification was required.  The undersigned finds that in this instance, where the prosecutor was relying upon information obtained from the district attorney's office that reflected that A.L. had a criminal conviction, and the prosecutor presented the documentation relied upon, the state courts' finding that no pretext had been established is supported by the record.

Tomlin's next contention that the prosecutor failed to question prospective jurors such as A.L. regarding the areas relied upon to strike them is without merit.  First of all, as determined by the appellate court, a review of the trial transcript does not show that any particular race of venire members was questioned more or less than others.  Further, in instances where the prosecution had the information available to them by way of jury questionnaires or other documentation, it was not necessary for the prosecution to ask questions about information already in their possession.  This is particularly

true where the record does not reflect that the prosecutor's questioning of prospective jurors was conducted in a discriminatory manner.

Equally without merit is Tomlin's contention that the prosecution's striking of some jurors, such as postal workers or teachers, was egregious and establishes pretext. On appeal, the appellate court determined that the prosecutor exercised its strike of teachers in a nondiscriminatory fashion. Specifically, the court found that "there is absolutely no evidence in the record, the voir dire, or the jury questionnaires, indicating that there was a white juror who was a teacher and was not struck by the state. 909 So. 2d at 247. Tomlin has not proffered any facts, which suggest that the prosecution struck black jurors on account of their occupation, but permitted white jurors with the same occupations to remain on the panel. Moreover, extant case law clearly provides that the prosecutor's articulated reason need not be logical or persuasive- it must merely be race neutral. The decision to strike jurors based on their occupation qualifies as such.

As noted *supra*, Tomlin also argues as evidence of pretext that the prosecutor worked in an office with a history of Batson violations and cites the case of Chatom v. State, 1991 Ala.

34

Crim. App. LEXIS 1082 (Ala. Crim. App. May 31, 1991) and Jones
v. Davis, 906 F. 2d 552 (11th Cir. 1990) in support of his
contention that Don Valeska, one of the prosecutors in this
case, was part of an office with a history of Batson violations.
A review of the Chatom decision reflects Valeska was the
prosecutor, that the case was reversed because in his opening
statement, he make statements about offenses other than those
for which the defendant was charged, and that the appellate
court found that the comments denied the defendant's right to a
fair trial.  The appellate court in Chatom also noted that in
response to defendant's challenge of the striking of all eleven
blacks on the venire, the trial court erroneously found that a
white defendant could not challenge the removal of blacks from
the venire.  Thus, the court held that even if the case had not
been remanded because of the opening statement, it would have
been remanded for a Batson hearing.  The determination that a
Batson hearing would have been warranted is a far cry from a
finding that the prosecutor had engaged in discriminatory Batson
violations.  Likewise, the fact that Valeska was employed in a
district attorney's office during the period in which there was
a finding of a Batson violation is not evidence that he
exercised his preemptory strikes in a discriminatory fashion in

35

this case, or any other.  Simply put, Tomlin has not pointed to any facts that suggest that Valeska has a history of committing _Batson_ violations.

Having carefully reviewed the record at length, the Court finds that there is no evidence that the Alabama state courts' credibility determination that the peremptory challenges of black prospective jurors by the prosecution in this case were not motivated by intentional racial discrimination is a decision that was "contrary to" or "an unreasonable application of federal law" or a decision "that was based on unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2). Therefore, Tomlin's claim that his constitutional rights were violated by the State's use of its peremptory challenges, as alleged in habeas Claim One, is without merit.


   A. Claim Two.

   In Claim Two, Petitioner asserts that the trial court's practice of implementing the more restrictive of two possible remedies for a successful _Batson_ challenge, _i.e._, dismissing the entire jury venire instead of re-seating any improperly removed jurors, made the assertion of the challenge impracticable and

effectively denied him his rights under the Equal Protection
Clause of the Fourteenth Amendment. (Doc. 1 at 18).
Petitioner presented this same argument to the Alabama Court of
Criminal Appeals on direct appeal of his fourth trial, and, in
its memorandum opinion rejecting Petitioner's claim, the court
stated:

> Tomlin argues in brief that "the trial
> court's practice of summarily implementing
> the more restrictive of two possible
> remedies for a Batson violation made the
> assertion of the Batson challenge
> impracticable in this case and effectively
> denied Phillip Tomlin his right to equal
> protection under the Fourteenth Amendment."
>
> We fail to *See* how this argument pertains to
> Tomlin's Batson objection. After Tomlin
> made his Batson objection and the discussion
> concerning Tomlin's objection was concluded,
> the following occurred:
>
>> "[Prosecutor]: Yes, Your Honor. We
>> would make a reverse Batson challenge
>> based on the fact that the Defense
>> struck 25 out of 25 white jurors and,
>> specifically, we would-we would
>> challenge-
>>
>> "The Court: And the State is requesting
>> and the State wants to be heard on all
>> 25 challenges for the Defense?
>>
>> "[Prosecutor]: I'm gonna pick those
>> individuals out. Juror Number Twenty,
>> Juror Number Thirty-two.

"The Court: Okay.   So the State wants to be heard on a reverse <u>Batson</u> and throughout (sic) the entire panel.

"[Prosecutor]: Those jurors which–

"The Court: Well, that's the only alternative I have if I hear your motion and grant your motion.

"[Prosecutor]: Well it depends, Your Honor, on different–

"The Court: Well, that's fine.  I was just telling you we'll hear each one you have an objection to and I'll give the other side an opportunity to either–

"[Prosecutor]: Your Honor, just so we're clear on–if we're clear on, if the individual is wrongly struck, if you should find that–

"The Court: I'll throw out the panel.

"[Prosecutor]: The entire panel?

"The Court: That's right.

"[Prosecutor]: Okay.   And is it the practice of some Courts to put one on–

"The Court: I don't put any jurors on.

"[Prosecutor]: Okay.   Your Honor, well then we'll withdraw our motions, with our understanding that that was the– that was the way–we don't believe that it would be correct to throw out this entire panel, Judge.

"The Court: I don't-that's the practice of my court.

"[Prosecutor]: Well, we wouldn't-Your Honor, I'm not saying-

"The Court: I understand that each judge is different. Some judges do that. I don't do it that way.

"[Prosecutor]: I'm not saying it's incorrect, I mean, we don't believe that, but it is-but we do believe and we want to say for the record that is hypocrisy, Your Honor, when the jury is made up as it is, 50 percent-

"The Court: If you want to be heard on that, I will hear you.

"[Prosecutor]: We'll withdraw our motion, Your Honor.

"The Court: [Defense Counsel].

"[Defense Counsel]: Yes, Your Honor. And I take it that Your Honor would have done the same thing if you would have granted our motion.

"The Court: I would have done the same thing."

Initially, we note that at no time in the above discussion did defense counsel object to the trial court's method of remedying the Batson objection. The only party to suffer any adverse ruling on this issue was the State-not the defense. The State argued that defense counsel used all of his 25 strikes to remove white prospective jurors. Because defense counsel did not object to this issue in the trial court, we review

39

this issue for plain error.  *See* Rule 45A, Ala. R. App. P.

As we recently stated in <u>Dorsey</u>, *supra*:

> "While Alabama has recognized that a proper way to remedy a <u>Batson</u> violation is to excuse the entire venire and to start anew, *See* <u>Ex parte Branch</u>, 526 So. 2d 609 (Ala. 1987), on remand, 526 So. 2d 634 (Ala. Crim. App. 1988), we have also held that another way to cure a <u>Batson</u> objection is to place a juror who was improperly removed back on the venire. *See* <u>O'Neal v. State</u>, 602 So. d 462, 465 (Ala. Crim. App. 1992).  The United States Supreme Court in <u>Batson</u> specifically refused to 'formulate particular procedures' to remedy a <u>Batson</u> violation; instead it left this decision to the state and federal courts.  <u>Batson</u>, 476 U.S. at 99, 106 S. Ct. 1712.

> "The Maryland Court of Appeals in <u>Jones v. State</u>, 343 Md. 584, 683 A.2d 520 (1996), thoroughly reviewed the methods of curing <u>Batson</u> violations used by the different state and federal courts. The <u>Jones</u> court stated:

> "'Some jurisdictions require trial courts finding a <u>Batson</u> violation to disallow the strike or to re-seat the improperly stricken juror. *See* <u>Ellerbee v. State</u>, 215 Ga. App. 312, 450 S.E.2d 443, 448 (1994); <u>State v. Grim</u>, 854 S.W.2d 403, 416 (Mo. 1993), *cert. denied*, <u>Grim v. Missouri</u>, 510 U.S. 997, 114 S. Ct. 562, 126 L. Ed. 2d 462 (1993) ("[T]he proper remedy for discriminatory use of peremptory strikes is to quash the strikes and

40

permit those members of the venire stricken for discriminatory reasons to sit on the jury if they otherwise would."); <u>Conerly v. State</u>, 544 So. 2d 1370 (Miss. 1989) ("Having determined that the state's explanation did not provide a valid reason for striking Swain, the trial court was obligated to seat her on the jury unless the state could suggest another racially neutral reason for striking her."); <u>U.S. v. Robinson</u>, 421 F. Supp. 467, 474 (D. Conn. 1976), *aff'd*, 556 F. 2d 562 (2nd Cir. 1977).

"'A minority of jurisdictions require the trial court to discharge the entire venire and conduct jury selection from a newly convened venire. *See* <u>State v. McCollum</u>, 334 N.C. 208, 433 S.E. 2d 144, 159 (1993), *cert. denied*, <u>McCollum v. North Carolina</u>, 512 U.S. 1254, 114 S. Ct. 2784, 129 L. Ed. 2d 895 (1994) (the court noted that while neither reseating the stricken jury nor discharging the entire panel was inconsistent with the procedure required by <u>Batson</u> to remedy such a violation, "the simpler and ... clearly fairer approach is to begin the jury selection anew...."); <u>People v. Wheeler</u>, 22 Cal. 3d 258, 148 Cal. Rptr. 890, 907, 583 P.2d 748, 765 (1978). *See* <u>Minniefield v. State</u>, 539 N.E. 2d 464 (Ind. 1989) (holding that the trial court erred by failing to grant mistrial as result of prosecution's <u>Batson</u> violation).

"'The majority of courts, however, have delegated to the discretion of the trial judge the determination of the appropriate remedy for a <u>Batson</u>

41

violation. *See e.g.* State v. Franklin, 318 S.C. 47, 456 S.E.2d 357, 360 (1995), *cert. denied*, Franklin v. South Carolina, 516 U.S. 856, 116 S. Ct. 160, 133 L. Ed. 2d 103 (1995) ("We hold ... that it is within the trial judge's discretion to fashion the appropriate remedy under the particular facts of each case" .... (citation omitted)); Ezell v. State, 909 P.2d 68, 72 (Okla. Crim. App. 1995) ("We adopt this flexible approach as the best solution. We interpret Batson as suggesting that either remedy may be appropriate depending on the particular circumstances at trial"). Commonwealth v. Fruchtman, 418 Mass. 8, 633 N.E. 2d 369, 373 (1994), *cert. denied*, Fruchtman v. Massachusetts, 513 U.S. 951, 115 S. Ct. 366, 130 L. Ed. 2d 319 (1994)("Choice of remedy was ... the prerogative of the judge"); Haschke v. Uniflow Manufacturing Co., 268 Ill. App. 3d 1045, 206 Ill. Dec. 387, 391, 645 N.E. 2d 392, 396 (1994); Friedman v. State, 654 So. 2d 50, 52 (Ala. Crim. App. 1994), *cert. denied*, No. 1940189 (Ala. 1995); Koo v. State, 640 N.E. 2d 95, 100 (Ind. Ct. App. 1994) ("Clearly, the remedy which a particular trial court employs upon a finding of purposeful discrimination is a matter left to the court's discretion."); State ex rel. Curry v. Bowman, 885 S.W.2d 421, 425 (Tex. Crim. App. 1993), *cert. denied*, Texas v. Bowman, 513 U.S. 866, 115 S. Ct. 184, 130 L. Ed. 2d 118 (1994) ("[W]here a Batson claim is sustained the court may fashion a remedy in its discretion...."); Jefferson v. State, 595 So. 2d 38, 41 (Fla. 1992) ("[I]t is within the trial judge's discretion to fashion the

42

appropriate remedy under the particular
facts of each case...."); People v.
Irizarry, 165 A.D.2d 715, 560 N.Y.S.2d
279, 281 (1990); State v. Walker, 154
Wis. 2d 158, 453 N.W.2d 127, 135 n. 12
(1990), *cert. denied*, 498 U.S. 962, 111
S. Ct. 397, 112 L. Ed. 2d 406 (1990);
U.S. v. Forbes, 816 F. 2d 1006, 1011
(5th Cir. 1987).'

"343 Md. at 594-95, 683 A.2d at 525-26.
Alabama is one of the jurisdictions
that leave the choice of the method to
deal with a Batson violation to the
sound discretion of the trial court.
*See* Ex parte Branch, *supra*.  Alabama
has never required that the trial
court follow a certain procedure.  We believe
that the method used will depend on the
facts presented in each case."

881 So. 2d at 488-89.  There was no
plain error here.

Tomlin, 909 So. 2d at 248-51 (footnote omitted).

Having reviewed the record in this matter, the Court agrees
with the Alabama Court of Criminal Appeals, for the precise
reasons stated in its memorandum opinion, that Petitioner failed
to establish that his constitutional rights under the Equal
Protection Clause were violated by the trial court's practice of
dismissing the entire jury panel upon finding a Batson
violation.  The Eleventh Circuit has recognized that a trial
court, in its discretion, may dismiss the entire jury panel to
remedy a Batson violation.  *See* U.S. v. Walker, 490 F. 3d 1282,

43

1294, 1295 n.14 (11th Cir. 2007) (trial courts are accorded "significant latitude" in fashioning a remedy for a Batson violation, which may include calling additional jurors to the venire, granting additional challenges to the injured party, "or in cases where those remedies are insufficient, the jury selection might begin anew with a fresh panel."). Moreover, having found no Batson violation in this case, the trial court never implemented its challenged policy of dismissing the entire jury venire to remedy such a violation; thus, Petitioner suffered no prejudice therefrom. Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2), and that the court rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Two, is without merit.

   B. Claims Three and Four.

   In Claim Three, Petitioner asserts that his rights to due process and a fair trial were violated by the trial court's admission into evidence of Captain Sanford Henton's testimony

that he investigated the death of Petitioner's brother, David
Tomlin, and determined that the death was accidental. (Doc. 1
at 19). In Claim Four, Petitioner asserts that his rights to
due process and a fair trial were violated by the trial court's
admission into evidence of Captain Henton's testimony that Ricky
Brune told him during that investigation that he and David
Tomlin were friends. (Id. at 20). Petitioner presented both of
these claims to the Alabama Court of Criminal Appeals on direct
appeal of his fourth trial, and, in its memorandum opinion
rejecting Petitioner's claims, the court stated:

> Tomlin argues that the trial court erred in
> allowing a State's witness, Sanford Henton,
> a retired captain with the Prichard Police
> Department, to testify that David Tomlin's
> death was ruled accidental.
>
> Capt. Henton testified that he investigated
> David Tomlin's death in November 1975.
> Instead of going into every aspect of the
> investigation, Capt. Henton was allowed to
> testify, over defense objection, that he
> determined that David Tomlin's death was
> accidental. He based this finding on the
> scene of the shooting, the toxicologist
> findings, and the coroner's findings.
>
> On appeal, Tomlin argues that the trial
> court erroneously admitted this testimony
> because it was based on facts the witness
> did not personally observe. Although Capt.
> Henton did not personally observe the
> shooting that took David Tomlin's life, his
> opinion that the shooting was an accident

45

was admissible.   Rule 701, Ala. R. Evid.,
states:

> "If the witness is not testifying as an
> expert, the witness's testimony in the
> form of opinions or inferences is
> limited to those opinions or inferences
> which are (a) rationally based on the
> perception of the witness and (b)
> helpful to a clear understanding of the
> witness's testimony or the
> determination of a fact in issue."

Here, Capt. Henton supervised the
investigation into David Tomlin's death and
formed a conclusion about the shooting.   He
correctly shared that conclusion with the
jury instead of relating every aspect of his
investigation.

In Acklin v. State, 790 So. 2d 975, 1004
(Ala. Crim. App. 2000), *cert. denied*, 790
So. 2d 1012 (Ala.), *cert. denied*, 533 U.S.
936, 121 S. Ct. 2565, 150 L. Ed. 2d 729
(2001), this Court stated:

> "'Alabama has long recognized ... that
> a lay witness may give an opinion when
> the witness is unable to relate the
> facts to the jurors well enough to
> place the jurors in as good a position
> as the witness was in to reach an
> opinion or to draw a conclusion.   Some
> would call this the "collective facts"
> exception to the opinion evidence
> rule.'

"Advisory Committee's Notes to Rule 701,
Ala. R. Evid.

"In this case, the witness's opinion
amounted to this sort of shorthand

46

recitation of the facts and was admissible under Rule 701, Ala. R. Evid."

*See* McGahee v. State, 554 So. 2d 454, 463 (Ala. Crim. App. 1989), *aff'd*, 554 So. 2d 473 (Ala. 1989) ("'Consequently, a witness, who has had an opportunity to observe (Sees, hears, feels, tastes, or smells...) the facts concerning which he is to testify, may testify on his "belief," his "best recollection," or his "understanding." A witness may also testify that something "looked like" or "Seemed like" something.'"). *See also* Dysart v. State, 581 So. 2d 541 (Ala. Crim. App. 1990), *cert. denied*, 581 So. 2d 545 (Ala. 1991); McWilliams v. State, 476 So. 2d 1244 (Ala. Crim. App. 1985); Andrews v. State, 473 So. 2d 1211 (Ala. Crim. App. 1985); Tice v. State, 460 So. 2d 273 (Ala. Crim. App. 1984); Wyrick v. State, 409 So. 2d 969 (Ala. Crim. App. 1981); Murrell v. State, 377 So. 2d 1102 (Ala. Crim. App. 1979), *cert. denied*, 377 So. 2d 1108 (Ala. 1979); Madison v. State, 40 Ala. App. 62, 109 So. 2d 749 (1958), *cert. denied*, 268 Ala. 699, 109 So. 2d 755 (Ala. 1959); Nugent v. State, 28 Ala. App. 182, 181 So. 707 (1938), *cert. denied*, 236 Ala. 213, 181 So. 709 (Ala. 1938).

As the State argued at trial, the circumstances surrounding David Tomlin's death were admissible at Tomlin's trial as tending to prove his motive for murdering Ricky Brune.  Motive evidence is always admissible.  Benefield v. State, 726 So. 2d 286 (Ala. Crim. App. 1997).

Moreover, Tomlin testified that the shooting involving his brother was accidental. Therefore, if the admission of this evidence was error it was rendered harmless by Tomlin's own testimony.  "Testimony that may

47

> be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." _Yeomans v. State_, 641 So. 2d 1269, 1272 (Ala. Crim. App. 1993). "The erroneous admission of evidence that is merely cumulative is harmless error." _Dawson v. State_, 675 So. 2d 897, 900 (Ala. Crim. App. 1995), _aff'd_, 675 So. 2d 905 (Ala. 1996).
>
> Tomlin also argues that the trial court erred in allowing Henton to testify about the relationship between Ricky Brune and David Tomlin-that Brune told him that he and David Tomlin had been friends. Specifically, he contends that this evidence was hearsay. Even if this evidence was hearsay, its admission was harmless. James Steven Heasling, the first defense witness, testified that he, Ricky Brune, and David Tomlin were friends. Thus, this evidence was lawfully before the jury.

_Tomlin_, 909 So. 2d at 253-54.

As evidenced by the opinion of the Alabama Court of Criminal Appeals quoted above, the question of whether the trial court erred in admitting the testimony of Captain Henton, as alleged in habeas Claims Three and Four, involves the interpretation and application of state law by state courts. Federal habeas relief for state prisoners attacking their conviction is limited in scope:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of

> habeas corpus in behalf of a person in
> custody pursuant to the judgment of a State
> court only on the ground that he is in
> custody in violation of the Constitution or
> laws or treaties of the United States.

28 U.S.C. § 2254(a) (emphasis added). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of a constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). Questions of state law rarely have federal constitutional significance because "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." Carrizales v. Wainwright, 699 F. 2d 1053, 1055 (11th Cir. 1983). Such questions are reviewed in federal habeas proceedings only to determine whether the alleged errors rendered "the entire trial fundamentally unfair." Id. at 1055.

In reviewing an evidentiary determination of a state trial court, the federal court will "not sit as a 'super' state supreme court.'" Shaw v. Boney, 695 F. 2d 528, 530 (11th Cir. 1983) (citations omitted). In Shaw, the Eleventh Circuit explained:

> Unlike a state appellate court, we are not
> free to grant the petitioner relief simply
> because we believe the trial judge has

49

erred. The scope of our review is severely restricted. Indeed, the general rule is that a federal court will not review a trial court's actions with respect to the admission of evidence. [Citations omitted]. A state evidentiary violation in and of itself does not support habeas corpus relief. [Citations omitted]. Before such relief may be granted, the violation must rise to the level of a denial of "fundamental fairness." [Citations omitted].

 In the context of state evidentiary rulings, the established standard of fundamental fairness is that habeas relief will be granted only if the state trial error was "material in the sense of a crucial, critical, highly significant factor." [Citations omitted]. Moreover, application of this standard has been notably one sided, consistent with the reluctance of federal courts to second guess state evidentiary rulings. This court has established a well documented resistance to granting relief when a habeas petition alleges a federal claim based merely on a state evidentiary ruling.

Id. Thus, habeas Claims Three and Four will be reviewed only to determine whether the alleged errors "render[ed] the entire trial fundamentally unfair." Carrizales v. Wainwright, 699 F. 2d 1053, 1055 (11th Cir. 1983).

Assuming, *arguendo*, that it was error for the trial court to admit the testimony of Captain Henton that Ricky Brune told him that he and David Tomlin were friends and that the

50

investigation into David Tomlin's death revealed that it was an accident, the record simply does not support a finding that the admission of this evidence prejudiced the outcome of Petitioner's trial and deprived him of fundamental fairness. As the Alabama Court of Criminal Appeals found, evidence that David Tomlin and Ricky Brune were friends and that the police considered David Tomlin's death an accident was admitted through other witnesses, including Petitioner himself. (Doc. 9, att. 6 at 66; Doc. 9, att. 7 at 47, 52-53, 59, 67, 92-95, 107). Thus, any error by the trial court in the admission of Captain Henton's testimony to this effect was not "material in the sense of a crucial, critical, highly significant factor" in the trial did not "render[] the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055; Shaw, 695 F. 2d at 530. Therefore, Petitioner's habeas Claims Three and Four fail to state cognizable federal habeas claims.

C. Claim Five.

In Claim Five, Petitioner asserts that his rights "to present a full defense" and to due process were violated by the trial court's refusal to allow him to introduce habit evidence of heroin abuse by one of the victims, Ricky Brune. (Doc. 1 at 21). Petitioner presented this claim to the Alabama Court of

Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court denied him his state and federal constitutional rights to present a full defense by precluding him from presenting habit evidence of Ricky Brune's heroin abuse. Tomlin makes the following argument in brief:
>
> > "At Mr. Tomlin's trial, defense counsel called a defense witness, Steve Hensarling. Mr. Hensarling was the former roommate of one of the victims, Ricky Brune. The defense needed Mr. Hensarling to testify as to the victim's habit. Specifically, the defense needed Mr. Hensarling to testify that, when Ricky Brune would go buy heroin, he would habitually take with him a [soft-drink] bottle filled with water, syringes, and other drug paraphernalia. This evidence was crucial to Mr. Tomlin's defense because it proved that Mr. Tomlin was not at the scene of the crime and therefore not guilty of the intentional murder of Cheryl Moore."
>
> During James Steven Heasling's testimony, defense counsel questioned the witness about whether he knew Brune's habits with regard to his drug use. Defense counsel then asked Heasling how much a "pill of heroin cost." After this question, the prosecution objected, stating that this line of questioning was not relevant. Defense counsel then made the following argument:

"Judge, this has denied my client's Constitutional right to present his case, to call witnesses on his own behalf. The State's whole argument in this case is gonna be about how much money these people had on them. They put in all of this evidence about what was in the car. They are gonna argue that my client was there with this other person. My theory of defense that what I'm gonna argue to the jury is that the [soft-drink] bottle, the syringes, and all the paraphernalia that was in the car-and this witness can testify, Your Honor, and he told the police officers this within days of the crime in his statement to the police-that that meant that this man was on his way to get drugs, because he never carried any of the paraphernalia, the needles or the bottle or the other things that were in the car. Those would be left elsewhere. That's competent evidence, Your Honor."

There was testimony presented that Brune used heroin. Also, a soft-drink bottle full of water and syringes was recovered from his vehicle. Heasling testified that Brune used these items when he used heroin. Heasling also testified that when he returned to his apartment on the day that Brune was killed, Brune was not there because "he was gone to score some drugs." Tomlin was allowed to present evidence indicating that Brune used heroin.

However, Tomlin did not present evidence indicating that when Brune was carrying his drug paraphernalia he would not go anywhere except to buy drugs. There was no evidence presented at trial indicating

53

that Brune was going to meet Tomlin at the
time he was murdered.  Neither was an offer
of proof or any evidence presented
indicating that Heasling was going to
testify that when Brune was carrying his
drug paraphernalia it was his habit not to
go anywhere else.  There was absolutely
nothing to connect Tomlin's contention that
Brune was on his way to buy drugs with his
conclusion that this meant that Tomlin could
not have been present at the murders.
Clearly, this evidence was not relevant
because there was no connection established
either at trial or argued in Tomlin's brief
to this Court.

Relevant evidence is defined in Rule
401, Ala. R. Evid., as "evidence having any
tendency to make the existence of any fact
that is of consequence to the determination
of the action more probable or less probable
than it would be without the evidence."

"The admissibility of evidence that has
been challenged as irrelevant and remote in
a criminal prosecution is within the sound
discretion of the trial judge.  Primm v.
State, 473 So. 2d 1149 (Ala. Cr. App. 1985).
What is relevant is a matter ordinarily
within the discretion of the trial judge,
and, unless that discretion is abused, a
ruling regarding relevancy will not be
considered error.  Dawkins v. State, 455 So.
2d 220 (Ala. Cr. App. 1984); Wicker v.
State, 433 So. 2d 1190 (Ala. Cr. App.
1983)."

Touart v. State, 562 So. 2d 625, 629
(Ala. Crim. App. 1989).  *See also* Bombailey

v. State, 580 So. 2d 41 (Ala. Crim. App. 1990).

Tomlin, 909 So. 2d at 264-65 (footnote omitted).[15]

As with Claims Three and Four, the question presented by Claim Five involves the interpretation and application of state law by state courts. Thus, the issue of whether the trial court erred in refusing to admit evidence that it was Ricky Brune's habit to take drug paraphernalia with him when he went to buy heroin (Doc. 1 at 21) will be reviewed on habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Assuming, arguendo, that it was error for the trial court to refuse to admit this evidence, the record does not support a finding that such error prejudiced the outcome of Petitioner's trial and deprived him of fundamental fairness. As the Alabama Court of Criminal Appeals found, the record shows that the trial court admitted evidence that Brune regularly used heroin and that he had drug paraphernalia in his car at the time of his

---

[15] Defense witness James Steven Heasling is also referred to as Steve Hensarling. Tomlin, 909 So. 2d at 264 n.12.

death.   (Doc. 9, att. 7 at 107-08; Doc. 9, att. 6 at 165-69).

Petitioner argues, however, that he should have been allowed to

further show that Ricky Brune habitually took drug paraphernalia

with him when he went to buy drugs, which, Petitioner argues,

would have proved that Brune was on his way to buy drugs at the

time of his death and "that Phillip Tomlin was not at the scene

of the crime."   (Doc. 1 at 21).   Petitioner's argument is

unavailing.   Even if Petitioner had been allowed to introduce

evidence that Brune was on his way to buy drugs at the time that

he was murdered, such evidence would not tend to show that

Petitioner was not present when Ricky Brune and Cheryl Moore

were shot or that he was not responsible for their deaths.

Thus, any error by the trial court in refusing to admit evidence

that Ricky Brune was on his way to buy drugs at the time that he

was killed was not "material in the sense of a crucial,

critical, highly significant factor" in the trial did not

"render[] the entire trial fundamentally unfair."   Shaw, 695 F.

2d at 530; Carrizales, 699 F. 2d at 1055.   Therefore,

Petitioner's habeas Claim Five fails to state a cognizable

federal habeas claim.

    D. Claim Six.

56

In Claim Six, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's admission of Petitioner's testimony from his first trial to the effect that he did not tell the police about his alibi because his "lawyers advised [him] not to."  (Doc. 1 at 24).  Petitioner claims that the admission of this testimony violates Doyle v. Ohio, 426 U.S. 610 (1976).  Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the prosecutor violated Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), by questioning him about his postarrest silence.  FN10   In Doyle, the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."  426 U.S. at 619, 96 S. Ct. 2240 (footnote omitted).
>
> [FN10. This testimony was admitted through Tomlin's testimony that was introduced from his first trial.]
>
> Tomlin testified that he was not in Alabama at the time of the murders but that he was in Houston, Texas.  He stated that on the night of the murders he had gone to several nightclubs.  The following then occurred:

57

"Q [Prosecutor]: So there's not one person in this world that could tell us where you were on the night of January the 1st, except you?

"A: If I was to guess, I probably could find somebody, yes, sir.

"Q: You tell me the name of one police officer that you've told what club you were in on January the 2nd?

"A: *One policeman, I didn't tell him nothing, my lawyers advised me not to.*"

(Emphasis added.)   Tomlin argues that the emphasized portion of his testimony violated Doyle v. Ohio.

In Whitehead v. State, 777 So. 2d 781 (Ala. Crim. App. 1999), *aff'd*, 777 So. 2d 854 (Ala. 2000), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233, 149 L. Ed. 2d 142 (2001), we addressed a similar claim.   We stated:

"'In Greer v. Miller, 483 U.S. 756, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987), the United States Supreme Court "clarified that 'the holding of Doyle is that the Due Process Clause bars "the use for impeachment purposes" of a defendant's postarrest silence.'" United States v. Stubbs, 944 F. 2d 828, 834 (11th Cir. 1991), quoting Greer, 483 U.S. at 763, 107 S. Ct. at 3108, in turn quoting Doyle, 426 U.S. at 619, 96 S. Ct. at 2245.   Furthermore, "while a single comment alone may sometimes constitute a Doyle violation, the Supreme Court's opinion in Greer makes clear that a single mention does not automatically suffice to violate defendant's rights when the government
58

does not specifically and expressly attempt to use-as was attempted in Doyle and Greer-the improper comment to impeach the defendant. *See* Lindgren v. Lane, 925 F. 2d 198, 201 (7th Cir. 1991)." Stubbs, 944 F. 2d at 835. (Emphasis in original.) In Lindgren, *supra*, the United States Court of Appeals for the Seventh Circuit found as follows: "At trial the prosecutor never called attention to the petitioner's silence. The defendant simply responded that he didn't 'wish to say any more' at the tail end of a compound answer to a question by the police officer. Consequently, no Doyle violation occurred." 925 F. 2d at 201. *See also* Mathenia v. Delo, 975 F. 2d 444, 452 (8th Cir. 1992), *cert. denied*, 507 U.S. 995, 113 S. Ct. 1609, 123 L. Ed. 2d 170 (1993) (testimony by officer that defendant did not make a statement to him at the time of his arrest not a comment on defendant's post-arrest silence because the testimony was "'merely preliminary to the admission into evidence of [Mathenia's] videotaped statement'"); Rowan v. Owens, 752 F. 2d 1186, 1190 (7th Cir. 1984), *cert. denied*, 476 U.S. 1140, 106 S. Ct. 2245, 90 L. Ed. 2d 691 (1986) (testimony by officers that defendant stated "he didn't want to say anything else" at conclusion of interrogation not a comment on defendant's post-arrest silence because it simply indicated the end of the interrogation and the testimony was not emphasized so "as to invite the jury to infer that [the defendant] had decided to 'clam up' after realizing he was incriminating himself").

59

"'Our review of the record reveals that the comment by Officer Wilkinson to which the appellant objects was never mentioned or alluded to again at trial by the prosecutor. The statement was not specifically elicited by the prosecutor and appears to be nothing more than part of Officer Wilkinson's narrative of the events leading to the making of the appellant's third taped statement. Clearly, the comment did not constitute an improper comment on the appellant's post-arrest silence for purposes of Doyle.'"

777 So. 2d at 823, quoting Wilkerson v. State, 686 So. 2d 1266, 1272-73 (Ala. Crim. App. 1996).

Tomlin argues in his brief to this Court that "the prosecutor specifically asked Mr. Tomlin why he had not given this alibi to the police after he was arrested." However, our review of the questioning shows that this statement is not supported by the record. Here, as in Whitehead, the statement volunteered by Tomlin was not specifically elicited by the prosecutor. Neither was any undue emphasis placed on Tomlin's answer. In fact, defense counsel mentioned Tomlin's silence in his opening statement. The following occurred:

"You're going to hear one other thing, ladies and gentlemen, and you're gonna hear-hear about reading testimony, and you're gonna hear in this case that when Phillip Tomlin was asked, not long after all of this happened if he had anything to do with it. He did the same thing that the President of the United States did when he was asked in that deposition-

60

> "....
>
> "The evidence will be that he didn't
> tell the truth about where he was, that
> he said he was in Houston, said he was
> stuck in the mud out there, he said Ron
> Daniels came and got him out of the mud
> and that's not true, ladies and
> gentlemen. In fact, what you'll find
> is that everybody that had anything to
> do with this case didn't want to admit
> that they had any part of it."
>
> There was no Doyle violation here.
> Moreover, given defense counsel's argument
> in opening, any conceivable error that may
> have occurred was harmless. *See* Harris v.
> State, 611 So. 2d 1159 (Ala. Crim. App.
> 1992).

Tomlin, 909 So. 2d at 260-61 (emphasis in original).

As the Alabama Court of Criminal Appeals discussed, the
State in Doyle sought to use the petitioner's post-arrest
silence for the express purpose of impeaching the exculpatory
story that he told at trial. The Supreme Court held that:
"[a]fter an arrested person is formally advised by an officer of
the law that he has a right to remain silent, the unfairness
occurs when the prosecution, in the presence of the jury, is
allowed to undertake impeachment on the basis of what may be the
exercise of that right." Doyle, 426 U.S. at 619.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for the precise reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's admission of Petitioner's testimony in this case that he did not talk to the police about his alibi because his lawyers advised him not to do so. As the Alabama Court of Criminal Appeals found, Petitioner testified at his first trial that he had been in several bars in Houston, Texas, on the night of the murders of Ricky Brune and Cheryl Moore in Mobile, Alabama. The prosecutor in that trial challenged Petitioner's story by asking him whether he had attempted to locate any witnesses at any of the bars who might have remembered him, whether he had sent his wife to try to locate any such witness, or whether he had even told the police that he was at a bar in Houston at the time of the murders. (Doc. 9, at 7 at 53-55, 61-62). Petitioner responded that he had made no attempt to locate any witnesses at any of the bars he claimed to have patronized on the night of the murders, nor had he told the police about his alibi because his "lawyers advised [him] not to." (Id.). During that same line of questioning, Petitioner retracted his statement and insisted that he "probably" did tell the police that he was not

in Mobile on the day of the murders and that he had been in a couple of nightclubs in Houston when the murders occurred.   (Id. at 63-64).   Under the circumstances of this case, there is no Doyle violation.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *See* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).   Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Six, is without merit.

E. Claims Seven through Ten.

Claims Seven through Ten relate to alleged errors by the trial court in refusing to grant Petitioner's requests to remove certain prospective jurors for cause.   Petitioner complains that, in each instance, he was forced to exercise one of his peremptory strikes to remove the challenged juror.

In Claim Seven, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's failure to remove prospective juror "B.L." for

cause after she stated that one of the witnesses for the prosecution had been her ex-husband's partner in the Prichard Police Department thirty years earlier. (Doc. 1 at 25). Petitioner claims that, because he was required to use one of his peremptory strikes to remove juror "B.L.," he was denied "the full exercise of his peremptory strikes." (Id.). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in failing to grant his motion to remove prospective juror B.L. for cause. Specifically, he argues that B.L. was married to a Prichard police officer who was the former partner of Capt. Bud Henton, a witness for the State. He contends that we should presume bias based on this juror's connection to Capt. Henton. Tomlin cites Ex parte Tucker, 454 So. 2d 552 (Ala. 1984), in support of this argument.
>
>  Initially, we note that the record reflects that B.L. stated during voir dire that she was the ex-wife of a retired police captain in the Prichard Police Department. The following occurred during the voir dire of B.L.:
>
>> "[Defense counsel]: Would you mind telling us just how well did you know him [Capt. Henton], how long did you know him?

"[B.L.]: Well, I haven't Seen him in over 30 years.

"[Defense counsel]: Okay.

"[B.L.]: So, maybe, 40 years-

"[Defense counsel]: Okay.

"[B.L.]:-but at one time, I think, Bud was the-my husband-ex-husband's partner.

"[Defense counsel]: Oh, he was?

"[B.L.]: So I used to see him quite often.

"[Defense counsel]: Okay. And was your ex-husband-then he was an officer with the Prichard Police Department.

"[B.L.]: Yes, he retired as captain with the Prichard Police Department. Most of the people would have known him.

"[Defense counsel]: Okay. And so the-

"[B.L.]: Rufus Harbin was his brother and he was a captain with the County and Joe Harbin was the lieutenant with the City of Prichard.

"[Defense counsel]: Do you think if these folks that you know so well were testifying-not all of these folks, but just Mr.-I guess the only one that would testify would be Mr. Henton-that since you know him and have a relationship with him outside of court, do you think that would-you might-

65

"[B.L.]: No, I haven't Seen Bud in years so-

"[Defense counsel]: And you think the passage of these 30 years, everything would be fine?

"[B.L.]: Yes.

"[Defense counsel]: And you could treat him just like any other witness, not give any more credibility, not any less credibility?

"[B.L.]: Right.

"[Defense counsel]: Thank you, ma'am."

In order to successfully challenge a prospective juror for cause, the basis for the challenge must be a statutory ground under § 12-16-150, Ala. Code 1975, or a matter that imports absolute bias and leaves nothing to the discretion of the trial court. *See* Dorsey, *supra*.

In Ex parte Tucker, *supra*, the case cited by Tomlin in his brief to this Court, the Alabama Supreme Court reversed the conviction because of prosecutorial misconduct. The Court then stated:

"On a second point, we note that during the qualification of the venire, it was discovered that a potential venireman ... was the brother of a witness for the State. Counsel for petitioner challenged the venireman for cause, stating, 'He is the brother of perhaps the most material witness in the entire case.' The trial judge denied the challenge. To do so was reversible

66

> error.  Nobis v. State, 401 So. 2d 191
> (Ala. Crim. App.), cert. denied, 401
> So. 2d 204 (Ala. 1981)."

Tucker, 454 So. 2d at 553.  The above quote
is the extent of the Court's discussion on
this issue in Tucker.  Clearly, the
situation presented in this case did not
rise to the level denounced in Tucker.
Here, B.L. was the ex-wife of a former
Prichard police captain who had been the
former partner of a State's witness.  B.L.
was not related by blood or marriage to a
State's witness.  B.L. also said that she
had not Seen the witness in over 30 years.
Moreover, B.L. stated that her former
association with Henton would not effect her
ability to be impartial.

Tomlin further argues that we should presume
bias based on B.L.'s former relationship and
that we should find the circumstances
sufficient to amount to a common-law reason
to remove B.L. for cause.

In addition to the statutory grounds for
removing a juror for cause contained in §
12-16-150, [FN4] Alabama courts have also
recognized that there may still be a common-
law basis for removing a juror for cause.
See Hutchins v. DCH Reg'l Med. Ctr., 770 So.
2d 49 (Ala. 2000); CSX Transp., Inc. v.
Dansby, 659 So. 2d 35 (Ala. 1995).  In
Beasley v. State, 39 Ala. App. 182, 96 So.
2d 693 (1957), the court discussed the
common-law grounds for a challenge for cause
and stated:

> [FN4. Section 12-16-150 states, in
> pertinent part:
> "It is good ground for challenge of
> a juror by either party:

"(1) That the person has not been a resident householder or freeholder of the county for the last preceding six months.

"(2) That he is not a citizen of Alabama.

"(3) That he has been indicted within the last 12 months for felony or an offense of the same character as that with which the defendant is charged.

"(4) That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured.

"(5) That he has been convicted of a felony.

"(6) That he has an interest in the conviction or acquittal of the defendant or has made any promise or given any assurance that he will convict or acquit the defendant.

"(7) That he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.

"(8) That he is under 19 years of age.

"(9) That he is of unsound mind.

"(10) That he is a witness for the other party."]

. . . The common-law grounds as far as applicable to our system and not changed by statute remain for our guidance. Our statute has added certain grounds of challenge for cause, but they are not exclusive of the common law remaining unchanged. ...' ... *See also* dictum in <u>Wyatt v. State</u>, 36 Ala. App. 125, 57 So. 2d 350."

39 Ala. App. at 185, 96 So. 2d at 696,
quoting <u>Brown v. Woolverton</u>, 219 Ala. 112,
121 So. 404, 406 (1928) (Emphasis in
original.)

> "[W]here a common law ground is
> involved, there must either be some
> matter which imports absolute bias or
> favor and leaves nothing for the
> discretion of the court or a situation
> which presents a mixed question of law
> and fact to be determined by the trial
> court in its sound discretion."

<u>Mullis v. State</u>, 258 Ala. 309, 312, 62 So.
2d 451, 453 (1952).

> "'A challenge for favor or bias is to
> be determined by the trial court as any
> other question of fact, tried without a
> jury, and is reviewable on like
> principles. 35 Corpus Juris, 312, 403,
> 404; 16 R.C.L. 279, 282, 288; <u>Calhoun
> v. Hannan</u>, 87 Ala. 277, 6 So. 291
> [(1889)]; <u>Larkin v. Baty</u>, 111 Ala. 303,
> 307, 18 So. 666 [(1895)]. The decision
> of the trial court on such question
> founded on oral evidence is entitled to
> great weight and will not be interfered
> with unless clearly erroneous,
> equivalent to an abuse of discretion.
> 35 Corpus Juris, 404, 405; 16 R.C.L.
> 289.'"

<u>Felton v. State</u>, 46 Ala. App. 579, 584, 246
So. 2d 467, 471 (Crim. 1971), quoting <u>Brown
v. Woolverton</u>, 121 So. at 406.

> "'Our Supreme Court has held that "[n]o
> right of an accused felon is more basic
> than the right to 'strike' a petit
> [jury] from a panel of fair-minded,
> impartial prospective jurors." <u>Ex</u>

69

parte Beam, 512 So. 2d 723, 724 (Ala.
1987).    The   propriety   of   a   trial
court's  ruling  in  the  challenge  of  a
venireperson  for  cause  based  on  bias
must  be  measured  against  a  defendant's
constitutional  right  to  a  fair  trial.
Ex parte Beam, U.S. Const. Amends. VI,
XIV.     The     qualification     of     a
prospective  juror  is  a  matter  within
the  discretion  of  the  trial  court,  and
a  trial  court's  ruling  on  a  challenge
for  cause  based  on  bias  is  entitled  to
great  weight  and  will  not  be  disturbed
on   appeal   unless   there   is   a   clear
showing  of  abuse  of  that  discretion.
Ex parte Rutledge, 523 So. 2d 1118
(Ala. 1988).    An  appellate  court  must
look  to  the  questions  propounded  to,
and    the    answers    given    by,    the
prospective   juror   to   see   if   this
discretion   was   properly   exercised.
Knop v. [ McCain], 561 So. 2d 229 (Ala.
1989).    "Ultimately,  the  test  to  be
applied  is  whether  the  juror  can  set
aside  [his  or]  her  opinions  and  try  the
case  fairly  and  impartially,  according
to  the  law  and  the  evidence."   Id. at
232.   "[A] prospective  juror  should  not
be   disqualified   for   prejudices   or
biases  if  it  appears  from  his  or  her
answers  and  demeanor  that  the  influence
of  those  prejudices  and  biases  can  be
eliminated   and   a   verdict   rendered
according  to  the  evidence."   Id. See
also Fordham v. State, 513 So. 2d 31
(Ala. Cr. App. 1986).'"

England v. State, 601 So. 2d 1108, 1109
(Ala. Crim. App. 1992), quoting Hunter v.
State, 585 So. 2d 220, 221-22 (Ala. Crim.
App. 1991).

B.L.'s answers to the voir dire questions clearly indicated that she was not so biased that the trial court had no discretion but to grant a challenge for cause. Therefore, there was also no common-law reason to remove B.L. for cause.

Moreover, B.L. was removed by the defense's use of one of its peremptory strikes. The United States Supreme Court in United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000), held that as long as the selected jury was impartial there was no prejudicial error when a trial court failed to remove a juror for cause who was subsequently removed by the defense using a peremptory challenge. The Martinez-Salazar Court stated:

> "In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. *See*, *e.g.*, J.E.B. [ v. Alabama ex rel. T.B.], 511 U.S. [127], at 137, n. 8 [(1994)] (purpose of peremptory challenges '"is to permit litigants to assist the government in the selection of an impartial trier of fact"') (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991)); Georgia v. McCollum, 505 U.S. 42, 57 (1992) (peremptory challenges are 'one state-created means to the constitutional end of an impartial jury and a fair trial'); Frazier v. United States, 335 U.S. 497, 505 (1948) ('the right [to peremptory challenges] is given in aid of the party's interest to secure a

71

fair and impartial jury'). Moreover,
the immediate choice Martinez-Salazar
confronted-to stand on his objection to
the erroneous denial of the challenge
for cause or to use a peremptory
challenge to effect an instantaneous
cure of the error-comports with the
reality of the jury selection process.
Challenges for cause and rulings upon
them, as Judge Rymer observed, *See
supra*, at 310, are fast paced, made on
the spot and under pressure. Counsel
as well as court, in that setting, must
be prepared to decide, often between
shades of gray, 'by the minute.' [
United States v. Martinez-Salazar,] 146
F. 3d [653] at 661 [(9th Cir. 1998)].

"....

"We answer today the question left open
in Ross [v. Oklahoma, 487 U.S. 81
(1988)] and hold that a defendant's
exercise of peremptory challenges
pursuant to Rule 24(b) is not denied or
impaired when the defendant chooses to
use a peremptory challenge to remove a
juror who should have been excused for
cause. Martinez-Salazar and his
codefendant were accorded 11 peremptory
challenges, the exact number Rule 24(b)
and (c) allowed in this case.
Martinez-Salazar received precisely
what federal law provided; he cannot
tenably assert any violation of his
Fifth Amendment right to due process.
*See* Ross, 487 U.S., at 91."

528 U.S. at 315-17, 120 S. Ct. 774. The
Alabama Supreme Court has relied on the
United States Supreme Court's decision in
Martinez-Salazar to affirm a trial court's
erroneous grant of a challenge for cause.

72

In Evans v. State, 794 So. 2d 411, 414 (Ala. 2000), the Alabama Supreme Court stated:

> "Evans argues that the trial court's error in excusing E.F.W. violated his right to a trial by an impartial jury, a right guaranteed by Amendments 6 and 14 of the United States Constitution and § 6 of the Alabama Constitution. However, the United States Supreme Court has held that a defendant's federal right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause. Ross v. Oklahoma, 487 U.S. 81, 87-88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); see also United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). As long as the jury that heard the case was impartial, the right guaranteed by the United States Constitution was not violated. See Ross, 487 U.S. at 87-88, 108 S. Ct. 2273. This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial 'by an impartial jury of the county or district in which the offense was committed.' The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6.
>
> "Evans has made no showing that his rights, such as his right to an impartial jury, were probably injuriously affected by the trial court's excusing E.F.W. Therefore, we

> conclude that the trial court's error in excusing E.F.W. was not reversible, because, even with the error, Evans still had a fair trial with an impartial jury."

> The Supreme Court found that any error in the trial court's erroneous removal of a juror for cause was harmless because the defendant did not show that the empaneled jury was not impartial.  This Court, citing Martinez-Salazar, has likewise found harmless error.  *See* Ray v. State, 809 So. 2d 875, 886 (Ala. Crim. App. 2001), *cert. denied*, 809 So. 2d 891 (Ala. 2001), *cert. denied*, 534 U.S. 1142, 122 S. Ct. 1096, 151 L. Ed. 2d 993 (2002) ("In United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000), the defendant used a peremptory challenge to cure the trial court's erroneous denial of a challenge for cause.  The United States Supreme Court held that the defendant's right to exercise his peremptory challenges was not denied or impaired when he chose to use a peremptory challenge to remove a juror who should have been challenged for cause."); Smith v. State, 908 So. 2d 273 (Ala. Crim. App. 2000) ("[A]ny possible error was harmless based on the United States Supreme Court's recent holding in United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000).").

> Therefore, if any error did occur, it was harmless.  *See* Ray v. State, *supra*; Smith v. State, *supra*.

Tomlin, 909 So. 2d at 234-38 (footnote three omitted).

74

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for each of the reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's refusal to strike prospective juror, "B.L.," for cause. Moreover, as the Alabama Court of Criminal Appeals found, Petitioner used one of his peremptory strikes to remove juror "B.L."[16] (Doc. 9, att. 5 at 63). Thus, even assuming, *arguendo*, that the trial court erred in refusing to remove this juror for cause because her ex-husband had been the former police partner of one of the witnesses over thirty years earlier (Doc. 9, att. 4 at 12), Petitioner was not deprived of a constitutional right thereby. *See* United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000) ("We hold, however, that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."); *accord* Ross v. Oklahoma, 487 U.S. 81, 88 (1988) ("peremptory challenges are not of constitutional dimension. . .

---

[16] "B.L." is identified in the record as juror number one. (Doc. 9, att. 5 at 63).

. They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.").

Similarly, in Claims Eight and Nine, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's failure to remove prospective juror "P.J." for cause after she cried during voir dire and stated that the evidence to be presented at trial would bring back memories of her mother-in-law's suicide (Claim Eight) and by the trial court's denial of Petitioner's request to ask further questions of prospective juror "P.J." (Claim Nine). (Doc. 1 at 26-27).  As with Claim Seven, Petitioner claims that, because he was required to use one of his peremptory strikes to remove juror "P.J.," he was denied "the full exercise of his peremptory strikes."  (Id.).

Petitioner presented these claims to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claims, the court stated:

> Tomlin argues that the trial court erred in failing to grant his challenge for cause of prospective juror P.J.   He contends that

this juror cried during voir dire after she indicated that she had found her mother-in-laws's body after the mother-in-law had committed suicide, that P.J. admitted that she suffers from anxiety attacks, and that P.J. admitted that the photographs of the victims' bodies might trigger an anxiety attack.  Tomlin argues that P.J. should have been struck for cause "because she could not be neutral, objective, or impartial."

The following occurred during the voir dire examination of P.J.:

> "The Court: Okay.  [P.J.]  I think you wanted to make a statement out of the presence of the other jurors.

> "[P.J.]: Well, I just may get upset, because when you mentioned the evidence, pictures and things, and I didn't put it on my sheet and I apologize, I honestly didn't think about it, but my mother-in-law was dying of cancer and she committed suicide and I happened to find her and just-

> "The Court: Okay, ma'am, I'm sorry and I understand that would bother you, but if you were selected as a juror, understanding that would bother you, but you could still decide the evidence based upon what's presented to you from the testimony and the law that I instruct you?

> "[P.J.]: And I may cry.

> "The Court: I understand.  I understand that.  We can't stop that.

> "[P.J.]: I don't like guns.

77

"The Court: Yes, ma'am, I appreciate your candor. Anything else, Mr. Valeska, of [P.J.]?

"[Prosecutor]: No, Your Honor.

"The Court: Mr. Bright?

"[Defense counsel]: [P.J.] you cried a little bit when you answered the question though, right?

"[P.J.]: (Juror nods.)

"[Defense counsel]: You have to give an audible answer, yes or no, for the court reporter?

"[P.J.]: Yes.

"[Defense counsel]: And you think you may have that same reaction if you saw the pictures and so forth, that we talked about earlier?

"[P.J.]: I'd probably be all right, but I have these little anxiety attacks.

"[Defense counsel]: Well, do you think it might interfere with your ability to fairly consider the case?

"[P.J.]: No.

"[Defense counsel]: Well, do you think that you could put it aside and listen to all of the evidence-

"The Court: She's answered the question-just a moment, she's answered the question.  Thank you, [P.J.]." [FN5]

78

[FN5. Tomlin also argues that the trial court erred in restricting his questioning of this juror.  However, the record reflects that the trial court did not restrict Tomlin's questioning, but merely would not allow him to ask a question that he had already asked of the juror-a question that this juror had previously answered on two separate occasions.]

Tomlin argues that we should presume bias based on the above dialogue with P.J.   He cites Rideau v. Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), and Turner v. Louisiana, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), in support of his contention.

In Rideau, the United States Supreme Court reversed the appellant's conviction based on the trial court's failure to grant a motion for a change of venue.  The record showed that after Rideau was arrested he confessed to the local sheriff, and the confession was videotaped and audiotaped.  The tape was broadcast on local television stations three times before Rideau's trial.  The Supreme Court found that Rideau's right to an impartial trial was violated.

In Turner, the United States Supreme Court granted Turner a new trial after two deputies who were key witnesses in the case and who were also in charge of the sequestered jurors had outside contact with the jurors.  Neither case is similar to the situation presented in this case.

Prospective juror P.J. indicated that she could impartially try the case.  The trial court committed no error in failing to remove this juror for cause.

79

> Moreover, this juror was removed by the defense's use of one of its peremptory strikes.

<u>Tomlin</u>, 909 So. 2d at 238-40.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for each of the reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's refusal to strike prospective juror, "P.J.," for cause or by the trial court's denial of Petitioner's request to ask her further questions.  Moreover, as the Alabama Court of Criminal Appeals found, Petitioner removed juror "P.J." from the jury by exercising one of his peremptory strikes.[17]  (Doc. 9, att. 5 at 63).  Thus, for the same reasons discussed above with respect to Claim Seven, even assuming, *arguendo*, that the trial court erred in refusing to remove juror "P.J." after she expressed anxiety about viewing some of the evidence to be presented at trial (Doc. 9, att. 4 at 123-24) or in denying Petitioner's request to ask "P.J." further questions, Petitioner was not deprived of a

---

[17] "P.J." is identified in the record as juror number forty-three.  (Doc. 9, att. 5 at 63).

constitutional right thereby. *See* <u>Martinez-Salazar</u>, 528 U.S. at 307; <u>Ross</u>, 487 U.S. at 88.

Likewise, in Claim Ten, Petitioner asserts that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's failure to strike prospective jurors "S.B.," "L.R.," and "G.R." after they admitted having heard or read about the case. (Doc. 1 at 28). As with Claims Seven through Nine, Petitioner claims that, because he was required to use his peremptory strikes to remove these prospective jurors, he was denied "the full exercise of his peremptory strikes." (<u>Id.</u>).

Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in failing to remove three prospective jurors who were not impartial, he argues, because they indicated that they had heard or read about the case. He contends that this is sufficient to establish a common-law basis to strike these jurors.
>
> However, neither this Court nor the United States Supreme Court has ever required jurors to be totally ignorant about the facts and circumstances of a case. As the United States Supreme Court stated in <u>Irvin v. Dowd</u>, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961):

81

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.  Spies v. Illinois, 123 U.S. 131 [(1887)]; Holt v. United States, 218 U.S. 245 [(1910)] Reynolds v. United States, [98 U.S. 145 (1878)].

"The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' Lisenba v. California, 314 U.S. 219 [(1941)].  As stated in Reynolds, the test is 'whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality.  The question thus presented is one of mixed law and fact....'  At page 156 [of 98 U.S.].  'The affirmative of the issue

82

is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside....'"

Specifically, Tomlin challenges the trial court's failure to remove prospective jurors S.B., L.R., and G.R. for cause because they answered that they had heard or read about the case. A review of the record reflects that S.B. stated that she had read about the case but that she could not remember any particulars. L.R. stated that he had read in the newspaper in the 1970s that several people had been found dead in or near a car. G.R. stated that he did not remember the details of the case because it happened when he was a teenager but that he did remember that it had happened. All stated that any knowledge that they had about the case would not effect their ability to render an impartial verdict.

Clearly, the vague comments of the three questioned jurors were not sufficient to grant a challenge for cause. As stated in Irvin v. Dowd, *supra*, we have never held that a juror must be totally ignorant about a case before he/she is eligible to sit on a jury.

Tomlin, 909 So. 2d at 240-41.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for each of the reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's

83

refusal to strike prospective jurors "S.B.," "L.R.," and "G.R." for cause. Moreover, as the Alabama Court of Criminal Appeals found, Petitioner removed these jurors from the jury by exercising his peremptory strikes.[18] (Doc. 9, att. 5 at 64-68). Thus, as discussed above with respect to Claims Seven through Nine, even assuming, *arguendo*, that the trial court erred in refusing to remove these jurors for cause based on the fact that they had heard or read about the case (Doc. 9, att. 4 at 17, 72, 117), Petitioner was not deprived of a constitutional right thereby. *See* Martinez-Salazar, 528 U.S. at 307; Ross, 487 U.S. at 88.

Accordingly, the Court finds that the decisions of the Alabama Court of Criminal Appeals with respect to Claims Seven through Ten were a reasonable determination of the facts in light of the evidence presented, *See* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered decisions that were neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C

---

[18] "S.B." is identified in the record as juror number six (Doc. 9, att. 5 at 67); "L.R." is identified as juror number twenty-three (Doc. 9, att. 5 at 68); and "G.R." is identified as juror number thirty-five (Doc. 9, att. 5 at 64).

84

§ 2254(d)(1).     Therefore,   Petitioner's   claims   that   his
constitutional rights were violated, as alleged in habeas Claims
Seven through Ten, are without merit.

    F. <u>Claim Eleven</u>.

In  Claim  Eleven,  Petitioner  asserts  that  the  trial  court
allowing  the  State's  expert,  James  Small,  to  testify  outside  of
his  area  of  expertise,  violated  his  rights  under  the  Sixth  and
Fourteenth Amendments.     (Doc. 1 at 29).     Petitioner concedes
that  Small  was  qualified  to  testify  in  the  field  of  toxicology;
however,  Petitioner  maintains  that  he  was  not  qualified  to
testify  in  the  areas  of  ballistics,  pathology,  or  fingerprints.[19]

---

[19] Petitioner's  claim  that  Small  was  unqualified  to  render
an  expert  opinion  on  fingerprinting  does  not  appear  to  have  been
raised  in  the  state  court  and  is,  therefore,  unexhausted  and
procedurally  defaulted.     *See* <u>O'Sullivan v. Boerckel</u>, 526 U.S.
838,  848  (1999)  (A  state  prisoner's  failure  to  present  his
claims  to  the  state  courts  in  the  proper  manner  results  in  a
procedural  default  of  those  claims); <u>Bailey v. Nagle</u>, 172 F. 3d
1299,  1302,  1306  (11th  Cir.  1999)  ("A  state  habeas  corpus
petitioner  who  fails  to  raise  his  federal  claims  properly  in
state  court  is  procedurally  barred  from  pursuing  the  same  claim
in  federal  court  absent  a  showing  of  cause  for  and  actual
prejudice  from  the  default"  or  "actual  innocence.").     Because
Petitioner  does  not  allege  cause  and  prejudice  for  the  default,
nor  is  there  evidence  of  "actual  innocence,"  the  claim  is
procedurally  barred  in  federal  court.     In  any  event,  even  if  not
procedurally  barred,  the  admission  of  this  testimony  was  not
"material  in  the  sense  of  a  crucial,  critical,  highly
significant  factor," <u>Shaw</u>, 695 F. 2d at 530, and did not render
(Continued)

(Id.).  Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in allowing James L. Small, a former toxicologist with the Alabama Department of Forensic Sciences, to be qualified as a ballistic expert and a pathologist.
>
> The following occurred when James Small was examined:
>
>> "Q [Prosecutor]: State your name, please, sir, for the ladies and gentlemen of the jury and the Court.
>>
>> "A: My name is James L. Small.
>>
>> "Q: And, Dr. Small, what do you do?
>>
>> "A: I am currently employed by the Baldwin County District Attorney's Office, working in environmental science.
>>
>> "Q: Prior to that, did you work for the Alabama Department of Forensic Sciences here in Mobile?
>>
>> "A: Approximately, 25 years.

---

"the entire trial fundamentally unfair."  Carrizales, 699 F. 2d at 1055.  Thus, it does not state a cognizable federal claim.

"Q: And you were the state toxicologist here in the old courthouse?

"A: That's correct, sir.

"Q: And you were such employed in 1977 and 1978?

"A: That's correct, sir.

"Q: Would you tell the ladies and gentlemen of the jury what a toxicologist is and does, please, sir?

"A: Well at that time, the toxicologist for the State of Alabama was charged with investigation of crimes that he was called to by law enforcement, examination of evidence submitted by law enforcement, examination of scenes, and examination of bodies that were involved in crime.

"Q: And how long had you been doing this prior to 1977?

"A: Approximately, 12 years.

"Q: And where did you get your education?

"A: I received a bachelor's degree and a master's degree from Auburn University.  The master's degree was in toxicology.

"Q: And how many violent deaths and evidence had you examined, in your best judgment, prior to January 2, 1977?

"A: I had examined approximately 500 bodies involved with violent deaths, prior to that time.

87

"Q: And did you have any other special training in which you otherwise told the jury?

"A: In our profession, we regularly attend short courses, seminars, and training programs that deal with specific items or specific types of evidence that we are to handle and make examinations on.

"[Prosecutor]: Judge, at this time, I'd ask for Mr. Small as an expert.

"The Court: Any objections from the Defense?

"[Defense Counsel]: Yes. Can I just voir dire on the qualifications?

"....

"Q [Defense Counsel]: Okay. Okay. Now, and your area of expertise would be then, in the area of toxicology is poisons; is that correct?

"A: The training-the academic training was an area of toxicology. The training that we further received as part of our employment and part of our duties with the State of Alabama, involved the conduction of autopsies, determining cause of death, collection of evidence from bodies, scenes, evaluating that evidence, making scientific determinations as to what the evidence relates to and then testifying in court.

"....

"Q:  [Defense   Counsel]:  Okay.  Your experience  was  kind  of,  would  it  be fair  to  say,  on-the-job  and  going  to some seminars from time to time?

"A:  Being  taught  specifically  what  to do  on  the  job  and  special  courses,  yes, sir.

"....

"A: Well, in particular, with firearms, we  spent  several  months  in  the laboratory  examining  bullets,  examining items  from  bullets,  and  shotgun  shells and  firearms,  firing  these,  making  test comparisons  until  the  senior  examiners knew  that  we  could  sit  down  and  make  a comparison  of  a  bullet  to  a  particular firearm and get the correct answer.

"[Prosecutor]:  Judge,  we  offer  him  as an expert.

"The  Court:  Any  objections  from  the Defense?

"[Defense Counsel]: I'm sorry, he's an expert in what, Your Honor?

"[Prosecutor]:   In   toxicology,   in autopsies,  and  everything  that  he  just testified to.

"[Defense  counsel]:  I  don't  have  any problem  with  him  testifying-I  think he's  an  expert  in  toxicology,  Your Honor. I don't believe he's established expertise in any other area.

"The  Court:  Noted  for  the  record, overruled.  Proceed."

89

Tomlin does not question Small's qualifications as a toxicologist. However, he contends that Small was not qualified to testify about the victims' causes of death nor was he qualified to testify concerning ballistic information. We do not agree.

Mr. Small testified that Dr. Edwin Scott, who was the coroner for Mobile County at the time of the murders, performed the autopsies on both victims. Small testified that Scott died shortly after he conducted the autopsies. Small further testified that he was present when the autopsies were conducted and, from his testimony, it appears that he assisted with the autopsies.

The appellate courts of this state have long held that a toxicologist may testify as to the cause of death. In Luckie v. State, 55 Ala. App. 642, 318 So. 2d 337 (Ala. Crim. App.), cert. denied, 294 Ala. 764, 318 So. 2d 341 (1975), this Court addressed the same issue concerning James Small, the same toxicologist in this case. This Court stated:

> "At the conclusion of the testimony offered by the State the appellant moved to exclude on the grounds that the State had not proved the cause of death of decedent; that James Small, a toxicologist, who testified for the State as to the cause of death was not properly qualified to give such testimony; and that there had been no expert testimony to show the cause of death.
>
> "The question of the qualifications of a person to testify as an expert rests largely in the discretion of the trial court and will not be disturbed by the

90

appellate courts in the absence of
abuse. *See* numerous cases collected in
Alabama Digest, Criminal Law, Volume 6,
[key cite] 481.

"The case of Richardson v. State, 39
Ala. App. 207, 98 So. 2d 59, *cert.
denied*, 266 Ala. 699, 98 So. 2d 65
[(1957)], along with many other cases,
holds that a toxicologist, properly
qualified, may testify as to the cause
of death."

55 Ala. App. at 644-45, 318 So. 2d at
340. *See also* Dobbins v. State, 274
Ala. 524, 149 So. 2d 814 (1963) (a
state toxicologist was correctly
allowed to testify that the cause of
the victim's death was bullet wounds to
the head); Johnson v. State, 272 Ala.
633, 133 So. 2d 53 (1961) (an assistant
state toxicologist was properly allowed
to testify that the victim died as a
result of blunt-force injuries); Smarr
v. State, 260 Ala. 30, 68 So. 2d 6
(1953) (a state toxicologist was
properly allowed to testify that one of
the victims died as a result of a
fractured skull); Collins v. State, 250
Ala. 58, 33 So. 2d 18 (1947) (a
toxicologist was properly allowed to
testify that the victim died of a
bullet wound to skull); Wilson v.
State, 243 Ala. 1, 8 So. 2d 422 (1942)
(a toxicologist was properly allowed to
testify that the victim was poisoned);
Hall v. State, 49 Ala. App. 695, 275
So. 2d 374 (1973) (a toxicologist was
properly allowed to testify that the
victim's cause of death was blunt-force
injuries to the head); Holland v.
State, 49 Ala. App. 104, 268 So. 2d 883
(1972) (a toxicologist was properly

91

allowed to testify that the victim died of gunshot wounds); Richardson v. State, 39 Ala. App. 207, 98 So. 2d 59 (1957), *cert. denied*, 266 Ala. 699, 98 So. 2d 65 (1957) (a toxicologist was properly allowed to testify that the victim died from a bullet wound to the chest).

Here, Small was properly qualified to testify that in his opinion the victims died of multiple gunshot wounds. Moreover, we note that the causes of death were never contested.

Small was also qualified to testify as a ballistic expert. Rule 702, Ala. R. Evid., states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Whether a person is qualified to testify as an expert is within the discretion of the trial court, whose ruling will not be disturbed unless there is an abuse of that discretion. *See* Bailey v. State, 574 So. 2d 1001, 1003 (Ala. Crim. App. 1990). Challenges to the qualifications of an expert go to the weight, not the admissibility, of the expert's testimony. *See* Smoot v. State, 520 So. 2d 182, 189 (Ala. Crim. App. 1987).

> Here, Small testified to his training in ballistics. He also testified that he had been conducting such investigations for 12 years before 1977-the year of the murders. The trial court did not err in allowing this witness to testify as a pathologist and as a ballistics expert. Small was properly qualified as an expert in all those fields of expertise.

Tomlin, 909 So. 2d at 257-59.

The issue of whether the trial court erroneously admitted the expert testimony of James Small involves the interpretation and application of state law by state courts. As with the state law issues discussed above, in such instances, the claim will be reviewed on habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner has failed to show that the trial court erred in allowing the State's witness, James Small, to testify as an expert in the areas of pathology and ballistics. The record supports the state court's findings

related to Small's experience and training in these areas. Moreover, as the Alabama Court of Criminal Appeals found, the cause of death of the victims from multiple gunshot wounds was never contested at trial. Furthermore, Petitioner's own attorney elicited Small's opinion on issues of ballistics. (Doc. 9, att. 6 at 161-62, 169). Having failed to show that the trial court erred in allowing Small's expert testimony in the areas of pathology and ballistics, as alleged in habeas Claim Eleven, and that the error rendered his entire trial fundamentally unfair, Petitioner fails to state a cognizable federal habeas claim.

G. Claim Twelve.

In Claim Twelve, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's admission of testimony that Petitioner was the subject of a prior undercover narcotics investigation in Texas. (Doc. 1 at 30). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues in his brief to this Court that the trial court erred in allowing evidence indicating that "two narcotics

94

officers in March 1976 were engaged in a sting operation against Mr. Tomlin."

The record reflects that Tomlin moved in limine to "exclude any testimony about an investigation and trial for possession of marijuana that resulted in a hung jury in Texas in 1976." In this motion, Tomlin argued:

> "At the previous capital trials in 1978 and 1990, two agents from Houston testified that they investigated Mr. Tomlin, tried to purchase one to three pounds of marijuana from him, and charged him with the sale of drugs, but that the jury was hung and the charges were dismissed. This testimony was highly prejudicial and in no way necessary to the trial of Mr. Tomlin."

The trial court granted this motion. Officer Eddie Hebison, a former employee of the Texas Department of Public Safety, testified that he had a conversation with Tomlin in Houston about one year before the murders. The following occurred during his testimony:

> "Q [Prosecutor]: And what were you doing on that day, if you recall?
>
> "A: My role on that particular day was to serve as a back-up for Officer Hammons while he was inside the [Wet and Wild] club.
>
> "Q: Okay. What type of law-enforcement operation were you conducting at the time?
>
> "A: It was an undercover capacity law-enforcement thing.

95

"Q: And what were your duties, specifically, in relation to Mr. Hammons?

"A: At that time, my duties were to be a back-up for Officer Hammons while he was inside the establishment.

"Q: Okay. Was your-did Mr. Hammons-was there someone in particular Mr. Hammons was going to see that evening.

"[Defense Counsel]: Objection, same objection we made earlier, Your Honor.

"The Court: Overruled.

"The witness: He was to meet an individual at the bar by the name of Mr. Tomlin, Phillip Wayne Tomlin."

After this exchange, Hebison testified that he heard Tomlin tell Hammons that he had to go to Alabama to take care of some family business and kill the person who had killed his brother.

Tomlin argues that the above exchange indicated that Tomlin was the subject of a police investigation. There is absolutely no indication from Hebison's testimony that Tomlin was the subject of any investigation nor that he had any prior convictions. Neither was there any reference to what type of law-enforcement agency Hebison worked for. The record does not support Tomlin's contention.

Tomlin, 909 So. 2d at 261-62.

Claim Twelve involves the interpretation and application of state law by state courts. Therefore, as with the state law issues discussed above, the issue of whether the trial court erred in allowing Officer Hebison's[20] testimony will only be reviewed on habeas to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner has failed to show that the trial court erred in allowing Officer Hebison's testimony. As the Alabama Court of Criminal Appeals found, the record shows that Officer Hebison testified that he and his partner, Officer Hammons, were working undercover in 1976 and went to meet Petitioner at a nightclub. (Doc. 9, att. 6 at 39). While there, Officer Hebison overheard Petitioner tell Officer Hammons that "he had to go to Alabama to take care of some family

---

[20] This officer's name is spelled Hebisen in the trial court record. (Doc. 9, att. 6 at 38).

business, to kill an individual, because he had learned that his brother's death had not been an accident." (Id. at 40). Contrary to Petitioner's assertion in his habeas petition, Officer Hebison did not testify that Petitioner was the subject of a narcotics "sting operation" or that he was arrested and tried but not convicted. (Doc. 1 at 30). Having failed to show that the trial court erred in allowing Hebison's testimony, as alleged in Claim Twelve, and that the error rendered his entire trial fundamentally unfair, Petitioner fails to state a cognizable federal habeas claim.

H.   Claim Thirteen.

In Claim Thirteen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's denial of Petitioner's motion for a judgment of acquittal based on the insufficiency of the evidence. (Doc. 1 at 32). Specifically, Petitioner argues that there was insufficient evidence that he was at the scene of the murder, that he had a motive or intended to kill anyone other than Ricky Brune, that he knew that his co-defendant may have killed two people, or that he had a particularized intent to kill Cheryl Moore. (Id.). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial,

and, in its memorandum opinion rejecting Petitioner's claim, the

court stated:

> Tomlin argues that the evidence was
> insufficient to support his conviction and
> that the trial court erred in denying his
> motion for a judgment of acquittal.
>
> The facts of the case were discussed in
> detail at the beginning of this opinion; we
> will not recite them here. We also noted
> that the evidence presented at Tomlin's
> fourth trial did not vary in any great
> respect from the evidence presented at his
> previous three trials. In our opinion on
> Tomlin's appeal from his third conviction,
> we stated:
>
>> "Tomlin contends that the prosecutor
>> presented insufficient evidence to
>> support a guilty verdict. The state's
>> case-in-chief, as it was presented at
>> Tomlin's two previous trials, has been
>> reviewed on appeal several times by
>> this court and the Alabama Supreme
>> Court. *See* 540 So. 2d 668 (Ala. 1988),
>> 591 So. 2d 550 (Ala. Cr. App. 1991),
>> and 443 So. 2d 47 (Ala. Cr. App. 1979),
>> *aff'd*, 443 So. 2d 59 (Ala. 1983). In
>> each of those prior appeals, Tomlin did
>> not question the sufficiency of the
>> evidence. However, those opinions
>> reviewed Tomlin's case under the
>> doctrine of plain error and did not
>> suggest that the prosecution's case was
>> lacking in any way. Notably, in
>> Tomlin, 443 So. 2d 47 (Ala. Cr. App.
>> 1979), this court reviewed Tomlin's
>> first trial and expressly held that the
>> evidence in that case was sufficient to
>> support Tomlin's conviction. In this
>> trial, the evidence presented was

materially indistinguishable from the evidence at the first trial.

"In this third trial, the state's case-in-chief deviated from that of the previous trials in only a few respects.

"1. In this trial, the testimony did not establish that all of the shots that killed Moore and Brune were fired from the back seat of the automobile;

"2. In this trial, the testimony did not establish the brand of .38 caliber gun that inflicted the wounds;

"3. In this trial, the testimony did not establish that Daniels was in fact a 'hit man'; however, the testimony did establish that Tomlin represented that he was one. [FN11]

   [FN11.   In relation to the three noted differences set out in our previous opinion, we note the following facts that were presented at Tomlin's fourth trial.  There was testimony from James Small indicating that the shotgun wound to Moore's body was not fired from inside the vehicle.  Small testified that at least two bullets were fired from the backseat of the car.  Four .38 caliber bullets were recovered from Brune's body.  One .38 caliber bullet was recovered from Moore's body.  Moore had also been shot with a .16 gauge shotgun.  No particular gun was ever identified as the gun that fired the .38 caliber bullets.  Small testified that the .38 caliber bullets recovered from Brune's and Moore' bodies were fired from the same gun.  Danny Shanks testified that

Tomlin referred to Daniels as a "hit man."]

"These minor variations from the evidence presented in Tomlin's prior trials have no material effect on the sufficiency of the evidence presented during the state's case-in-chief. We conclude that in this trial, 'even though the evidence is circumstantial, when viewed in a light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of guilt.' Daniels v. State, 534 So. 2d 628, 636 (Ala. Cr. App. 1985), *aff'd*, 534 So. 2d 656 (Ala. 1986), *cert. denied*, 479 U.S. 1040, 107 S. Ct. 898, 93 L. Ed. 2d 850 (1987)." 695 So. 2d at 162-63.

There was sufficient evidence on which to submit the case to the jury for its determination. The trial court did not err in denying Tomlin's motion for a judgment of acquittal.

Tomlin, 909 So. 2d at 263-64.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's denial of his motion for a judgment of acquittal based on the

insufficiency of the evidence.   The evidence recounted by the Alabama Court of Criminal Appeals[21] is supported by the record and is more than sufficient to support Petitioner's convictions of the capital murders of Cheryl Moore and Ricky Brune.   *See* Tomlin, 909 So. 2d at 224.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *See* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).   Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Thirteen, is without merit.

   I.   Claim Fourteen.

In Claim Fourteen, Petitioner asserts that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's denial of his motion for a change of venue.   (Doc. 1 at 33).   Petitioner presented this claim to the Alabama Court of

---

[21] The evidence is set forth in detail at the beginning of this Report and Recommendation in the "Findings of Fact and Proceedings."

Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the extent of the pre-trial publicity surrounding the case created an atmosphere of prejudice and resulted in his being denied a fair and impartial trial. Specifically, Tomlin contends that the community was saturated with negative publicity surrounding the facts of the case and the procedural posture of the case-specifically, that this was Tomlin's fourth trial on the capital-murder charges.
>
> The majority of Tomlin's argument in his brief to this Court on this issue is devoted to attacking the number of articles published and the extent of the prospective jurors' knowledge of the case before Tomlin's 1993 trial. It is not disputed that the publicity surrounding this case was extensive. However, the majority of the articles were written in 1977, immediately after the murders, and again immediately before Tomlin's 1993 trial.
>
> During the hearing on the motion for a change of venue, the trial court stated:
>
>> "The Court: ... I have no idea what [the newspaper] will print, what they will not print. I'm not inclined at this time to grant the motion for a change of venue. I do think some serious concerns and issues have been raised, and the Court is aware of those issues, and the Court will keep those issues in mind throughout these proceedings, but I'm not going to grant a change of venue.

103

"I will state for the record, though, unless there is a need to hear argument on this or there is a strong objection from either side, I am going to request-no, I'm going to order that there are no interviews by the State or Defense with the local [newspaper].  I think that would only aggravate the situation, cause additional problems and then-knowing how the media may or may not take that, and it's not only limited to the Mobile Register but any electronic media or print media.

"The intent at this point is to make sure that the State and the Defense receive a fair and impartial trial, and nothing is to be gained by giving any interviews, in my opinion, to any media outlet, either in Mobile or any part of this state.  I think it just would aggravate the situation.

"I am also inclined to deviate from my normal jury selection process if there's a request from either side to initially start out with individual voir dire so as to ensure that we don't taint the panel and have to have a motion or hearing after we start the proceedings, and I'm not happy about that because that's a very tedious process, a very long process and, actually, it will take longer than the actual trial.  But just out of an abundance of caution I think that may be appropriate so we will not be back here again.  And at the appropriate time if either side is going to make that request, you know the Court's feeling on that."

104

The trial court then denied the motion.

The record reflects that 75 people were summoned for the jury venire in this case. The venire was questioned as a group concerning general background information. The group was then split into 5 panels of 15 members. The panels were questioned about whether the members had any prior knowledge of the case. Any member of the panel who responded affirmatively was questioned individually about what knowledge he or she had about the case and whether that knowledge would affect the person's ability to render an impartial verdict. In panel one, three prospective jurors indicated that they had heard about the case. One indicated that she had read about the case in the newspaper about two months before the trial and that she could not remember any details about the case. Another juror in panel one indicated that at the time of the offense she vaguely remembered hearing about the case. The third juror indicated that he had heard two people talking about the case at the courthouse. All were questioned individually, and each indicated that he or she could set aside any knowledge about the case and render a decision based on the evidence presented at the trial. In panel two, three prospective jurors indicated that they had read about the case in the newspaper. All indicated that they could not remember any details. In panel three, three prospective jurors indicated that they had heard something about the case. All could remember no specifics, just a vague recollection. It appears that panel four and five were questioned as a group because of the lateness of the hour. In this group only one prospective juror indicated that he remembered vaguely hearing about the case. All of the jurors indicated that they could

be impartial and that any knowledge they had about the case would not affect their ability to be impartial.

The record also indicates that the court adjourned for the day before the petit jury was struck.   The trial court gave the prospective jurors a very thorough instruction that they were not to watch television, read a newspaper, or discuss the case.   The next morning, defense counsel introduced a newspaper article that had appeared in a local newspaper that same morning.   The trial court stated that it would ask the jurors if they had followed its instructions by not reading the newspapers or listening to the news.   No juror indicated that he or she had failed to follow the trial court's instructions.   The court once again denied the motion for a change of venue.

A review of the voir dire proceedings indicates that this is not a case where the area was so saturated with pretrial publicity that Tomlin was unable to obtain a fair trial.   It is clear, after reviewing the voir dire examination, that very few of the 75 veniremembers indicated that they had any prior knowledge of the case.   It is also clear that the passage of time in this case between the murders and the fourth trial, approximately 22 years, resulted in the prospective jurors' remembering very little about the facts and the circumstances surrounding the murders.

We have stated:

> "'Media publicity can prejudice prospective jurors and thereby result in a denial of a defendant's right to a impartial jury.   Chandler v. Florida,

106

449 U.S. 560, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981). In order to get a change of venue based on pretrial publicity, the defendant must prove that there existed actual prejudice against the defendant as a result of the publicity or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Newspaper articles or widespread publicity, without more, is insufficient to grant a motion for a change of venue. Anderson v. State, 362 So. 2d 1296, 1298 (Ala. Cr. App. 1978).

"'Our review of the voir dire examination concerning pretrial publicity indicates that, while many veniremembers had heard something about the case from the media, there were no grounds to warrant a change of venue. See Stewart v. State, 730 So. 2d 1203, 1241 (Ala. Cr. App. 1996).'

"Also, in Williams v. State, 565 So. 2d 1233, 1237-38 (Ala. Crim. App. 1990), we stated:

            "'"As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961):

            "'"'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

107

It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'

"'"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. <u>Murphy v. Florida</u>, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' <u>Anderson v. State</u>, 362 So. 2d 1296, 1299 (Ala. Crim. App. 1978)."

"' <u>Ex parte Grayson</u>, 479 So. 2d 76, 80 (Ala. 1985), *cert. denied*, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 [(1985)].' "

<u>Dorsey</u>, 881 So. 2d at 480.  It is abundantly clear after reading the voir dire examination of the prospective jurors that the trial court committed no error in denying Tomlin's motion for a change of venue.

<u>Tomlin</u>, 909 So. 2d at 229-32.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's

108

denial of his motion for a change of venue.  The record fully supports the findings of the Alabama Court of Criminal Appeals with regard to the ten prospective jurors out of the venire of seventy-five who stated that they had heard or read something about the case.  As the Alabama Court of Criminal Appeals found, upon questioning by the trial judge, those prospective jurors had only the vaguest concept or memory of the case.  (Doc. 9, att. 4 at 24-30, 69-72, 117-18, 195-96).

Moreover, as the Alabama Court of Criminal Appeals found, the majority of the articles published about Petitioner's case occurred in 1993, at the time of Petitioner's third trial, and in 1977, at the time of the murders, many years before Petitioner was tried for the fourth time in 1999.  Although an article appeared in the Mobile Register on the morning of Petitioner's fourth trial reporting that he had been convicted of capital murder in three previous trials and sentenced to death (Doc. 1 at 33), the Alabama Court of Criminal Appeals found, and the record confirms, that on the evening before Petitioner's trial began, the trial judge expressly ordered the jurors not to watch television, not to read the newspaper, not to listen to the radio, and not to discuss the case with anyone. (Doc. 9, att. 5 at 14-15).  On the morning of trial, the judge

109

questioned the jurors in detail about whether anyone had failed to follow his instructions.  (Id. at 58-60).  Two jurors asked to speak to the judge.  One juror stated that her sixteen-year-old son had attempted to discuss the case with her, and she had responded, "don't tell me anything, don't tell me anything." (Id. at 60-61).  A second juror stated that her husband had asked her if she was going to be on "the big case," and she responded that she could not talk about it and ended the conversation.  (Id. at 62).  There is absolutely no evidence that any prior knowledge or pre-trial publicity affected the venire in this case, nor is there evidence that the pretrial publicity was "so ubiquitous and inflammatory that prejudice must be presumed despite the lack of any bias or prejudice expressed by the eventual jurors during voir dire."  Henyard v. McDonough, 459 F. 3d 1217, 1242 (11th Cir. 2006) ("[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one. . . .  It is only where a 'barrage of inflammatory publicity immediately prior to trial' inspires a 'huge wave of public passion' against the defendant that the local jury pool should be presumed unable to judge the

defendant impartially.") (quoting <u>Patton v. Yount</u>, 467 U.S. 1025, 1033 (1984)).   The record contains no such evidence.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).   Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Fourteen, is without merit.

J. <u>Claim Fifteen</u>.

In Claim Fifteen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the prosecutor's misconduct in presenting evidence to the grand jury of Petitioner's involvement in a plot to "murder for pecuniary gain," a charge of which he had been acquitted in a previous trial.   (Doc. 1 at 34; Doc. 19, att. 2 at 57).   Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

111

Tomlin argues that the prosecutor engaged in misconduct when he abused the grand-jury process. Specifically, Tomlin argues that the prosecutor presented evidence to the grand jury to secure a two-count indictment charging double murder and murder for hire, the latter of which Tomlin had been acquitted of as a result of the verdict in his second trial. Tomlin contends that the prosecutor's actions in presenting such evidence prejudiced him and violated his constitutional rights.

This same issue was presented on the appeal from Tomlin's third trial and conviction. This Court stated:

> "Tomlin contends that the prosecutor improperly manipulated the grand jury in the current proceedings by presenting to it evidence relating to the murder-for-hire charge, as to which he had been acquitted in the second trial. Tomlin claims that as a result, the grand jury was prejudiced against him and was improperly induced to charge him with double murder-a charge that it would, allegedly, not have otherwise returned. Because, as we have previously noted, the grand jury found probable cause to indict Tomlin for murder-for-hire, we presume that the prosecutor presented to the grand jury evidence of an alleged contract. However, the record before us contains none of the evidence presented to the grand jury. Thus, for purposes of our discussion of this issue, we assume that the evidence relevant to a murder-for-hire charge that was presented to the grand jury was the same subsequently presented to the petit jury: (1) that Tomlin referred to

Daniels as a 'hit man,' and (2) that
Tomlin stated that he hired Daniels to
kill the victims.

"Tomlin has failed to present anything
in the record that would indicate that
the prosecutor did not present
sufficient evidence to the grand jury
on the charge of double murder.

"'"When it appears that witnesses were
examined by the grand jury, or that the
grand jury had before them documentary
evidence, no inquiry into the
sufficiency of the evidence is
indulged." Loyd v. State, 279 Ala.
447, 448, 186 So. 2d 731 (1966).'

"Coral v. State, 551 So. 2d 1181, 1182
(Ala. Cr. App. 1989). It appears in
this case that the grand jury did
examine witnesses and [documents];
therefore, we will not address whether
that evidence was sufficient to support
the grand jury's return of the double
murder indictment.

"Tomlin's argument is merely that the
grand jury considered illegal,
prejudicial evidence. However,

"'[w]hile an indictment cannot rest
"solely" on [illegal] evidence ...,
Alsobrook v. Bridges, 43 Ala. App. 145,
146, 182 So. 2d 382 (1966), the fact
that illegal evidence was considered by
the grand jury along with legal
evidence does not render the indictment
void or subject to being quashed.
Aaron v. State, 271 Ala. 70, 77, 122
So. 2d 360 (1960).'

113

"*Coral*, 551 So. 2d at 1182. Furthermore, all evidence that would have supported a charge that Tomlin contracted the murders was also relevant to the issue whether Tomlin intentionally caused the deaths of the victims and was in the form of admissible hearsay testimony. Therefore, without question, this evidence was admissible in regard to the double murder charge.

"Tomlin's argument is thus reduced to the mere claim that evidence presented to the grand jury was prejudicial. This contention is axiomatic and does not, without more, render that evidence inadmissible. *Cf.*, Oregon v. Kennedy, 456 U.S. 667, 675, 102 S. Ct. 2083, 2089, 72 L. Ed. 2d 416, 424 (1982) ('Every act on the part of a rational prosecutor during a trial is designed to "prejudice" the defendant by placing before the judge or jury evidence leading to a finding of guilt.'). Based upon the record on appeal, the prosecution did not place Tomlin twice in jeopardy on the charge of murder-for-hire, and the trial court properly allowed the trial to proceed under the indictment that charged him with double murder."

695 So. 2d at 163-64 (footnote omitted).

Tomlin, 909 So. 2d at 228-29.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner's

114

constitutional rights were not violated by the prosecutor's alleged misconduct in presenting evidence in the grand jury proceedings that Petitioner was involved in a "murder for pecuniary gain."   Nowhere in his petition does Petitioner state precisely what evidence he claims was presented to the grand jury on this issue, nor does the record contain the grand jury proceedings.   Therefore, the Court must assume, as did the Alabama Court of Criminal Appeals, that the evidence was the same as that presented at trial, that is, that Petitioner accompanied a man named John "Ron" Daniels to Mobile, Alabama, from Houston, Texas, to avenge the death of Petitioner's brother and that Petitioner referred to Daniels as a "hit man."   (Doc. 9, att. 6 at 49, 55, 70, 91, 107-08).   Assuming that the prosecutor presented this evidence to the grand jury, Petitioner is not entitled to habeas relief.

First, as the Alabama Court of Criminal Appeals found, Petitioner was indicted, tried, and convicted of the capital offense of double intentional murder of Ricky Brune and Cheryl Moore.   (Doc. 9, att. 5 at 116; Doc. 9, att. 8 at 14, 47).   Evidence that Petitioner traveled to Mobile with a man named Daniels at the time of the murders for the stated purpose of avenging the death of his brother and that he referred to

Daniels as a "hit man" supports the grand jury's charge of intentional double murder and, thus, was not improperly admitted, despite Petitioner's acquittal on the murder-for-hire charge in a previous trial.

Moreover, even assuming that this evidence was not properly admitted in the grand jury proceedings in Petitioner's fourth trial, its admission was not material to the grand jury's decision to indict Petitioner for double intentional murder and, thus, did not affect the indictment. Anderson v. Secretary for Dep't of Corrs., 462 F. 3d 1319, 1325 (11th Cir. 2006) ("Beasley's grand jury testimony, although false in part, was not false in any material respect that would have affected the indictment. . . . [W]e are not faced with subsequent testimony that can be said to remove the underpinnings of the indictment.").

Finally, in Anderson, the Eleventh Circuit recognized that, in some circumstances, a petit jury's conviction renders harmless any admission of illegal evidence before the grand jury. See Anderson, 462 F. 3d at 1327 ("Although Mechanik does not squarely address the situation presented in this case, it arguably favors a holding that the petit jury's conviction of Petitioner renders harmless Beasley's perjured grand jury

116

testimony.") (citing United States v. Mechanik, 475 U.S. 66, 70 (1986) (holding that a violation of Federal Rule of Criminal Procedure 6(d), which specified who could be present during a grand jury proceeding, was harmless beyond a reasonable doubt because "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); see also Lopez v. Riley, 865 F. 2d 30, 32 (2d Cir. 1989) ("This appeal, by contrast, does put in issue whether the specified claims of deficiencies in the state grand jury proceedings [i.e., the use of misleading and prejudicial evidence, among others] are cognizable in a habeas corpus proceeding.  In light of Mechanik, we conclude they are not."). Cf., St. Pierre v. United States, 2005 WL 2126955, *2 (M.D. Fla. 2005) (unpublished) ("The issue concerning the alleged misrepresentation of facts to the grand jury in order to obtain the Indictment is not cognizable in a § 2255 proceeding.  It is not a constitutional issue . . . and in light of the subsequent jury verdict it would not result in a complete miscarriage of justice if condoned.").  Therefore, as the Supreme Court in Mechanik held, "[m]easured by the petit jury's verdict," any error in the grand jury proceeding

connected with the admission of evidence that Petitioner hired a hit man to kill the victims was "harmless beyond a reasonable doubt." Mechanik, 475 U.S. at 70.

Accordingly, for each of these reasons, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *See* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Fifteen, is without merit.

K. Claim Sixteen.

In Claim Sixteen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's admission of hearsay evidence in the form of an airport parking claim ticket found at the New Orleans International Airport in an abandoned vehicle owned by Petitioner's sister. (Doc. 1 at 35). The date on the ticket corresponded with the time of the murders and corroborated the State's theory that Petitioner and Daniels drove to New Orleans,

118

Louisiana, after the murders and flew home to Houston.  (Doc. 9,
att. 7 at 77).   This evidence was introduced through the
testimony of the manager of the ground parking lot at the
airport.  (Id.).

Petitioner presented this claim to the Alabama Court of
Criminal Appeals on direct appeal of his fourth trial, and, in
its memorandum opinion rejecting Petitioner's claim, the court
stated:

> Tomlin argues that the trial court committed
> reversible error in allowing a ticket issued
> for the parking lot at the New Orleans
> International Airport to be introduced into
> evidence.  He cites the case of Bowden v.
> State, 542 So. 2d 335 (Ala. Crim. App.
> 1989), in support of this contention.
>
> In Bowden, a cash-register receipt from a
> Hardee's fast-food restaurant was introduced
> into evidence.  The officer who found the
> receipt in the defendant's vehicle testified
> to the contents of the receipt.  The officer
> based his testimony on what an employee of
> Hardee's had told him about the contents of
> the receipt.  In reversing Bowden's murder
> conviction, this Court stated:
>
>> "The state argues that it is evident
>> from the record that [the police
>> officer] was testifying, from his own
>> first-hand knowledge, about the meaning
>> of the numbers on the receipt.  Our
>> review of the record does not lead us
>> to the same conclusion.  In our
>> opinion, [the police officer's]
>> explanation of the meaning of the

entries on the receipt was pure hearsay. Its probative force depended entirely on the competency and credibility of some person other than [the police officer]. The record does not show that [the police officer] had first-hand knowledge of the meaning of the entries, particularly, the entry of '06.67,' which was crucial. His testimony that he 'verified' the information and 'would have surmised it,' indicates a lack of knowledge. The principal reason for the hearsay rule was violated here. Appellant was denied the right to cross-examine the person who did possess first-hand knowledge of the entries to test the accuracy of the information. (Moreover, the veracity of this person was not subject to scrutiny.) A person from the Hardee's restaurant, with such knowledge, would have been the proper person to be subpoenaed and questioned, under oath, for that purpose. For example, appellant could have questioned this employee on the accuracy of the Hardee's clock or cash register computer."

542 So. 2d at 339.

In this case, Vonda Wilding, manager of the ground parking lot at the New Orleans International Airport, explained the procedure when a vehicle enters the parking lot. She testified that the ticket dispenser at the entrance to the lot dispenses a ticket. A parking ticket was discovered by police after searching Tomlin's sister's car found abandoned at the New Orleans International Airport parking lot. Wilding testified to the entries on the ticket. She testified that the ticket

120

> contained the date, time, and year the car
> entered the parking lot.  Wilding was the
> ideal person to testify concerning the
> parking ticket.  She testified that she
> performed the maintenance on the machine.
> She could have been cross-examined about the
> machine's accuracy.
>
> Bowden does not hold, as Tomlin implies in
> his appellate brief, that the contents of a
> cash-register receipt are hearsay.  It was
> not the admission of the cash-register
> receipt that this Court found offensive in
> Bowden, but the hearsay statements of the
> officer concerning the entries on the
> receipt.
>
> Here, Wilding had firsthand knowledge about
> the entries on the parking ticket. This
> ticket was correctly received into evidence
> after a proper predicate for its admission
> was made.  There is no error here.

Tomlin, 909 So. 2d at 256-57.

Claim Sixteen involves the interpretation and application of state law by state courts.  Thus, as with the state law issues discussed above, the issue of whether the trial court erred in admitting the airport parking claim ticket into evidence will be reviewed on habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

121

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err in allowing the admission of this evidence.  That being the case, Petitioner cannot show that the alleged error rendered his entire trial fundamentally unfair, and, thus, Petitioner fails to state a cognizable federal habeas claim.

L. <u>Claim Seventeen</u>.

In Claim Seventeen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court allowed a transcript of his testimony from his first trial to be read into evidence.  (Doc. 1 at 36).  Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in allowing a transcript of his testimony at his first trial to be read into evidence at his fourth trial.  Tomlin argues that his testimony at his first trial was involuntary, that it was compelled because of the unconstitutional statutory scheme, and that it was given because his trial counsel had rendered ineffective assistance of counsel.

122

In _Willingham v. State_, 50 Ala. App. 363, 279 So. 2d 534 (1973), *cert. denied*, 291 Ala. 803, 279 So. 2d 538 (1973), this Court stated:

> "It is the general rule that a defendant who voluntarily takes the witness stand in his own behalf and testifies without asserting the privilege against self-incrimination, waives his privilege as to the testimony given and the same may be used against him in a subsequent trial for the same offense. Decennial Digest, Criminal Law, [key cite] 406(4) and 539(2). This rule is so broad that even if the defendant does not take the stand at the second trial this does not prevent the use of his testimony at the former trial.

> "In _Harrison v. United States_, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 [(1968)], the court per Mr. Justice Stewart said:

> > "'In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is not less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.'

123

"In this state this rule is applied to inculpatory statements in transcript of testimony voluntarily given by a defendant in the prosecution of another for crime. Green v. State, 24 Ala. App. 235, 133 So. 739 [(1931)]."

Five years later in Ashurst v. State, 462 So. 2d 999 (Ala. Crim. App. 1984), we stated:

"The general rule is that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. Harrison v. United States, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968); Koch v. State, 401 So. 2d 796, 801 (Ala. Cr. App.), cert. denied, Ex parte Koch, 401 So. 2d 801 (Ala. 1981); Cantrell v. State, 353 So. 2d 80, 82 (Ala. Cr. App. 1977); Willingham v. State, 50 Ala. App. 363, 367, 279 So. 2d 534, cert. denied, 291 Ala. 803, 279 So. 2d 538 (1973). However, this rule does not apply where the former testimony was given at a hearing where the accused was denied his right to the assistance of counsel, People v. Martin, 21 Mich. App. 667, 176 N.W.2d 470 (1970), or where the former testimony was 'impelled' in order to rebut evidence introduced against the accused in violation of his constitutional rights. Harrison, supra."

462 So. 2d at 1008.

124

In <u>Harrison v. United States</u>, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), the United States Supreme Court addressed the issue whether a defendant's testimony at a previous trial was admissible at a subsequent retrial for the same offense. In <u>Harrison</u>, the defendant testified at his first trial after the State had introduced three confessions he had made while he was in police custody. On appeal, Harrison's conviction was reversed. The Court of Appeals found that the confessions were illegally obtained. At Harrison's retrial, his prior testimony was read into evidence. The appeals court affirmed, and the United States Supreme Court granted "certiorari to decide whether the petitioner's trial testimony was the inadmissible fruit of the illegally procured confessions." 392 U.S. at 221, 88 S. Ct. 2008 (footnote omitted). The Supreme Court held that Harrison's testimony should not have been admitted at his retrial. The Court stated that the State failed to demonstrate that "the petitioner's testimony was obtained 'by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint.' <u>Wong Sun v. United States</u>, 371 U.S. 471, 488." 392 U.S. at 226, 88 S. Ct. 2008.

Here, the conviction resulting from Tomlin's first trial was not reversed because of the unlawful admission of a confession. Tomlin's first conviction was reversed on second application for rehearing by the Alabama Supreme Court because of an improper prosecutorial argument made in closing argument. There was no confession introduced. Nor is there any claim or any suggestion in the record that Tomlin's testimony in his first trial was made while

125

Tomlin was denied his right to the assistance of counsel.

As we stated in Whitehead v. State, 777 So. 2d at 822:

> "Here, 'the record ... clearly shows that [Whitehead] intelligently waived his constitutional right to remain silent. [He] voluntarily took the stand and testified [at his codefendant's trial] under the guidance and supervision of his counsel and in the presence of and under the protection of the trial court.' Ex parte Godbolt, 546 So. 2d [991] at 996 [(Ala. 1987)]. Whitehead was not 'impelled' to testify to rebut evidence against him, nor was he denied the right to assistance of counsel. In fact, the record shows that Whitehead's counsel advised him not to testify at [his codefendant's] trial, advice that Whitehead chose not to follow.... Thus, we find no error, plain or otherwise, in the admission into evidence of Whitehead's prior testimony."

Tomlin further argues that the State failed to meet its burden of proving that Tomlin's prior testimony was voluntary. Tomlin cites Harrison v. United States, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), in support of this contention. In Harrison, the United States Supreme Court stated,

> "[h]aving illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not

126

been used.  'The springs of conduct are subtle and varied,' Mr. Justice Cardozo once observed.  'One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others.'  Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony."

392 U.S. at 224, 88 S. Ct. 2008 (quoting DeCicco v. Schweizer, 221 N.Y. 431, 438, 117 N.E. 807, 810 (1917)) (footnotes omitted; emphasis added).  The Supreme Court explained this quote by stating that the prosecution has always had the burden of proving that a subsequent statement made after an involuntary statement "'was not directly produced by the existence of the earlier confession.'"  392 U.S. at 225 n.12, 88 S. Ct. 2008 (quoting Darwin v. Connecticut, 391 U.S. 346, 351, 88 S. Ct. 1488, 20 L. Ed. 2d 630 (1968) (Harlan, J., concurring in part and dissenting in part)).

The holding in Harrison has no application in this case.  No confession was admitted in Tomlin's first trial or any subsequent trial.  Nor were any of Tomlin's convictions reversed based on the erroneous admission of an involuntary confession.  There was no confession in this case.  Tomlin's prior testimony consisted of establishing an alibi for the time that he was Seen in Mobile the day before and day of the murders.  The State was not obliged to establish that Tomlin's prior testimony was not induced by the unlawful admittance of a confession; therefore, the holding in Harrison was not controlling.  Tomlin's prior testimony was

127

> correctly received into evidence at his
> fourth trial.
>
> Moreover, at Tomlin's second and third
> trials his former testimony was admitted
> into evidence. On the appeal of each
> conviction we found no plain error in its
> admission.

Tomlin, 909 So. 2d at 251-53.

Having reviewed the record in this matter, the Court agrees with the Alabama Court of Criminal Appeals, for the precise reasons stated in its memorandum opinion, that Petitioner's constitutional rights were not violated by the trial court's admission of the transcript of his testimony from his first trial. (Doc. 9, att. 7 at 28-73). As the Alabama Court of Criminal Appeals discussed, "a defendant's testimony at a former trial is admissible in evidence against him in later proceedings." Harrison, 392 U.S. at 222; accord U. S. v. Nell, 570 F. 2d 1251, 1259-60 (11th Cir. 1978). In this case, there is no evidence whatsoever that Petitioner's testimony from his first trial was involuntary or was the result of constitutionally ineffective representation.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, See 28 U.S.C.

128

§ 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, Petitioner's claim that his constitutional rights were violated, as alleged in habeas Claim Seventeen, is without merit.

    M. Claim Eighteen.

    In Claim Eighteen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's admission of gruesome and duplicative photographs of the crime scene. (Doc. 1 at 37). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in allowing prejudicial, cumulative, and gruesome photographs to be received into evidence. He asserts that the admission of those photographs deprived him of his constitutional rights.
>
> We have reviewed the photographs that were admitted at trial. The trial court did not err in admitting these photographs into evidence. As we have stated:
>
> "'Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to

129

illustrate some relevant fact or evidence,
or to corroborate or dispute other evidence
in the case. Photographs that tend to shed
light on, to strengthen, or to illustrate
other testimony presented may be admitted
into evidence. <u>Chunn v. State</u>, 339 So. 2d
1100, 1102 (Ala. Cr. App. 1976). To be
admissible, the photographic material must
be a true and accurate representation of the
subject that it purports to represent.
<u>Mitchell v. State</u>, 450 So. 2d 181, 184 (Ala.
Cr. App. 1984). The admission of such
evidence lies within the sound discretion of
the trial court. <u>Fletcher v. State</u>, 291
Ala. 67, 277 So. 2d 882, 883 (1973); <u>Donahoo
v. State</u>, 505 So. 2d 1067, 1071 (Ala. Cr.
App. 1986) (videotape evidence).
Photographs illustrating crime scenes have
been admitted into evidence, as have
photographs of victims and their wounds.
<u>E.g.</u>, <u>Hill v. State</u>, 516 So. 2d 876 (Ala.
Cr. App. 1987). Furthermore, photographs
that show the external wounds of a deceased
victim are admissible even though the
evidence is gruesome and cumulative and
relates to undisputed matters. <u>E.g.</u>, <u>Burton
v. State</u>, 521 So. 2d 91 (Ala. Cr. App.
1987). Finally, photographic evidence, if
relevant, is admissible even if it has a
tendency to inflame the minds of the jurors.
<u>Hutto v. State</u>, 465 So. 2d 1211, 1212 (Ala.
Cr. App. 1984).'"

<u>Travis v. State</u>, 776 So. 2d 819, 869 (Ala.
Crim. App. 1997), *aff'd*, 776 So. 2d 874
(Ala. 2000), *cert. denied*, 531 U.S. 1081,
121 S. Ct. 785, 148 L. Ed. 2d 681 (2001),
quoting <u>Ex parte Siebert</u>, 555 So. 2d 780,
783 (Ala. 1989), *cert. denied*, 497 U.S.
1032, 110 S. Ct. 3297, 111 L. Ed. 2d 806
(1990).

<u>Tomlin</u>, 909 So. 2d at 262-63.

Claim Eighteen involves the interpretation and application of state law by state courts. Thus, as with the state law issues discussed above, the issue of whether the trial court erred in admitting these photographs will be reviewed on habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Having reviewed the photographs at issue (Doc. 10, att. 6 at 59-89), the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err in admitting photographs of the crime scene, including photographs of the bodies of the victims and their gunshot wounds. Furthermore, assuming, *arguendo*, that the trial court did err with respect to the admission of the photographs, Petitioner has not shown that this alleged error rendered his entire trial fundamentally unfair. Thus, Petitioner fails to state a cognizable federal habeas claim.

N. Claim Nineteen.

In Claim Nineteen, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's admission of hearsay evidence in the form of a letter written by Petitioner's father regarding the death of David Tomlin, Petitioner's brother. (Doc. 1 at 38). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in allowing a letter written by Tomlin's father, Jack Tomlin, to be introduced into evidence. Specifically, he contends that this letter was hearsay and that its admission violated numerous of his constitutional rights. FN9
>
> > [FN9. The contents of the letter consisted of the following:
> > "To: Circuit Solicitor Chs. Graddick
> > "On November 22, 1975, my son Paul David Tomlin was killed by a shotgun blast fired into his body. This took place while he was asleep in his bed.
> > "Richard Brune admitted firing the gun but claimed it to be an accident. Since there were no eyewitnesses to this terrible act [M.H.] from your office refused any further help, therefore bringing police investigation to a halt.
> > "I made several calls to you but you have repeatedly refused to talk to me or return my calls. You also would

132

not talk to me when I visited your
office.
     "This continued neglect of your
duties as public defender in my opinion
is not excusable.
     "It is true the boy was only 18
years of age but I think he is due some
protection under our laws.
     "Unless some positive action is
taken by you within 5 (five) days, I
shall take further action.
     "Jack Tomlin
     "Copies sent to:
     "Governor: State of Alabama
     "Crime Commission State of Alabama
     "Mobile County Sheriff
     "Foreman Mobile Co. Grand Jury
     "Chief of Police Prichard Alabama
     "Mobile Press
     "W.A.L.A. Television Station
     "W.U.N.I. Radio Station
     "Alabama State Attorney General
Office"]

During the examination of Willie Edward
Estes, a former deputy with the Mobile
County Sheriff's Department, the letter was
offered and admitted into evidence. The
following occurred:

     "[Prosecutor]: Judge, we'd offer
State's Exhibit One.

     "The Court: Any objections?

     "[Defense Counsel]: No objection, Your
Honor.

     "The Court: It's admitted.

     "(State's Exhibit Number One was
admitted into evidence.)

133

"The Court: Anything else of this witness?

"[Prosecutor]: No, Your Honor."

Because defense counsel did not object to the admission of the letter, we must evaluate this argument only for plain error. Rule 45A, Ala. R. App. P.

Not only did defense counsel not object to the admission of the letter, defense counsel questioned this witness in-depth about the contents of the letter. The prosecution elicited very little information from this witness concerning the contents of the letter. However, defense counsel conducted the following examination of this witness:

"Q: Let me hand you, if I might, that exhibit that we just identified, I didn't know where it was just a minute ago, State's Exhibit Number One. Now this is the letter to the Circuit Solicitor, Mr. Graddick, that is signed by Jack Tomlin; is that right?

"A: My understanding, yes, sir.

"Q: Yes, sir. And in the first paragraph, this is the one where he said, 'The shotgun was fired into the body. This took place while he was asleep in bed'?

"A: Yes, sir.

"Q: And then that's referring to his son?

"A: Yes, sir.

134

"Q: And the next paragraph, you said, 'Ricky Brune admitted firing the gun.'?

"A: Yes, sir.

"Q: Now look just at the next page of that, copies of that letter, according to that document in front of you, were sent, is this not true, Mr. Estes, to the Governor?

"A: Yes, sir.

"Q: Is that true. To the Crime Commission of the State of Alabama?

"A: Yes.

"Q: Mobile County Sheriff?

"A: Yes.

"Q: Foreman of the grand jury?

"A: Yes.

"Q: Chief of police in Prichard?

"A: Yes.

"Q: To the Mobile Press?

"A: Yes.

"Q: WALA Television?

"A: Yes, sir.

"Q: WUNI?

"A: Yes, sir.

135

"Q: And the State Attorney General's
Office?

"A: Mine runs out right there, sir.
Let me see, yes.

"[Defense counsel]: That's all.  Thank
you very much."

Tomlin argues that the contents of the
letter were hearsay and inadmissible.
Hearsay is defined in Rule 801(c), Ala. R.
Evid., as "a statement, other than one made
by the declarant while testifying at the
trial or hearing, offered in evidence to
prove the truth of the matter asserted."

Clearly the letter was not admitted to prove
the truth of the contents-that the district
attorney's office was no longer
investigating Tomlin's son's death.  The
letter was offered to prove the state of
mind of the declarant.  Danny Shanks
testified that the Tomlin family had bad
feelings toward Richard Brune because they
believed that the shooting of David Tomlin
was not an accident.

The trial court properly allowed the letter
to be received into evidence.

Tomlin, 909 So. 2d at 254-56.

Claim Nineteen involves the interpretation and application

of state law by state courts.  Thus, as with the state law

issues discussed above, the issue of whether the trial court

erred in admitting this evidence will be reviewed on habeas only

to determine whether the alleged state trial error was "material

136

in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the precise reasons stated in its memorandum opinion, that the trial court did not err in admitting the letter written by Petitioner's father regarding the death of Petitioner's brother, David Tomlin. (Doc. 9, att. 8 at 166). The State's theory of the case was that Petitioner killed Ricky Brune, on behalf of the entire Tomlin family, in retaliation for Ricky Brune killing his brother, David Tomlin. As discussed by the Alabama Court of Criminal Appeals, the letter written to the police and other officials by Petitioner's father, which threatened "further action" if the police continued to "neglect [their] duties" with respect to the killing of David Tomlin by Ricky Brune, was clearly admissible to show motive for the murder of Ricky Brune. (Id.). Furthermore, even assuming, *arguendo*, that the trial court did err with respect to the admission of the letter, Petitioner has not shown that this alleged error rendered his entire trial fundamentally unfair. Thus, Petitioner fails to state a cognizable federal habeas claim.

O. Claim Twenty.

In Claim Twenty, Petitioner asserts that his rights under
the Fifth, Sixth, and Fourteenth Amendments were violated by
improper and misleading arguments by the prosecutor in his
opening statement and closing argument, specifically including
comments related to David Tomlin's death being accidental,
Petitioner's knowledge that Ricky Brune had a girlfriend, and
evidence of Petitioner's "flight" after the murders. (Doc. 1 at
39; Doc. 19, att. 3 at 1-13). Petitioner presented this claim
to the Alabama Court of Criminal Appeals on direct appeal of his
fourth trial, and, in its memorandum opinion rejecting
Petitioner's claim, the court stated:

> Tomlin argues that the prosecutor engaged in
> misconduct that denied him his right to due
> process and a fair trial. Tomlin's entire
> argument in brief on this issue consists of
> the following:
>
>> "Throughout closing argument, the
>> prosecutor made allegations that were
>> entirely unsupported by the evidence.
>> For instance, the prosecutor argued
>> that Mr. Tomlin knew that Ricky Brune
>> had a girlfriend and that 'they went
>> around together.' There was absolutely
>> no evidence to that effect. The
>> prosecutor also improperly argued that
>> the death of David Tomlin was
>> accidental. Again, there was no
>> admissible evidence to support that

138

conclusion. The prosecutor also made an improper argument about flight."

Even though Tomlin fails to make any argument concerning these allegations in his brief, because this is a death-penalty case we will review the contentions raised by Tomlin in his brief. *See* Rule 45A, Ala. R. App. P.

> "'The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So. 2d 1139 (Ala. Cr. App.), *cert. denied*, 340 So. 2d 1140 (Ala. 1976 [1977] ). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So. 2d 1148 (Ala. Cr. App.), *cert. denied*, 361 So. 2d 1152 (Ala. 1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So. 2d 634 (Ala. Cr. App. 1979); McQueen v. State, 355 So. 2d 407 (Ala. Cr. App. 1978).'"

Ballard v. State, 767 So. 2d 1123, 1135 (Ala. Crim. App. 1999), cert. quashed, 767 So. 2d 1142 (Ala. 2000), quoting Watson v. State, 398 So. 2d 320, 328 (Ala. Crim. App. 1980), *cert. denied*, 398 So. 2d 332 (Ala. 1981), *cert. denied*, 452 U.S. 941, 101 S. Ct. 3085, 69 L. Ed. 2d 955 (1981).

First, Tomlin stated that the prosecutor engaged in misconduct by arguing that Tomlin knew that Brune had a girlfriend. The prosecutor argued in closing, "I mean, they

knew   [Brune.]     They   knew   he   had   a
girlfriend.     They   knew   they   went   around
together-"   When this statement was made,
defense counsel objected, stating that there
was   no   evidence   to   support   the   statement.
The trial court then stated, "The jury heard
the   evidence   and   the   jury   understands   that
this   case   will   be   decided   on   the   evidence
from   the   witness   stand   and   the   law   that   I
will   instruct   you   on."   It appears that the
trial   court   sustained   Tomlin's   objection   to
this   argument.     Moreover,   this   is   a
legitimate   inference   that   could   be   drawn
from   the   testimony.     There   was   testimony
that David Tomlin and Brune were friends and
that   Brune   was   even   one   of   the   pallbearers
at   David   Tomlin's   funeral.     Certainly,   this
evidence   would   tend   to   imply   that   Brune   was
known to the Tomlin family.

Tomlin also states that the prosecutor erred
in arguing that David Tomlin's death was an
accident   when   there   was   "no   admissible
evidence" to support this statement.     Tomlin
himself testified that David Tomlin's death
was   an   accident.     Also,   Officer   Henton
testified   that   the   police   had   ruled   David
Tomlin's   death   an   accident.     This   was   a
proper   argument   based   on   the   evidence
presented at trial.

Tomlin   last   states   that   the   prosecutor
improperly   argued   flight   evidence.     We   note
that   there   was   no   objection   to   any   flight
argument   made   until   after   all   of   the
arguments   had   been   made.     Moreover,   Tomlin
failed   to   identify   what   he   considered   to   be
an argument on flight.     We have reviewed the
opening statement, and we find no reference
to   any   flight   evidence.     The   only   reference
made   was   that   Tomlin   flew   from   Houston   to
New Orleans.     There was no plain error here.

140

Tomlin, 909 So. 2d at 265-66.

Claim Twenty involves the interpretation and application of state law by state courts. Thus, as with the state law issues discussed above, the issue of prosecutorial misconduct, as set forth in Claim Twenty, will be reviewed on habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw, 695 F. 2d at 530, and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that there was no prosecutorial misconduct with respect to the prosecutor's comments in opening statement and closing argument related to flight, David Tomlin's death being accidental, or Petitioner's knowledge that Ricky Brune had a girlfriend. (Doc. 9, att. 5 at 115-132; Doc. 9, att. 7 at 157-168, 200; Doc. 9, att. 8 at 1-8). As the Alabama Court of Criminal Appeals found, the trial judge instructed the jury repeatedly in opening and closing arguments that the statements and arguments of counsel were not evidence and were not to be considered evidence. Moreover, as the Alabama Court of Criminal Appeals found, the record evidence supports every inference and

141

fact argued by the prosecutor with respect to these matters. Indeed, even Petitioner's own counsel referred to evidence in his opening statement and closing argument indicating that David Tomlin's death was accidental. (Doc. 9, att. 5 at 136; Doc. 9, att. 7 at 171, 186). Furthermore, with respect to evidence that Petitioner and his accomplice fled to New Orleans and then to Houston after the murders, Petitioner's own counsel referred to the tag that was found on luggage belonging to Petitioner's co-defendant, John Ronald Daniels, showing that Daniels had flown from New Orleans to Houston shortly after the murders. (Doc. 9, att. 5 at 145-46; Doc. 9, att. 7 at 190, 199). Petitioner's counsel further discussed the ease with which one could buy an airplane ticket in 1977 without providing a name or identification. (Id. at 147). Finally, there was sufficient evidence from which the jury could infer that the Tomlins were well acquainted with Ricky Brune and would have known that he had a girlfriend. Therefore, for each of these reasons, there was no error with respect to the prosecutor's comments on these matters.

Even assuming, *arguendo*, that the prosecutor's arguments, as set forth above, were improper, Petitioner has not shown that these alleged errors rendered his entire trial fundamentally

unfair.   Thus, Petitioner fails to state a cognizable federal habeas claim.

    P. Claims Twenty-one through Twenty-five.

    In Claims Twenty-one through Twenty-five, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated with respect to various portions of the trial court's instructions to the jury.   Each of these claims involves the interpretation and application of state law by state courts.   Therefore, as with the state law issues discussed above, federal review of the propriety of jury instructions from a state trial is very limited.   *See* Agan v. Vaughn, 119 F. 3d 1538, 1545 (11th Cir. 1997) ("Our limited role on habeas review, when faced with a challenge to a state law jury charge, is to determine whether any error or omission in the jury charge was so prejudicial as to amount to a violation of due process.") (citing Carrizales, 699 F. 2d at 1055).   "A defendant's right to due process is not violated unless an erroneous instruction, when viewed in light of the entire trial, was so misleading as to make the trial unfair."   Id.

    In Claim Twenty-one, Petitioner argues that the trial court improperly reinstructed the jury on the issue of "particularized intent" after the jury asked questions related to intent.   (Doc.

143

1 at 40; Doc. 19, att. 3 at 14-19).   Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court improperly reinstructed the jury on particularized intent.
>
> The record reflects that, after the jury had begun deliberations, it returned with two questions related to intent.   The jury requested the definition of particular intent and asked whether you can transfer a particular specific intent from one person to another.   The trial court and the attorneys then discussed what portions of the jury charge that the trial court would repeat to the jury.
>
> On appeal, Tomlin argues that the trial court's reinstruction on particularized intent was improper and erroneous.   He fails to state in what way the instruction was improper or erroneous.
>
> After Tomlin's second trial and conviction we addressed the trial court's failure to instruct the jury on the requirement of a particularized intent to kill.   *See* Tomlin, 591 So. 2d at 557.   In accordance with our holding in the prior appeal, the trial court in Tomlin's fourth trial gave very thorough and accurate instructions on the intent to kill.   There was no plain error in the trial court's instructions on intent.

Tomlin, 909 So. 2d at 269-70.

144

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err with respect to its reinstruction on the issue of "particularized intent." The record shows that, after being prompted by questions from the jury, the trial court essentially repeated its earlier instructions on particularized intent. (Doc. 9, att. 8 at 15-18, 40-42). Although Petitioner complains that the trial court went further than necessary when it included a portion of its earlier instruction that "[i]ntent may be formed while the killer is pressing the trigger that fired the fatal shot" (Doc. 9, att. 8 at 42), he fails to show how the inclusion of that language was erroneous or otherwise improper.

Moreover, even assuming, *arguendo*, that the trial court's reinstruction on particularized intent was improper, Petitioner has not shown that this alleged error rendered his entire trial fundamentally unfair. Thus, Petitioner fails to state a cognizable federal habeas claim.

In Claim Twenty-two, Petitioner states that the trial court gave improper instructions on premeditation, deliberation, and malice. (Doc. 1 at 41; Doc. 19, att. 3 at 20). The record shows that the trial court instructed the jury that:

145

Premeditation and deliberation in the law of homicide are synonymous terms, meaning simply that the accused, before he committed the fatal act, intended that he would commit the act at the time that he did and that death would result. It does not mean that the accused must have sat down and reflected over it or thought over it for an appreciable length of time. Premeditation and deliberation and intent may be formed while the killer is pressing the trigger that fired the fatal shot. There need be no appreciable time of space between the formation of the intention to kill and the act of killing. It is possible for the Defendant to have framed a premeditated – excuse me, it is possible for the Defendant to have framed a premeditated, as well as a malicious design to kill, before taking the gun and before it was fired. The formation of an intent to kill involved in premeditation and deliberation may be inferred from the character and extent of the wounds to the decedent.

It is well settled that malice will be presumed if the slayer used a loaded gun or any other deadly weapon, unless the presumption is properly rebutted by the circumstances involved.

(Doc. 9, att. 8 at 18-19). After the jury began deliberations, they returned with questions about intent, capital murder, and the lesser included offenses of intentional murder and felony murder. (Id. at 40). The trial court reinstructed the jury, in part, as follows:

In order to convict the Defendant of the Capital Offense of Double Intentional Murder, you must find that Phillip Wayne

146

Tomlin had two separate specific intents to
kill, one specific intent to kill Richard
Brune and a separate specific intent to kill
Cheryl Moore.   You must find that Phillip
Tomlin had the particularized intent that
both victims be killed.  . . .

The first offense that I will define for you
is Capital Murder - excuse me, is Capital
Offense of Double Intentional Murder charged
in the indictment.   In order to convict
Phillip Tomlin of the Capital Offense of
Double Intentional Murder, you must be
convinced, beyond a reasonable doubt, of the
existence of five elements: One, that
Phillip Tomlin caused the death of Richard
Brune.   Two, that Phillip Tomlin caused the
death of Cheryl Moore.   Three, that Phillip
Tomlin caused the death by one act or
pursuant to one scheme or course of conduct.
Four, that Phillip Tomlin had the
particularized intent to kill Richard Brune.
And, five, that Phillip Tomlin had the
particularized intent to kill Cheryl Moore.

(Id. at 41-42).

Petitioner argues that there was no need to instruct the

jury on the elements of premeditation, deliberation, or malice,

that the instructions served only to confuse the jury, and that

the instruction on the presumption of malice impermissibly

shifted the burden of proof. (Doc. 1 at 41; Doc. 19, att. 3 at

23).  Petitioner presented this claim to the Alabama Court of

Criminal Appeals on direct appeal of his fourth trial, and, in

147

its memorandum opinion rejecting Petitioner's claim, the court

stated:

> Tomlin argues that the trial court
> erroneously instructed the jury on
> premeditation, deliberation, and malice. He
> asserts that there was no need to instruct
> on these elements and doing so only confused
> the jury and lowered the State's burden of
> proof.
>
> Tomlin was indicted and convicted of
> violating § 13-11-2(a)(10), Ala. Code 1975
> (superseded). That section read:
>
>> "Murder in the first degree wherein two
>> or more human beings are intentionally
>> killed by the defendant by one or a
>> series of acts."
>
> Murder in the first degree was defined in §
> 13-1-70 (superseded). This section stated:
>
>> "Every homicide perpetrated by poison,
>> lying in wait or any other kind of
>> wilful, deliberate, malicious and
>> premeditated killing; or committed in
>> the perpetration of, or the attempt to
>> perpetrate, any arson, rape, robbery or
>> burglary, or perpetrated from a
>> premeditated design unlawfully and
>> maliciously to effect the death of any
>> human being other than him who is
>> killed; or perpetrated by any act
>> greatly dangerous to the lives of
>> others and evidencing a depraved mind
>> regardless of human life, although
>> without any preconceived purpose to
>> deprive any particular person of life,
>> is murder in the first degree; and
>> every other homicide committed under
>> such circumstances as would have

148

> constituted murder at common law is
> murder in the second degree."

> (Emphasis added.)

The indictment returned against Tomlin
charged:

> "The Grand Jury of said County charge,
> that, before the finding of this
> indictment Phillip Wayne Tomlin whose
> name is to the Grand Jury otherwise
> unknown than as stated, did by one act
> or a series of acts, unlawfully,
> intentionally, and with malice
> aforethought, kill Richard Brune by
> shooting him with a gun, and
> unlawfully, intentionally, and with
> malice aforethought, kill Cheryl Moore
> by shooting her with a gun, in
> violation of Code of Alabama 1975, §
> 13-11-2[a](10), against the peace and
> dignity of the State of Alabama."

Under the statute pursuant to which Tomlin
was charged the murder must be "wilful,
deliberate, malicious and premeditated." *See*
Young v. State, 428 So. 2d 155 (Ala. Crim.
App. 1982); Sanders v. State, 392 So. 2d
1280 (Ala. Crim. App. 1980); Carey v. State,
361 So. 2d 1176 (Ala. Crim. App. 1978),
*cert. denied*, 374 So. 2d 332 (Ala. 1979).
The trial court's jury instructions on
premeditation, deliberation, and malice were
consistent with the law and accurate
accounts of the law at the time that the
murders were committed.  No error occurred
here.

Tomlin, 909 So. 2d at 266-67 (footnote omitted).

149

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err with respect to its instructions on premeditation, deliberation, or malice. The record shows, as the Alabama Court of Criminal Appeals found, that Petitioner was indicted for "unlawfully, intentionally, and with malice aforethought" killing Richard Brune and Cheryl Moore, in violation of Alabama Code § 13-11-2(a)(10) (*superceded by* § 13A-5-40(a)(10)).[22]   (Doc. 9, att. 1 at 15).   As the Alabama Court of Criminal Appeals stated, under § 13-11-2(a)(10), which governed "[m]urder in the first degree wherein two or more human beings are intentionally killed by the

---

[22]   The Alabama legislature revised the Alabama criminal code effective January 1, 1980.   In doing so, it repealed § 13-1-70 (defining the degrees of murder); it abolished the degrees of murder; and it divided homicide into murder, manslaughter, and criminally negligent homicide.   *See* Ex parte Mitchell, 936 So. 2d 1094, 1101 n.5 (Ala. Crim. App. 2006); Williams v. State, 461 So. 2d 834, 838 (Ala. Crim. App. 1983), *rev'd on other grounds*, 461 So. 2d 852 (Ala. 1984); Thigpen v. Smith, 603 F. Supp. 1519, 1533-36 n.10, n.12 (S.D. Ala. 1985), *vacated on other grounds*, 792 F. 2d 1507 (11th Cir. 1986).   The murders at issue here occurred on January 2, 1977.   Thus, the law in effect at the time of the murders, §§ 13-11-2(a)(10) and 13-1-70, controlled the prosecution.   *See* Blake v. State, 2010 WL 3834036, *2 (Ala. Crim. App. 2010) (unpublished) (quoting Minnifield v. State, 941 So. 2d 1000, 1001 (Ala. Crim. App. 2005) ("It is well settled that the law in effect at the time of the commission of the offense controls the prosecution.").

defendant by one or a series of acts," the State was required to prove that the killings were "willful, deliberate, premeditated and malicious." Sanders v. State, 392 So. 2d 1280, 1282 (Ala. Crim. App. 1980). Thus, the trial court's instructions to the jury on premeditation, deliberation, and malice (Doc. 9, att. 8 at 18) were consistent with the applicable law and were not erroneous.

Moreover, with respect to Petitioner's argument that the trial court's jury instruction on malice impermissibly shifted the State's burden of proof, the Court has reviewed the trial court's jury instructions in this case as a whole and finds that the State clearly retained the burden of proving that Petitioner had the particularized, specific intent to kill Richard Brune and Cheryl Moore and that he caused their deaths by one act or pursuant to one scheme or course of conduct. *Cf.*, Jones v. Campbell, 436 F. 3d 1285, 1300-02 (11th Cir. 2006) (finding that a similar jury charge stating that "[e]very intentional and unlawful killing of a human being with a deadly weapon, such as a pistol or with a knife, is presumed to be done with malice unless the evidence that proved the killing rebuts the presumption of malice" did not shift the burden of proof to the

151

petitioner).   Thus,   the   trial   court's   instruction   on   malice   in this case was not erroneous.

That being said, even assuming that the trial court erred with respect to its instructions on premeditation, deliberation, or malice, any such error was harmless given that the trial court subsequently reinstructed the jury on particularized intent and the elements of the capital offense of double intentional murder and did not mention premeditation, deliberation, or malice, thereby remedying any confusion or error created by its inclusion of those elements in its earlier instructions.   (Doc. 9, att. 8 at 40).   Furthermore, any error in the trial court's instructions in this regard was harmless given the overwhelming evidence of Petitioner's guilt, as recounted by the state court in Tomlin, 909 So. 2d at 224.   *Cf.* Jones, 436 F. 3d at 1303 (finding with respect to a jury charge on the presumption of malice that, "[w]eighing the probative force of the evidence of guilt against the probative force of the presumption standing alone, there is no doubt in our minds that the verdict resting on that evidence would have been the same in the absence of the presumption.").   Because Petitioner has failed to show that the trial court's instructions on premeditation, deliberation, or malice were erroneous and so

152

prejudicial or misleading as to render his entire trial fundamentally unfair, Petitioner fails to state a cognizable federal habeas claim.

In Claim Twenty-three, Petitioner argues that the trial court improperly instructed the jury on accomplice liability. Specifically, Petitioner claims that the trial court placed undue emphasis on the issue by repeating the instruction several times. (Doc. 1 at 42; Doc. 19, att. 3 at 25-28). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in allegedly instructing the jury numerous times on the doctrine of accomplice liability.
>
> Tomlin did not object to the trial court's instruction on accomplice liability; therefore, we look for plain error. *See* Rule 45A, Ala. R. App. P.
>
> We have reviewed the trial court's instruction on accomplice liability. The trial court initially gave an instruction on accomplice liability and then explained that the phrase "aids and abets" may encompass "acts or words of encouragement or support, actual or constructive." There was no repetition of any accomplice-liability instruction.

Moreover, the trial court gave the following instruction:

> "Ladies and gentlemen, I may-I may, during the charge to you, give you one instruction that is similar to or identical to another charge. It is not that I intend to give emphasis to that particular instruction or charge, it's simply they do come from different sources and I may very well repeat one."

> There is no plain error here.

Tomlin, 909 So. 2d at 269.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals that the trial court did not err with respect to its instructions on accomplice liability. Although the trial court referenced accomplice liability separately with respect to capital murder, intentional murder, and felony murder (Doc. 9, att. 8 at 16, 19, 21), the instructions were not improper and, viewing the instructions as a whole, the trial court did not place undue emphasis on that issue. Because Petitioner has not shown that an error with regard to this instruction rendered his entire trial fundamentally unfair, he fails to state a cognizable federal habeas claim.

154

In Claim Twenty-four, Petitioner argues that the trial court improperly refused to instruct the jury on the lesser included offenses of murder with extreme indifference to human life and manslaughter. (Doc. 1 at 43; Doc. 19, att. 3 at 30). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in failing to give lesser-included offense instructions on murder with extreme indifference to human life and on manslaughter. Tomlin does not state what evidence in the record brought the murders within the definition of the offense of murder with extreme indifference to human life or manslaughter. Tomlin's entire argument on this issue consists of one paragraph in his brief to this Court.
>
> The Alabama Supreme Court addressed this issue in this case on application for rehearing in the appeal of the first conviction. The Supreme Court stated:
>
> > "While Tomlin's petition for writ of certiorari was pending before this court, the United States Supreme Court handed down Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), in which it found Alabama's 1975 death penalty statute defective because the preclusion clause in the act prohibited juries from considering any lesser included offenses. Because

we interpreted Beck v. Alabama to
require that all defendants theretofore
convicted under that statute be granted
new trials, we entered an order
reversing Tomlin's conviction.

"The State filed an application for
rehearing in which it asked us to
reconsider our interpretation of Beck
v. Alabama. While the application for
rehearing was pending, the Supreme
Court released its opinion in Hopper v.
Evans, 456 U.S. 605, 102 S. Ct. 2049,
72 L. Ed. 2d 367 (1982). Evans had
been convicted and sentenced to death
after testifying that he intentionally
shot the proprietor of a pawnshop
during a robbery. Because Evans
suggested no plausible claim not
contradicted by his own testimony at
trial which would entitle him to a jury
instruction on a lesser included
offense, the Court ruled that he had
not been prejudiced by the preclusion
clause. It concluded, therefore, that
Evans was not entitled to a new trial.
Hopper, *supra*, 456 U.S. at 613-14, 102
S. Ct. at 2054. We hereby withdraw our
previous opinion in this case in order
to enter an order in accordance with
Hopper and its progeny.

"A defendant convicted under § 13-11-2
of the 1975 statute is entitled to a
new trial because of the preclusion
clause in the statute if there was
evidence introduced at trial which
would have warranted a jury instruction
on a lesser included offense or if the
defendant suggests any plausible claim
not contradicted by his own testimony
which he might conceivably have made
which would have entitled him to a jury

156

> instruction on a lesser included
> offense. Cook v. State, 431 So. 2d
> 1322, 1324 (Ala. 1983).

> "Tomlin testified that he was in Texas
> at the time of the killings. We
> examined in Cook v. State, *supra*, the
> effect of an alibi defense on the
> question of whether a defendant
> convicted under the 1975 death penalty
> statute is entitled to a new trial
> because of the preclusion clause. We
> concluded that when a defendant
> testified that he was in a distant
> location when the crime was committed,
> his own testimony directly contradicted
> any evidence he might have introduced
> to show that he was guilty of a lesser
> included offense. Cook, *supra*, at
> 1325."

Tomlin, 443 So. 2d at 61-62.

Tomlin argues that he was entitled to an
instruction on murder with extreme
indifference to human life. This tracks the
current murder statute found in § 13A-6-
2(a)(2), "Under circumstances manifesting
extreme indifference to human life, he
recklessly engages in conduct which creates
a grave risk of death to a person other than
himself, and thereby causes the death of
another person." However, in 1977, at the
time of the murders, Alabama had degrees of
murder and manslaughter.

> "Murder is the unlawful killing of a
> human being with malice aforethought.
> Hornsby v. State, 16 Ala. App. 89, 75
> So. 637 (1917). In Alabama, murder in
> the first degree is divided into four
> classes according to mental intent.
> Mitchell v. State, 60 Ala. 26 (1877).

157

> Title 14, Section 314, Code of Alabama
> 1940 lists the four classes of first
> degree murder: (1) Premeditated intent-
> to-kill murder; (2) murder in the
> commission of certain enumerated
> felonies; (3) murder of an unintended
> victim where the intent was to kill
> another; and (4) depraved mind or heart
> murder sometimes referred to as murder
> resulting from universal malice."

Napier v. State, 357 So. 2d 1001, 1007 (Ala.
Crim. App. 1977), *rev'd*, 357 So. 2d 1011
(Ala. 1978) (judgment was reversed because
State had not proved prima facie case). The
argument Tomlin makes about extreme
indifference to human life is similar to the
prior offense of universal malice murder in
the first degree. However, there was
absolutely no evidence indicating that the
murders fit within this definition. This
Court in Napier discussed the types of
murder that constitute universal malice.
The Court stated:

> "Typical illustrations of the doctrine
> of universal malice are wilfully riding
> an unruly horse into a crowd, and
> throwing a timber from a roof into a
> crowded street. Moore v. State, 18
> Ala. 532 (1851). Other examples are
> shooting a firearm into a crowd or into
> a train, dwelling house or automobile
> containing occupants. Bailey v. State,
> 133 Ala. 155, 32 So. 57 (1901); Johnson
> v. State, 203 Ala. 30, 81 So. 820
> (1919); Washington v. State, 60 Ala.
> 10, 31 Am. Rep. 28 (1877); *see also*
> Gallant v. State, 167 Ala. 60, 52 So.
> 739 (1910) (setting off explosion
> beneath a house); Presley v. State, 59
> Ala. 98 (1877)(placing obstacles on
> railroad track); Langford v. State,

158

Ala. Cr. App. 1977, 354 So. 2d 297
(driving an automobile in a grossly
wanton manner)."

357 So. 2d at 1007.

Here, the evidence established that the two
victims were killed by gunshot wounds fired
at close range. The toxicologist testified
that at least two shots were fired from the
backseat of the car. Moore was also shot
with a shotgun after she got out of the car.
All of the bullets except the shotgun wound
were made from the same .38 caliber gun.
There was absolutely no evidence that the
murders fit within the "universal malice"
definition of first-degree murder.

Tomlin further argues, without any reference
to facts in the record, that the trial court
erred in failing to give a jury instruction
on manslaughter. At the time of the
killings, the Alabama Code set out two
degrees of manslaughter. The manslaughter
statute, § 13-1-90, Ala. Code 1975
(superseded), stated:

> "Manslaughter by voluntarily depriving
> a human being of life is manslaughter
> in the first degree; and manslaughter
> committed under any other circumstances
> is manslaughter in the second degree."

We are assuming that Tomlin is arguing that
the trial court erred in failing to give a
jury instruction on manslaughter in the
first degree. Tomlin has not cited at trial
nor in his brief to this Court any facts
that would bring the homicides within the
definition of manslaughter. Certainly, the
record fails to show any evidence indicating
that the murders were anything but
intentional. The trial court did not err in

159

> failing to give these lesser-included
> offense instructions.

Tomlin, 909 So. 2d at 270-72.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err in refusing to charge the jury with respect to the lesser included offenses of "murder with extreme indifference to human life," *i.e.*, universal malice, and manslaughter.  Contrary to Petitioner's argument that the trial court's refusal to instruct the jury on these lesser included offenses contradicts the governing law set forth in Beck v. Alabama, 447 U.S. 625 (1980), the Eleventh Circuit has held that "Beck's prohibition against an all-or-nothing choice between death or acquittal is not violated where the law permits the charging of lesser included non-capital offenses if the evidence supports it."  Madison v. Allen, 2011 WL 1004885, *32 (S.D. Ala. 2011) (citing Maples v. Allen, 586 F. 3d 879, 894 (11th Cir. 2009)).

In the instant case, Alabama law permitted the charging of lesser included non-capital offenses, and the trial court did in fact instruct the jury on the lesser included non-capital offenses of intentional murder and felony murder.  (Doc. 9, att.

160

8 at 14-16, 19, 21).   However, as in Madison, "the evidence did

not support a finding of manslaughter [or universal malice];

thus, a jury charge on th[ese] lesser included offense[s] was

properly refused by the trial court."   Id.   Therefore, because

Petitioner has not shown that the trial court erred in refusing

to give his requested instructions and that the error rendered

his entire trial fundamentally unfair, he fails to state a

cognizable federal habeas claim.

In Claim Twenty-five, Petitioner argues that the trial

court improperly instructed the jury on reasonable doubt.   (Doc.

1 at 44; Doc. 19, att. 3 at 37).   Petitioner presented this

claim to the Alabama Court of Criminal Appeals on direct appeal

of his fourth trial, and, in its memorandum opinion rejecting

Petitioner's claim, the court stated:

> Tomlin argues that the trial court's jury
> instruction on reasonable doubt was flawed
> because the court used the term "moral
> certainty."   He contends that the trial
> court's instruction violated Cage v.
> Louisiana, 498 U.S. 39, 111 S. Ct. 328, 112
> L. Ed. 2d 339 (1990).
>
> In Reeves v. State, 807 So. 2d 18 (Ala.
> Crim. App. 2000), cert. denied, 534 U.S.
> 1026, 122 S. Ct. 558, 151 L. Ed. 2d 433
> (2001), we stated:
>
>> "It is well settled that '[t]he Due
>> Process Clause of the Fourteenth

161

Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."' <u>Knotts v. State</u>, 686 So. 2d 431, 459 (Ala. Crim. App.), opinion after remand, 686 So. 2d 484 (Ala. Crim. App. 1995), *aff'd*, 686 So. 2d 486 (Ala. 1996), *cert. denied*, 520 U.S. 1199, 117 S. Ct. 1559, 137 L. Ed. 2d 706 (1997), quoting <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). In <u>Cage v. Louisiana</u> [498 U.S. 39 (1990)], the United States Supreme Court held that an instruction that equated 'reasonable doubt' with 'grave uncertainty,' and 'actual substantial doubt' and stated that what was required to convict was a 'moral certainty,' could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in <u>Victor v. Nebraska</u>, 511 U.S. 1, 6, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583 (1994), 'the Court "made it clear that the proper inquiry is not whether the instructing 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it."' <u>Knotts</u>, 686 So. 2d at 459, quoting <u>Victor</u>, 511 U.S. at 6, 114 S. Ct. 1239 at 1243, 127 L. Ed. 2d 583, quoting, in turn, <u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73, 112 S. Ct. 475, 482, 116 L. Ed. 2d 385, n.4 (1991). The constitutional question is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof

162

insufficient to meet the <u>Winship</u> standard.' <u>Victor</u>, 511 U.S. at 6, 114 S. Ct. at 1243. In addition, the Supreme Court made it clear in <u>Victor</u> 'that, while it did not condone the use of the <u>Cage</u> terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if " 'taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.'"' <u>Lawhorn v. State</u>, 756 So. 2d 971, 985 (Ala. Crim. App. 1999), quoting <u>Victor</u>, 511 U.S. at 22, 114 S. Ct. at 1251, quoting, in turn, <u>Holland v. United States</u>, 348 U.S. 121, 140, 75 S. Ct. 127, 137, 99 L. Ed. 150 (1954). *See also* <u>Taylor v. State</u>, 666 So. 2d 36, 56 (Ala. Crim. App. 1994), *aff'd*, 666 So. 2d 73 (Ala. 1995), *cert. denied*, 516 U.S. 1120, 116 S. Ct. 928, 133 L. Ed. 2d 856 (1996) ('"Use of some but not all of the terminology found offensive in <u>Cage</u> does not automatically constitute reversible error."'); and <u>Sockwell v. State</u>, 675 So. 2d 4, 23 (Ala. Crim. App. 1993), *aff'd*, 675 So. 2d 38 (Ala. 1995), *cert. denied*, 519 U.S. 838, 117 S. Ct. 115, 136 L. Ed. 2d 67 (1996) ('It was the use of *all three phrases in conjunction* with each other that the Supreme Court determined was unconstitutional in <u>Cage</u>.' (Emphasis added [in <u>Reeves</u> ].)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of 'reasonable doubt' was correctly conveyed to the jury, we will not find error. *See*, *e.g.*, <u>Knotts</u>, *supra*."

163

807 So. 2d at 40-41.

The trial court gave the following instruction on reasonable doubt:

> "A reasonable doubt means simply what it says. It's a doubt for which a reason can be given. It is not merely a guess or a surmise. A reasonable doubt may arise from all of the evidence or from a lack of the evidence or from any part of the evidence. The State of Alabama is not required to prove the guilt of the Defendant, beyond all doubt, but beyond all reasonable doubt. If, after comparing and considering all of the evidence in the case, you can say that you have an abiding conviction to a moral certainty of the truth of the charge, then you are convinced, beyond a reasonable doubt, and your duty is to convict the Defendant. If you cannot say that, your duty is to acquit him."

Initially, we observe that Tomlin did not object to the trial court's jury instruction on reasonable doubt. Therefore, we are confined to determining whether there was plain error in the court's instruction. Rule 45A, Ala. R. App. P.

> "The use of the term 'moral certainty' alone in defining reasonable doubt did not create the error defined and discussed in Cage v. Louisiana, [498 U.S. 39 (1990)]; rather, it was the use of this term in conjunction with

164

other terms, such as 'grave
uncertainty' and 'actual
substantial doubt,' that served to
lessen the burden of proof."

Price v. State, 725 So. 2d 1003, 1021
(Ala. Crim. App. 1997), aff'd, 725 So.
2d 1063 (Ala. 1998), cert. denied, 526
U.S. 1133, 119 S. Ct. 1809, 143 L. Ed.
2d 1012 (1999). See also Boyd v.
State, 715 So. 2d 825, 843 (Ala. Crim.
App. 1997), aff'd, 715 So. 2d 852
(Ala.), cert. denied, 525 U.S. 968, 119
S. Ct. 416, 142 L. Ed. 2d 338 (1998)
("mere use of the term 'moral
certainty' did not make the charge
unconstitutional under Cage").

"The trial court repeatedly
emphasized that the burden was on
the State to prove Ferguson's
guilt beyond a reasonable doubt;
that a reasonable doubt could
arise from the evidence or from a
lack of evidence; and that the
jury must acquit Ferguson if the
State failed to prove each and
every element of the capital
offense ... beyond a reasonable
doubt. The instruction did not
decrease or shift the State's
burden of proof."

Ferguson v. State, 814 So. 2d 925, 955 (Ala.
Crim. App. 2000).

Tomlin, 909 So. 2d at 267-69.

Having reviewed the record in this case, the Court agrees

with the Alabama Court of Criminal Appeals, for the reasons

stated in its memorandum opinion, that the trial court did not

165

err in instructing the jury on reasonable doubt.  In Victor v. Nebraska, 511 U.S. 1, 14 (1994), the jurors were instructed, as they were in this case, "that they must have 'an abiding conviction, to a moral certainty, of the truth of the charge.'" The petitioner in Victor complained, as does Petitioner here, that "the moral certainty element of the California instruction invited the jury to convict him on proof below that required by the Due Process Clause." Id. at 15.  The United States Supreme Court rejected that argument in Victor, holding, "we are satisfied that the reference to moral certainty, in conjunction with the abiding conviction language, 'impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315 (1979)).  Accordingly, the Court agrees with the Alabama Court of Criminal Appeals that the trial court's instruction on reasonable doubt, which used the term "moral certainty" in conjunction with "abiding conviction," did not deprive Petitioner of due process and a fair trial by lowering the required standard of proof.  Because Petitioner has not shown that the trial court erred in its instructions on reasonable doubt and that the error rendered his entire trial

166

fundamentally unfair, he fails to state a cognizable federal habeas claim.

Q. Claim Twenty-six.

In Claim Twenty-six, Petitioner asserts that his rights under the Double Jeopardy Clause were violated by his prosecution in his fourth trial. (Doc. 1 at 45; Doc. 19, att. 3 at 45). Specifically, Petitioner argues that prosecutorial misconduct in his first three trials barred his fourth prosecution. (Id.). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the trial court erred in denying his motion Seeking to bar his further prosecution because, he said, it violated the Double Jeopardy Clause. Specifically, Tomlin argues that the prosecutor at both his 1978 and his 1993 trials committed such egregious misconduct that his convictions were reversed; therefore, he argues, because the prosecutor's conduct resulted in the prior reversals, any subsequent prosecution is barred based on United States v. Jorn, 400 U.S. 470, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971), and United States v. Dinitz, 424 U.S. 600, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976). Tomlin also argues that, once he raised the double jeopardy claim, the burden shifted to the State to prove that any

167

subsequent prosecution was not barred based
on the prosecutor's prior misconduct.

When arguing this issue at a pretrial motion
hearing, the following occurred:

> "[Defense counsel]: Basically, after a
> case has been reversed because of
> prosecutorial misconduct on a number of
> occasions, there comes a time when a
> case is a violation of double jeopardy.
> As I mentioned a number of times, the
> case was reversed in 1988 because of
> prosecutorial misconduct on the part of
> Don Valeska, comments on silence and
> comments on validity of the evidence.
> Those comments were so bad that the
> Court held them to be plain error on
> the second petition for rehearing.

> "The case was also reversed in 1991 for
> prosecutorial misconduct based on,
> again, a comment on silence and comment
> on the co-defendant being on death row
> and sentenced to death. There has been
> prosecutorial misconduct involved in
> the presentation of evidence that
> should have been excluded from the
> grand jury in 1993, and there also have
> been a panoply of improper comments to
> the media which are documented in
> Defendant's Exhibit Number One to the
> Court including comments to the Mobile
> paper that this is an absolute joke on
> the people of this state, as well as
> comments to the effect that the death
> penalty is too good for Tomlin.

> "So when you put all these together,
> Your Honor, you have a situation of
> repeated acts of misconduct that give
> rise to a double jeopardy claim under
> cases like United States v. Dinitz,

168

which is at 424 U.S. 600 in 1976, and
<u>United States v. [Jorn]</u>.  And basically
the double jeopardy clause in the
United States Constitution, and this is
equally applicable to the States, is
violated where, 'bad faith conduct by
judge or prosecutor threatens the
(inaudible) by successive prosecutions
and declaration of a mistrial so as to
afford the prosecution a more favorable
opportunity to convict the Defendant.'

"After a while, Your Honor, prosecution
is barred by double jeopardy."

This issue has been previously addressed by
this Court in the opinion on appeal from
Tomlin's third trial and conviction.   In
that opinion we stated:

"The principle of double jeopardy that
[most] closely resembles Tomlin's
argument is set out in <u>United States v.</u>
<u>Dinitz</u>, 424 U.S. 600, 96 S. Ct. 1075,
47 L. Ed. 2d 267 (1976), as follows:

"'The Double Jeopardy Clause does
protect a defendant against
governmental actions intended to
provoke mistrial requests and
thereby to subject defendants to
the substantial burdens imposed by
multiple prosecutions.  It bars
retrials where "bad-faith conduct
by judge or prosecutor," <u>United</u>
<u>States v. Jorn</u>, [400 U.S. 470,]
485, 91 S. Ct. [547,] 557[, 27 L.
Ed. 2d 543 (1971)], threatens the
"[h]arassment of an accused by
successive prosecutions or the
declaration of a mistrial so as to
afford the prosecution a more
favorable opportunity to convict"

169

> the defendant. <u>Downum v. United States</u>, [372 U.S. 734, 736, 83 S. Ct. 1033, 1034, 10 L. Ed. 2d 100, 102 (1963)].'

"424 U.S. at 611, 96 S. Ct. at 1081, 47 L. Ed. 2d at 276 (emphasis added). The gravamen of this principle is that the courts will not allow a prosecutor to circumvent the Double Jeopardy Clause by goading a defendant into nullifying a proceeding by Seeking a mistrial, thus resulting in a new trial at a later date. <u>Oregon v. Kennedy</u>, [456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982)], clarified the narrow test to be applied in determining whether a prosecutor's misconduct bars a defendant's retrial on double jeopardy principles:

>> "'Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on the defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.'

"456 U.S. at 676, 102 S. Ct. at 2089, 72 L. Ed. 2d at 424 (emphasis added).

"Although Tomlin relies solely on the <u>Dinitz</u> line of cases, this principle clearly does not support Tomlin's position. Likewise, the rule in <u>Dinitz</u> does not apply to the facts of this case-either as presented by Tomlin, or as independently gleaned from the record. Tomlin contends only that the prosecutor's habitual misconduct was reckless and that it had the incidental

effect of subjecting Tomlin to a Sisyphean crucible. On this point, we agree; however, we know of no double jeopardy principle that forbids successive trials resulting from clumsy prosecutions. *See* Morrison v. Missouri, 946 F. 2d 1340, 1343 (8th Cir. 1991), *cert. denied*, 504 U.S. 959, 112 S. Ct. 2312, 119 L. Ed. 2d 232 (1992) ('over-reaching, harassing, intentional and bad faith conduct' does not implicate double jeopardy unless 'the prosecutor's conduct was "intended to provoke the defendant into moving for a mistrial." [Oregon v.] Kennedy, 456 U.S. at 679, 102 S. Ct. at 2091[, 72 L. Ed. 2d at 427]'). Tomlin has not alleged that the prosecutor intentionally invited reversal at Tomlin's previous trials, and we have reviewed the record and have found absolutely no facts to support such an allegation. We hold that the trial court's summary denial of Tomlin's motion was proper. Even if all of the factual allegations contained in Tomlin's motion were taken as true, Tomlin would not be entitled to relief."

695 So. 2d at 164-65 (footnote omitted). *See also* Spears v. State, 647 So. 2d 15 (Ala. Crim. App. 1994) (no double jeopardy bar to retrial when the prosecutor violated the trial court's "gag" order and several newspapers articles appeared in the local paper during the trial thereby causing the trial court to declare a mistrial); Robinson v. State, 405 So. 2d 1328, 1332 (Ala. Crim. App.), *cert. denied*, 405 So. 2d 1334 (Ala. 1981) ("no double jeopardy impediment to appellant's retrial on the basis of the prosecution's alleged knowing use of perjured testimony at the first trial").

171

Moreover, the State did not have the burden of proof here.  In <u>Spears</u>, we addressed this identical issue and stated:

> "Here, the appellant has simply failed to carry his burden of proof on this issue.  '"Since a plea of former jeopardy sets up affirmative matter ..., the burden of proving this issue, from the start, is on the defendant....'  30 Am. Jur. 2d Evidence § 1160 (1967).'  <u>Morris v. State</u>, 465 So. 2d 1173, 1177 (Ala. Cr. App. 1984), reversed on other grounds, 465 So. 2d 1180 (Ala. 1985)."

> <u>Spears</u>, 647 So. 2d at 24.  Tomlin failed to meet his burden of proving that his subsequent retrial was barred based on a violation of the Double Jeopardy Clause.

<u>Tomlin</u>, 909 So. 2d at 226-28.

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that Petitioner's retrial did not violate the Double Jeopardy Clause.  As the Alabama Court of Criminal Appeals found, "[o]nly deliberate prosecutorial misconduct implicates double jeopardy principles . . .[,] and the prosecution must have actually intended to provoke the mistrial. <u>U.S. v. Walker</u>, 201 Fed. Appx. 737, 740 (11th Cir. 2006)

(unpublished)[23] (citing United States v. Vallejo, 297 F. 3d 1154, 1163 (11th Cir. 2002) and United States v. Shelley, 405 F. 3d 1195, 1200-01 (11th Cir. 2005)).   This Court finds, as did the state appellate courts in Petitioner's previous appeals, that there is no evidence that the actions of the prosecutor in any of the former proceedings were motivated by an actual intent to provoke a mistrial.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).   Thus, Petitioner's claim that his rights under the Double Jeopardy Clause were violated, as alleged in habeas Claim 26, is without merit.

R. Claim Twenty-seven.

---

[23] "Pursuant to Eleventh Circuit Rule 36 2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority."   Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC, 253 Fed. Appx. 861, 865 n.5 (11th Cir. 2007) (unpublished).

In Claim Twenty-seven, Petitioner asserts that the cumulative effect of multiple trial errors alleged in habeas Claims One through Twenty-six violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. (Doc. 1 at 46; Doc. 19, att. 3 at 53). Petitioner presented this claim to the Alabama Court of Criminal Appeals on direct appeal of his fourth trial, and, in its memorandum opinion rejecting Petitioner's claim, the court stated:

> Tomlin argues that the cumulative effect of the alleged errors denied him a fair trial. "Because we find no error in the specific instances alleged by the appellant, we find no cumulative error." McGriff v. State, 908 So. 2d 961, 1002 (Ala. Crim. App. 2000).

Tomlin, 909 So. 2d at 272.

As discussed above, this Court has reviewed the record and finds no merit in the assertions of error set forth by Petitioner in habeas Claims One through Twenty-six. Therefore, as the Alabama Court of Criminal Appeals found, Petitioner has failed to show that cumulative error, as alleged in those claims, violated his right to a fair trial.

Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C.

§ 2254(d)(2), and that the Alabama Court of Criminal Appeals rendered a decision that is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Thus, Petitioner's claim that his right to a fair trial was violated, as alleged in habeas Claim 27, is without merit.

S. Claim Twenty-eight.

In Claim Twenty-eight, Petitioner asserts that the state district court judge was not authorized under Alabama law to preside over a capital murder trial in circuit court. (Doc. 1 at 47; Doc. 19, att. 3 at 54). The Alabama Court of Criminal Appeals rejected this argument in its memorandum opinion affirming the denial of Petitioner's Rule 32 petition.[24] (Doc. 12, att. 10 at 2).

---

[24] In its memorandum opinion affirming the denial of Petitioner's request for Rule 32 relief, the Alabama Court of Criminal Appeals stated:

    With regard to Claim 2, the Circuit Court specifically found:

        "[A]s the State explains in its response, the Alabama Rules of Judicial Administration specifically provide that a district judge may be assigned to handle a matter in the circuit court. *See* Ala. R. Jud. Admin. 13. Here, the trial judge, a

(Continued)

175

As discussed at length above, it is well established that federal habeas relief is available to correct only constitutional injury. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'" Branan v. Booth, 861 F. 2d 1507, 1508 (11th Cir. 1988) (citation omitted).

---

district judge in Mobile County, was assigned Tomlin's case pursuant to a written standing order issued by the presiding circuit judge in Mobile County. Accordingly, the trial judge was authorized to preside over the trial of this case."

(C.R. 22). The record supports the circuit court's findings, and we adopt them as part of this memorandum. Therefore, the appellant is not entitled to relief on this claim.

(Doc. 12, att. 10 at 2).

In the instant case, Petitioner's claim that the state district court judge exceeded his authority under Alabama law to preside over a capital murder case in circuit court is based purely on state law, despite the fact that Petitioner couched the claim in terms of due process. Therefore, Petitioner fails to state a cognizable federal habeas claim.

T. Claim Twenty-nine.

In Claim Twenty-nine, Petitioner asserts that the trial court erred in instructing the jury on the elements of the capital murder offense with which he was charged. (Doc. 1 at 48; Doc. 19, att. 3 at 58). Petitioner raised this claim in his Rule 32 post-conviction proceedings in state court, and the circuit court dismissed the claim as untimely under Alabama Rule of Criminal Procedure 32.2(c).[25] The Alabama Court of Criminal

---

[25] Alabama Rule of Criminal Procedure 32.2(c) provides in pertinent part:

> Subject to the further provisions hereinafter set out in this section, the court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed: (1) In the case of a conviction appealed to the Court of Criminal Appeals, within one (1) year after the issuance of the certificate of

(Continued)

177

Appeals affirmed the circuit court's denial of Rule 32 relief on

this claim, stating:

> Following a long and tortured procedural
> history, the appellant was convicted of
> capital murder and was sentenced to
> imprisonment for life without the
> possibility of parole. *See* Tomlin v. State,
> 909 So. 2d 290 (Ala. Crim. App. 2004). This
> court issued a certificate of judgment on
> March 18, 2005. In January 2007, the
> appellant filed a Rule 32 petition,
> challenging his conviction, and he
> subsequently amended his petition. After
> the State responded, the circuit court
> summarily dismissed the petition. This
> appeal followed.
>
> The appellant argues that he is entitled to
> post-conviction relief because: . . .
> (3) the trial court allegedly gave improper
> jury instructions; . . . .
>
> The appellant filed his petition more than
> one year after this court issued a
> certificate of judgment. Therefore, Claims
> 1, 3, and 5 are precluded because they are
> time-barred. *See* Rule 32.2(c), Ala. R.
> Crim. P.

(Doc. 12, att. 10 at 1-2).[26]

--------------------------------

> judgment by the Court of Criminal Appeals
> under Rule 41, Ala. R. App. P.;. . . .

[26] The circuit court found that three of the five claims
raised in Petitioner's Rule 32 petition were time barred, and
two were without merit. (Doc. 12, att. 10 at 1-2).

As noted above, "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court" by giving the state court "a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." O'Sullivan, 526 U.S. 838, 842, 845 (1999). A state prisoner's failure to present his claims to the state courts in a timely and proper manner results in a procedural default of those claims. Id. at 848. "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

"Cause" for a procedural default exists if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," or that the procedural default was the result of ineffective assistance of counsel. Murray v. Carrier, 477 U.S. 478, 488 (1986). To establish "prejudice," the prisoner

179

additionally must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).  In the absence of a showing of cause and prejudice, the Court may yet consider a procedurally defaulted claim if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent."  Smith v. Murray, 477 U.S. 527, 537-38 (1986) (citations omitted).

"In order for a claim to be procedurally defaulted in federal court, the state court rule of procedure barring state court review must be both 'independent of the federal question and adequate to support the [state-court] judgment.'"  Hitchcock v. Secretary Dep't of Corrs., 360 Fed. Appx. 82, 84-85 (11th Cir. 2010) (unpublished) (citing Cone v. Bell, 556 U.S. 449, 129 S. Ct. 1769, 1780, 173 L. Ed. 2d 701 (2009); Coleman, 501 U.S. at 729).

> In order to be "adequate" to bar federal habeas review of a constitutional claim, the state procedural rule must be "firmly established and regularly followed." James v. Kentucky, 466 U.S. 341, 348-49, 104 S. Ct. 1830, 80 L. Ed. 2d 346 (1984); Payne v. Allen, 539 F. 3d 1297, 1312-13 (11th Cir.

2008).   The state's application of a procedural bar "must be faithfully and regularly applied, and must not be manifestly unfair in its treatment of a petitioner's federal constitutional claim." <u>Card v. Dugger</u>, 911 F. 2d 1494, 1516-17 (11th Cir. 1990) (citation and quotation omitted).   The faithful and regular application of a firmly established rule provides the due process notice necessary for the application of the rule to bar federal review of a claim raised in violation of the rule.   <u>Lee</u>, 534 U.S. at 389, 122 S. Ct. 877.   Ordinarily, violation of such "firmly established and regularly followed" state procedural rules will be adequate to foreclose review of the federal claim.   <u>Id.</u>

<u>Hitchcock</u>, 360 Fed. Appx. at 84-85.

Petitioner complains that <u>Alabama Rule of Criminal Procedure</u> 32.2(c) is "illogical" and "unjust" because it requires a petitioner to file a state post-conviction petition within one year of the issuance of the certificate of judgment by the Alabama Court of Criminal Appeals, even if there is a petition for a writ of certiorari pending at that time in the United States Supreme Court.   (Doc. 19, att. 3 at 66-68). However, Petitioner's point is unavailing.

Petitioner's objection to Rule 32's filing requirements involves a claim under state law, which, as discussed repeatedly herein, provides no basis for federal habeas corpus relief.   *See*

181

Carroll v. Secretary, DOC, 574 F. 3d 1354, 1365 (11th Cir. 2009).  Rather, this Court's review of Rule 32.2(c) is limited to determining, for purposes of procedural default, whether the state procedural rule was firmly established and regularly followed.  The Eleventh Circuit has answered that question in the affirmative.  *See* Siebert v. Allen, 455 F. 3d 1269, 1271 (11th Cir. 2006) (" In Hurth, this Court specifically held that the Alabama statute of limitation in Rule 32 is firmly established and regularly followed for purposes of applying the doctrine of procedural default.").  Therefore, Petitioner's claim is defaulted in state court pursuant to an independent and adequate state procedural ground and is barred in this Court absent a showing of cause and prejudice or a fundamental miscarriage of justice.  Because Petitioner has failed to even allege cause and prejudice related to his procedural default of this claim, and because there is no basis for finding a fundamental miscarriage of justice, review of Petitioner's habeas Claim 29 is barred in this Court, and that claim is due to be dismissed.

 U. Claim Thirty.

 In Petitioner's final claim, he asserts that his sentence of life imprisonment without the possibility of parole was

"illegal" because the aggravating circumstance on which it was based, *i.e.*, intentionally causing the death of two or more persons by one act or pursuant to one scheme, was not enumerated in Alabama Code § 13-11-6 (repealed), which, at the time of the murders in 1977, contained a list of aggravating circumstances upon which the death penalty or life imprisonment without the possibility of parole could be imposed. (Doc. 1 at 50; Doc. 19, att. 3 at 75). Petitioner presented this claim in his Rule 32 proceedings in state court, and the Alabama Court of Criminal Appeals rejected the argument, finding that the trial court properly sentenced Petitioner pursuant to the mandate of the Alabama Supreme Court issued in Ex parte Tomlin, 909 So. 2d 283 (Ala. 2003). The Alabama Court of Criminal Appeals stated:

> Finally, with regard to Claim 4 [that the trial court improperly sentenced Petitioner to imprisonment for life without the possibility of parole], after this court affirmed the appellant's conviction and sentence of death, the Alabama Supreme Court "reverse[d] the judgment of the Court of Criminal Appeals as to Tomlin's sentence and remand[ed] the case for that court to instruct the trial court to resentence Tomlin, following the jury's recommendation of life imprisonment without the possibility of parole." *See* Tomlin v. State, 909 So. 2d 283, 287 (Ala. 2003). On remand, the trial court complied with the Alabama Supreme Court's instructions and sentenced the appellant to imprisonment for life without

183

the possibility of parole.   *See* <u>Tomlin v.
State</u>, 909 So. 2d 290 (Ala. Crim. App.
2004).   Therefore, the appellant's argument
is without merit.

(Doc. 12, att. 10 at 2-3).

The Court agrees with the Alabama Court of Criminal Appeals that the trial court properly sentenced Petitioner to life in prison without the possibility of parole based on his conviction under Alabama Code, § 13-11-2(a)(10).   In <u>Ex parte Kyzer</u>, 399 So. 2d 330, 332-34 (Ala. 1981), the Alabama Supreme Court settled the question whether a defendant convicted under Alabama Code, § 13-11-2(a)(10) of "first degree murder 'wherein two or more human beings are intentionally killed by the defendant by one or a series of acts,'" could be sentenced to death or, alternatively, life in prison without the possibility of parole,[27] despite the fact that the aggravating circumstance was

---

[27] As discussed above, following Petitioner's conviction in his fourth trial of the capital murders of Richard Brune and Cheryl Moore, the trial judge overrode the jury's recommendation of life imprisonment without the possibility of parole and sentenced Petitioner to death.   However, in <u>Ex parte Tomlin</u>, 909 So. 2d 283, 287 (Ala. 2003), the Alabama Supreme Court ordered the Alabama Court of Criminal Appeals to remand the case to the trial court with instructions to vacate Petitioner's death sentence and to resentence Petitioner to life imprisonment without the possibility of parole based upon its finding that the mitigating circumstance of the jury's unanimous
(Continued)

184

not enumerated in the list of aggravating circumstances found in

Alabama Code, § 13-11-6.  The court stated:

> This case presents in purest form an anomaly
> in Alabama's Death Penalty Statute.  The
> legislature, in delineating the fourteen
> offenses for which the death penalty could
> be imposed, included the offense for which
> Kyzer was charged and convicted, viz,
> "Murder in the first degree wherein two or
> more human beings are intentionally killed
> by the defendant by one or a series of
> acts," (§ 13-11-2(a)(10)), but failed to
> provide a corresponding "aggravating
> circumstance" in § 13-11-6.
>
> . . . [I]t is clear that the legislature
> intended to punish capitally persons
> convicted of the aggravated offenses set
> forth in § 13-11-2, unless, of course, at
> the sentencing hearing the trial judge,
> after weighing the aggravating and
> mitigating circumstances, decided to refuse
> to accept the jury's sentence of death.
>
> . . . If a defendant is convicted of "murder
> in the first degree wherein two or more
> human beings are intentionally killed," and
> if the jury, after a hearing conducted in
> accordance with the principles set out in
> Beck, fixes the penalty at death, the trial
> judge, if convinced that the "aggravation"
> averred in the indictment "that two or more
> human beings were intentionally killed by
> the defendant by one or a series of acts"

_____

recommendation of life imprisonment without parole outweighed
the aggravating circumstance of first degree murder wherein two
persons were killed.

185

> outweighs the mitigating circumstances, may impose a sentence of death by setting forth in writing, as required by § 13-11-4, his findings, even though the "aggravating circumstance" is not "enumerated in § 13-11-6." The jury could make the same finding at its sentence hearing mandated by Beck.

Kyzer, 399 So. 2d at 334-38.

In Magwood v. Patterson, 130 S. Ct. 2788, 2793, 177 L. Ed. 2d 592 (2010), the United States Supreme Court recognized the holding in Kyzer, stating:

> As relevant here, Kyzer did away with the prior Alabama rule that an aggravating component of a capital felony could not double as an aggravating factor supporting a capital sentence. In Kyzer, the defendant had been sentenced to death for the intentional murder of "two or more human beings" under § 13-11-2(a)(10). See 399 So. 2d, at 332. The crime of murder, so defined, was aggravated by its serial nature, just as Magwood's crime of murder, as defined under § 13-11-2(a)(5), was aggravated by the fact that he killed an on-duty sheriff because of the sheriff's job-related acts. In Kyzer, the Alabama Supreme Court ultimately remanded for a new trial, but in order to guide the lower court on remand, addressed whether the aggravation in the charged crime, See § 13-11-2(a)(10), was sufficient to impose a sentence of death even without a finding of any "aggravating circumstance" enumerated in § 13-11-6. See id., at 337. The court ruled that if the defendant was convicted under § 13-11-2(a)(10), "the jury and the trial judge at the sentencing hearing [may] find the aggravation averred in the indictment as the

186

> aggravating circumstance, even though the
> aggravation is not listed in § 13-11-6 as an
> aggravating circumstance." Id., at 339
> (internal quotation marks omitted).

Magwood, 130 S. Ct. at 2793 n.3.[28]   Based on the foregoing,
Petitioner's argument that his sentence was "illegal" because
the aggravating circumstance on which his capital conviction was
based was not enumerated in Alabama Code, § 13-11-6, is without
merit.

Accordingly, the Court finds that the decision of the
Alabama Court of Criminal Appeals was a reasonable determination
of the facts in light of the evidence presented, *see* 28 U.S.C.
§ 2254(d)(2), and that the Alabama Court of Criminal Appeals
rendered a decision that is neither contrary to, nor an
unreasonable application of, clearly established federal law.
*See* 28 U.S.C. § 2254(d)(1).   Therefore, Petitioner's habeas
Claim 30 is due to be denied.

_____

[28] The Magwood court further noted: "In Jackson v. State,
the Alabama Court of Criminal Appeals held that Kyzer supported
a death sentence for a defendant who was convicted for an
offense committed before Kyzer was decided [in 1981] but was
resentenced after that decision. 501 So. 2d 542, 544 (1986)."
Magwood, 130 S. Ct. at 2794 n.6.   Petitioner in the present
case likewise was convicted of murders committed before Kyzer was
decided and resentenced to life in prison without the
possibility of parole after Kyzer was decided.

187

For each of the reasons set forth above, the Court finds that Petitioner's habeas petition is due to be denied in its entirety.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied.  28 U.S.C. foll. § 2254, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").   The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right."  28 U .S.C. § 2253(c)(2).  Where a habeas petition is being denied, in part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows ... that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district

court was correct in its procedural ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Where a habeas petition is being denied on the merits of an underlying constitutional claim, a certificate of appealability should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Id.</u> ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under <u>Barefoot</u> [<u>v. Estelle</u>, 463 U.S. 880, 893 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (internal quotation marks omitted); *accord* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).

None of Petitioner's claims warrants the issuance of a Certificate of Appealability in this case. For the reasons discussed above with respect to Petitioner's claims, reasonable jurists could not debate whether any of his claims should be resolved in a different manner or were adequate to deserve encouragement to proceed further on the merits. The

189

recommendation that these claims be denied is based on the straightforward application of clear Circuit precedent, and no reasonable jurist could differ on the appropriate disposition of the claims on the record presented.  It is thus recommended that the Court deny any request for a Certificate of Appealability. Because Petitioner is not entitled to a Certificate of Appealability, any request for leave to appeal *in forma pauperis* is likewise due to be denied.[29]

---

[29] The guidelines for proceeding *in forma pauperis* are set forth in 28 U.S.C. § 1915.  An appeal may not be taken *in forma pauperis* if the trial court certifies in writing that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); *See* Fed. R. App. P. 24(a)(3)(A); Lee v. Clinton, 209 F. 3d 1025, 1026 (7th Cir. 2000) (concluding that "good faith" is "an objective concept" and that "not taken in good faith" is "a synonym for frivolous"); DeSantis v. United Techs., Corp., 15 F. Supp. 2d 1285, 1288-89 (M.D. Fla. 1998) (stating that good faith "must be judged by an objective, not a subjective, standard" and that an appellant "demonstrates good faith when he seeks appellate review of any issue that is not frivolous").  An appeal filed *in forma pauperis* is frivolous if it appears that the appellant "has little or no chance of success," meaning that the "factual allegations are 'clearly baseless' or that the legal theories are 'indisputably meritless.'"  Carroll v. Gross, 984 F. 2d 392, 393 (11th Cir. 1993) (citations omitted).  For the reasons previously stated in addressing the Certificate of Appealability, the undersigned concludes that an appeal in this case would be without merit and would not be taken in objective good faith.  Thus, Petitioner is neither entitled to a Certificate of Appealability nor to appeal *in forma pauperis*.

CONCLUSION

Based on the foregoing, it is the opinion of the undersigned Magistrate Judge that Petitioner's constitutional rights were not violated in this case. Therefore, it is recommended that Petitioner's petition for a writ of habeas corpus be denied, that this action be dismissed, and that judgment be entered in favor of the Respondent, Tony Patterson, and against the Petitioner, Phillip Wayne Tomlin. It is further recommended that any motion for a Certificate of Appealability or for permission to appeal *in forma pauperis* be denied. Petitioner's Motion for an Evidentiary Hearing (Doc. 20) likewise is due to be denied.

The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this **8th** day of **March, 2013.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

191

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.  **Objection**.      Any   party   who   objects   to   this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.   Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F. 2d 736, 738 (11th Cir. 1988). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days[30] after being served with a copy of the recommendation, unless a different time is established by order.   The statement of

---

[30] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed. R. Civ. P. 72(b)(2).

objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed <u>de novo</u> and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Opposing party's response to the objection.** Any opposing party may submit a brief opposing the objection within fourteen (14) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial

determination that transcription is necessary is required before the United States will pay the cost of the transcript.